```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                      CASE NO. 19-CR-80181-RAR-1
 3
     UNITED STATES OF AMERICA,              Miami, Florida
 4
                                            November 22, 2022
 5          vs.
                                            10:43 a.m. - 2:12 p.m.
 6
     MINAL PATEL,
 7
                  Defendant.                Pages 1 to 180
 8   _____

 9
                      TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                      UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:        JAMIE DE BOER
                                EMILY GURSKIS
14                              REGINALD CUYLER, JR.
                                UNITED STATES DEPARTMENT OF JUSTICE
15                              CRIMINAL DIVISION, FRAUD SECTION
                                1400 New York Avenue, 8th Floor
16                              Washington, D.C. 20005

17   FOR THE DEFENDANT:         STEVEN H. SADOW
                                LAW OFFICE OF STEVEN H. SADOW, PC
18                              260 Peachtree Street NW
                                Suite 2052
19                              Atlanta, Georgia 30303

20   STENOGRAPHICALLY REPORTED BY:

21                              ILONA LUPOWITZ, CRR, RPR, RMR
                                Official Court Reporter to:
22                              The Honorable Rodolfo A. Ruiz, II
                                United States District Court
23                              299 East Broward Boulevard
                                Fort Lauderdale, Florida 3301
24                              (954) 769-5568

25
```

```
 1    (Appearances continued)

 2
      FOR THE DEFENDANT:              DONALD F. SAMUEL
 3                                    GARLAND, SAMUEL & LOEB, PC
                                      3131 Maple Drive NE
 4                                    Atlanta Georgia 30305

 5                                    BRIAN T. RAFFERTY
                                      BAKER & HOSTETLER, LLP
 6                                    1170 Peactree Street, Suite
                                      2400
 7                                    Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                (Call to the Order of the Court.)

 2           THE COURT:  We are here this morning in case number

 3      19-80181.  This is the matter of the United States of America

 4      versus Minal Patel.

 5           Let's get appearances, please, on behalf of the

 6      government.

 7           MS. DE BOER:  Good morning, Your Honor.  Jamie de Boer,

 8      Emily Gurskis, Reginald Cuyler, Jr., and Steven Michaels, for

 9      the United States.  Mr. Michaels is from the government's

10      filter team.

11           THE COURT:  Good morning to you all.

12           And on behalf of Mr. Patel?

13           MR. SADOW:  Good morning, Your Honor, in person.  Steve

14      Sadow on behalf of Mr. Patel.  I'll let co-counsel introduce

15      themselves.

16           MR. SAMUEL:  Don Samuel.

17           MR. RAFFERTY:  Good morning, Your Honor.  Brian

18      Rafferty.

19           THE COURT:  Good morning.  Good morning, guys.

20           Okay.  So we have little bit of homework to do today

21      before our trial, which is scheduled to begin on Monday.  The

22      Court intends to handle the motions in limine from both sides,

23      as well as the 404(b) motion, and I expect that we'll have a

24      little bit more housekeeping to do, to discuss, for example,

25      the appeal.  I have one or two questions that I want to check
```

1    in with everybody on regarding the purported conflict for

2    Mr. Sadow, and we'll deal with that at the end.

3              I think that the best thing to start with would be,

4    perhaps, 404(b).  And the way I envision doing this, just to

5    try to move through this at a good pace -- I've read everyone's

6    pleadings, so I don't want to necessarily belabor argument on

7    this.  I have a sense of where I want to go.

8              So as we go through it, I just want to make sure that

9    I'm not missing anything, so I'll prompt you all to make sure

10   that my analysis is correct and that I'm looking at the right

11   issues.  And then I plan on ruling, one by one, and ultimately

12   will go ahead and memorialize that in a paperless order, which

13   the government I think is familiar with, since they've cited

14   back a number of paperless orders from prior Medicare fraud

15   cases to me in their pleadings.  So I will go ahead and move

16   quite swiftly through this.

17             So let's start off with 404(b).  This is the issues

18   raised in Docket Entry 292.  There are five categories that are

19   raised in the notice of intent.  I'll go through them briefly.

20             The first one deals with defendant's prior enrollment

21   with Medicare where he signed off that he understood that he

22   would follow Medicare rules and regulations, including the

23   anti-kickback statute, or AKS, as we all call it.

24             Then there was an attempt to centralize some

25   telemarketing of genetic tests, all under the purview or

1    umbrella of LabSolutions; some statements that were made in a

2    civil deposition that the government seeks to introduce; some

3    knowledge from some former business partners regarding some

4    concerns, concerns about fraud, that were raised through the

5    civil suit, and then this comment made by the defendant

6    purportedly stating that he wished that a co-conspirator would

7    take care of or put a stop to the allegations from the civil

8    plaintiff.

9          So the reality is, we have two grounds, if you will.

10   One would be that these are all inextricably intertwined with

11   the charged conduct and necessary to complete the story, and

12   alternatively, they all qualify because they would fall under

13   the ambit of 404(b) to prove knowledge, intent, motive, and

14   absence of mistake.  We know that this case has a very robust

15   defense theory that relies on advice of counsel, and, of

16   course, on -- at least brings into question a lot of knowledge

17   and intent or motive issues in that, I believe, that the

18   defense will advance that Mr. Patel believed, based on advice

19   of counsel and his experience, that he was not violating the

20   anti-kickback statute or any Medicare rules and regulations.

21   So his state of mind is squarely in play in this case, and most

22   of what is being offered by the government appears to go to

23   that point.

24         So the first one is the prior enrollments with Medicare

25   for two clinics where he signed certifications.  I don't

1    believe, turning to the defense, that there is really a

2    challenge on any sort of admissibility or issues.  Simply put,

3    the government wants to introduce them as inextricably

4    intertwined, or 404(b) evidence, because it would show a state

5    of knowledge, meaning, Mr. Patel understands what he could and

6    could not do under Medicare's rules and regulations, including

7    AKS.

8         So I'll turn to the defense.  I think all you want to

9    make sure is that you can rebut this or ask questions about it,

10   but I don't believe there's any real objection to that first

11   point.  Am I right on that?

12        MR. SAMUEL:  I think that's correct.  I think what we

13   raised was making sure that the way in which it is introduced

14   stays within the bounds of the rules of evidence.  In other

15   words, they can't put a -- they, meaning the government,

16   shouldn't put up a witness to say let me explain what this

17   means, let me explain what was going through Mr. Patel's mind.

18   I know they wouldn't do that, but --

19        THE COURT:  As if it was an expert, right?  As if

20   you're trotting out an expert on Medicare rules and

21   regulations.

22        MR. SAMUEL:  And I think their response essentially was

23   we're going to put the document in evidence, and we'll argue

24   about it in closing argument, which we agree, that's

25   permissible.

1           THE COURT:  Is that correct, Ms. de Boer?  I mean, I

2    think all we're doing here is showing that he signed off on

3    this, and it would indicate his knowledge, that he was not, for

4    lack of a better phrase, a babe in the woods, not understanding

5    what it was.

6           I'm sorry, Ms. Gurskis.  Whoever is arguing this, go

7    ahead.

8           MS. GURSKIS:  Thank you, Your Honor.  I think that's

9    exactly right.

10          One point for clarification purposes:  I note that

11   Mr. Samuel referenced expert testimony.  We do intend to call

12   someone who we have noticed as an expert on the Medicare rules

13   and regulations, but certainly the testimony that would be

14   elicited regarding these 855 forms would be within the bounds

15   of the rules of evidence, as Your Honor noted a few moments

16   ago.

17          THE COURT:  Yeah, I think Docket Entry 328, where

18   you've done your supplemental notice of intent, I think that's

19   where you outlined to me a couple of experts, but as far as I

20   understand it, this portion of the 404(b) concerns itself with

21   Mr. Patel signing off on a couple of documents which would show

22   he has knowledge of the relevant rules and regulations.  Am I

23   right on that?

24          MS. GURSKIS:  That's correct.  And the expert will also

25   talk about the importance of the 855s in the Medicare

1    enrollment process, and the promises that are made each time a

2    provider is signing those forms.

3         THE COURT:  Okay.  I think as long as we don't -- we

4    have an opportunity to allow someone to explain it, without

5    necessarily treating these forms or heightening them in terms

6    of a probative value, and more about as an expert explaining

7    what they signify when someone signs off on these, I'm going to

8    be fine with that.  I don't think there's an issue.

9         For purposes of the 404(b) though, as Mr. Samuel

10   pointed out, I don't think there's any major concern here that

11   we can allow these documents to come in.

12        So the Court will go ahead and permit that first

13   request, which is the prior enrollments and defendant's forms

14   regarding his knowledge of Medicare rules and regulations.  All

15   right?  So that's going to be fine.  All right.

16        So moving on, we then have defendant's attempt to

17   centralize the telemarketing of the genetic tests.  Again, I

18   don't think there's a major defense objection to this.

19   Certainly the weight that the jury gives this evidence will be

20   their call.  I don't think there's any admissibility concerns.

21   It definitely, as we know under the case law, works well to

22   tell the story, as we often say, when it's inextricably

23   intertwined, and it just basically would indicate his desire to

24   try to control or centralize the telemarketing operation.  It

25   will be up to the government to try to further link that to

1    some of the charged conduct, but I don't think there's a

2    problem about discussing what he did as a business person in

3    that centralization.

4           Any issues from the defense on that?

5           MR. SAMUEL:  No, Your Honor.

6           THE COURT:  All right.  Thank you, Mr. Samuels.  So

7    that will also be permitted.

8           Then we have the civil deposition, and specifically --

9    my understanding is that in this deposition there was some

10   testimony that dealt with Mr. Patel acknowledging or

11   recognizing problems that can arise from compensating

12   physicians for specimens.  Again, this would presumably go to

13   knowledge, understanding that certainly he was aware that this

14   was a problem and that this behavior would not be permitted.  I

15   don't know that beyond that, there's much to this.

16          Let me just check with the government first.  I think

17   it's just to be able to parse out or utilize portions of the

18   transcript to indicate that he acknowledged in this deposition

19   that he knew these were things he was not permitted to do.

20          Is that really the bottom line?

21          MS. GURSKIS:  That's one bottom line, Your Honor.

22          Just one other point to add is that at other points

23   during the deposition, Mr. Patel acknowledged or made reference

24   to his control over LabSolutions.  How much of his day-to-day

25   was involved in -- I think --

1          THE COURT:  Yeah.  He slept in the office, right?  When

2    he wakes up until he goes to bed, this is what he does, right?

3          MS. GURSKIS:  Certainly, Your Honor, yes.  So that

4    would also go -- we would also be wanting to introduce that as

5    well.

6          THE COURT:  Okay.  Any concerns about that, Mr. Samuel?

7    I mean, again, the weight of that is up for the jury to

8    determine.  He's very dedicated.  He wants to portray himself

9    as a Elon Musk of LabSolutions, if that's what he wants to do.

10          MR. SAMUEL:  That would not be fair.

11          THE COURT:  That probably would not help him at this

12    point, given the public perception of Mr. Musk.  But certainly,

13    I don't think there's any problem with him talking about his

14    work habits or his understanding of the regulatory landscape

15    through the depo.  You pointed out, it's obviously 417 pages

16    long.  I don't think the government is going to sit there and

17    read entire sections of this, but I have to imagine they can

18    parse out where they want to highlight his involvement in the

19    enterprise.

20          MR. SAMUEL:  My understanding was they did highlight

21    exactly what they intend to introduce, and that's why in our

22    response I said, if there's more --

23          THE COURT:  Let us know.

24          MR. SAMUEL:  -- then we need to know because then we

25    have to start considering issues dealing with the rule of

 1    completeness.

 2        And then I'm also a little curious how it's going to be

 3    done, if it's going to be someone just on the stand saying let

 4    me just read the deposition with no icing.

 5        THE COURT:  Yeah.

 6        MR. SAMUEL:  Because, you know, this was a discovery

 7    deposition, and so there's no cross-examination.  You don't get

 8    to hear the other side of the story.

 9        THE COURT:  Right.

10        MR. SAMUEL:  But the excerpts they provided in their

11    original motion, we didn't really find much trouble with.

12        THE COURT:  Okay.  Can you answer that on the

13    government's end?  I think, number one, can we confirm we're

14    going to keep this focused to the sections you've already

15    highlighted?  Because I truthfully also don't want to belabor

16    testimony with large portions of the transcript.

17        Are we focusing just on those certain sections?  Maybe

18    there's a little bit around before and after for completeness,

19    but I certainly want the Court and the defense to be prepared

20    that we're only going to read what's been identified.

21        MS. GURSKIS:  Yes, Your Honor.  We would only seek to

22    admit what's been identified.  I think the current plan, in

23    terms of moving in those transcript portions, would likely be

24    in connection with our summary witness.

25        THE COURT:  Okay.  Any concern there, Mr. Samuel?  You

1    know, obviously, they'll have to lay a predicate, and we'll

2    deal with it when it comes up.  But I guess it's going to be

3    coming in through a summary witness is what I'm hearing.

4         MR. SAMUEL:  I'm not sure of the context, but as far as

5    the admissibility of the evidence, we don't dispute it's our

6    client's statements, so...

7         THE COURT:  Okay.  I think that's going to work, and

8    we'll let that play out.  But certainly, I'll allow it.  Given

9    it's limited to what's been identified, I'm not too concerned

10   we're going to have a full reading of a transcript that's going

11   to delay our trial.  We can get the highlights and move on.  So

12   I'm going to allow that portion of the transcripts to come in.

13        Then we have point four, which is the knowledge as

14   early as 2017 of allegations that the conduct was fraudulent.

15        So my understanding was this comes from the business

16   partners that were suing Mr. Patel for breach of contract.  And

17   again, we're going to acknowledge here -- if the government

18   wants to clarify, I believe really that this is going to come

19   in by way of allegations that have been made by the former

20   business partners?  Am I right, that that's how it's going to

21   come in from the Aleems, A-L-E-E-M-S?  Is that how it's going

22   to be?  Tell me a little bit about how it's going to come in.

23        MS. GURSKIS:  Yes, Your Honor.  The government does not

24   intend to call Mr. Aleem as a witness in this case.  But I

25   believe probably at this point this would also be introduced

1   potentially through the summary witness.  Again, we would just

2   use it to show that Mr. Patel was aware of the existence of

3   these regulations.

4        THE COURT:  So really, it goes back to -- I mean, I

5   don't think it's duplicative because they're all different ways

6   to establish knowledge, but certainly it kind of dovetails to

7   the original point of him selling off of the forms, right?

8   This is all to establish that he had a good understanding, and

9   if he didn't understand it when he signed it, he certainly was

10  made aware of it when the Aleems began to raise their concerns

11  in the form of the breach of contract; is that right?

12       MS. GURSKIS:  Certainly, Your Honor.  And it also goes

13  to knowledge and the efforts that -- the government's efforts,

14  rather, to review the advice-of-counsel defense as well.

15       THE COURT:  All right.  Mr. Samuel, any concerns there?

16  I think you guys were a little concerned, understandably, about

17  what exactly is the knowledge.

18       I will say this:  I certainly think that there's plenty

19  of fodder for cross-examination and rebuttal on the Aleems'

20  allegations.  I mean, it's a lawsuit, right?  So the jury is

21  going to decide whether or not they believe that any of that is

22  worthwhile because if Mr. Patel believed that this lawsuit was

23  in bad faith, then it wouldn't necessarily indicate that he

24  gained any knowledge because he didn't think he was doing

25  anything wrong.  The jury will have to determine that.  But

1    certainly, general conversations or general information about

2    what the Aleems alleged, I think that's probably okay.

3            MR. SAMUEL:  We take real exception to that, Your

4    Honor.

5            THE COURT:  Tell me the concern there on the Aleem

6    portion.

7            MR. SAMUEL:  Well, first of all, if you look at the

8    document, it is 11 pages long.  There's a cover letter, so ten

9    pages long with allegations that have nothing to do with this

10   case.  You're going to allow the government to put in evidence

11   that is not inextricably intertwined, is not relevant, wouldn't

12   come close to passing a 403 test.

13           So if you just look at the document talking about his

14   clinics, and this and that, things that you wouldn't allow in

15   evidence -- if it was gospel truth, you wouldn't allow it in as

16   404(b), and yet you're allowing, through hearsay, through

17   summary witness -- first time I've heard that that's the way

18   it's going to be introduced.  A summary witness is going to get

19   up and say the Aleems said you were, whatever, committing all

20   kinds of crimes.

21           How can we cross-examine the summary witness?  Summary

22   witness doesn't know what he's talking about; he's just reading

23   a piece of paper.

24           And then the question -- and maybe I didn't articulate

25   it very well.  What is the knowledge he's gaining from this?

1    The only knowledge he's gaining is someone is making an

2    accusation.  There's nothing else that he's acquiring knowledge

3    about, right?  I mean, usually when you talk about putting in

4    evidence to show knowledge, it's something that we all agree is

5    true, and the defendant now knows about it.  That's important

6    evidence in a lot of cases.

7         If you put a witness on the stand -- I told Minal

8    Patel, you know, that a doctor killed a patient.  Well, that's

9    important for him to know that.  But for a non-witness --

10   summary witness to say someone made an accusation that --

11   whatever, take any one of this long list of completely

12   irrelevant things.

13        So it doesn't even pass the test of being relevant to

14   Mr. Patel's state of mind.  It's just an allegation.  It's not

15   truth.  It's not being -- first of all, it's not being offered

16   for the truth of the matter at all.

17        THE COURT:  Right.

18        MR. SAMUEL:  It's being offered to show that he now

19   knows something.  What does he know?  He knows someone's making

20   an allegation as opposed to he now knows that his doctors were

21   engaged in corruption, or his marketers, or whatever.

22        I mean, just look at the list of supposed crimes.  So

23   it doesn't even pass that test.  That's why I cited Judge

24   Tjoflat's decision where he says you can't just say it's not

25   for the truth of the matter asserted and, therefore, it's

1    relevant.  It still has to be relevant.  That's the very

2    lengthy decision Judge Tjoflat ruled last year at *Elysee* or --

3            THE COURT:  And you don't believe it would be relevant

4    again -- again, I don't doubt -- and I can certainly give any

5    number of instructions to the jury on what to consider it for.

6    But looking at it as Attachment 17, 330-17, your point is it's

7    essentially just an affidavit of a third party from a civil

8    action alleging wrongdoing committed by your client, right?  Is

9    it --

10           MR. SAMUEL:  I don't think it's an affidavit.  It was a

11   threatening letter.

12           THE COURT:  Am I reading the wrong thing?

13           MS. GURSKIS:  It's an affidavit, Your Honor.

14           THE COURT:  Yeah.  No, let's make sure, because my

15   understanding, it's an affidavit.  If you look at it, it's

16   Docket Entry 330-17, and it's an affidavit of Omar Abdel-Aleem

17   in support of the reply brief for a temporary restraining order

18   in the civil suit.

19           No, definitely I think -- I don't know about any

20   threatening letters.  I have read it yesterday as an affidavit.

21   And essentially it's a court document where he was alleging

22   some of what LabSolutions was doing.

23           So, for example, he states that my suspicions were

24   confirmed when the doctors were connected with a

25   multimillion-dollar medical insurance fraud scheme.  He goes on

1   to say that LabSolutions' ongoing association with these felons

2   posed a serious threat.  And then he detailed some more of what

3   he believed were different elements of wrongdoing within the

4   company, and particularly alleges things against Mr. Patel.

5          So what I'm being told is that this document, again,

6   would be indicative not for the truth of the matter asserted.

7   Certainly, the Court would have to give that curative before it

8   comes in at all, if it comes in.  But it's more to show the

9   presence, the state of mind, or knowledge, arguably maybe

10  even -- I don't want to say maybe it's modus operandi, but it

11  is talking a little bit about MO, about how he did things and

12  purportedly did things at LabSolutions.  So can the government

13  maybe respond to Mr. Samuel's point --

14          MR. SAMUEL:  I've got --

15          THE COURT:  You want to add something?  Go ahead,

16  Counsel.

17          MR. SAMUEL:  The other part that we raised in our

18  response was some of this was investigated.  An Atlanta lawyer

19  was hired.  Not a criminal defense lawyer, a business lawyer,

20  who did a very thorough analysis of the accusations made by the

21  Aleems and prepared a very detailed report, that there were

22  lies.  You put that in.  Maybe it's for the truth of the matter

23  asserted.

24          THE COURT:  Yeah.

25          MR. SAMUEL:  If we're going to have all of this not for

1    the truth of the matter asserted, we're wasting a lot of the

2    jury's time.  And if it's coming in -- and the government's

3    going to say, you see?  His business partner told him that

4    doctors were committing fraud.  You know, then we get to bring

5    in -- oh, but our expert -- our lawyer that we hired and paid a

6    lot of money to do an investigation said they didn't commit a

7    crime.

8            THE COURT:  Which you would then say is trying to

9    negate any state of mind, right?  I mean, because we're going

10   to have to do this with the figment of telling jurors that this

11   is not for the truth of the matter asserted.

12           But the point would be, you'd rebut it with some other

13   report that would simply state that as much as he was put on,

14   quote, unquote, notice of illegality of this affidavit, an

15   independent report was done that absolved him of wrongdoing to

16   begin with, so this doesn't really move the needle for state of

17   mind, right?

18           MR. SAMUEL:  And why would we just be limited to the

19   report?  We'll bring the lawyer in who did the investigation,

20   if we're trying to prove what's in his state of mind.  The

21   lawyer will come in and say, let me tell you what I told him.

22   I told him this was all bologna.

23           And this would become such a sideshow.  And as I put it

24   in my brief, it becomes a major sideshow.  It becomes a Maxim

25   trial to determine whether a lawsuit where someone who is --

1   you know, we described as being extortion.  That may be too

2   strong, but that's our view of what was going on.

3          My first entry into this case was the mediation that

4   resolved this case for almost nothing.  And thousands and

5   thousands of dollars spent on lawyers to litigate the dispute

6   between the Aleems and LabSolutions and Mr. Patel.

7          I know Steve is itching to help me out here a little

8   bit more, but --

9          THE COURT:  Well, let me ask you this:  Before I let

10  Mr. Sadow jump in, let me turn to the government.

11         Look, we're already talking about -- your concern is,

12  truthfully, intent, and knowledge.  We already have coming in

13  his signoff on Medicare forms where he is acknowledging the

14  understanding of rules and regulations and the anti-kickback

15  statute.  We're already going to have a portion of the

16  depositions where he is acknowledging what can and cannot be

17  done, and we're going to have experts talk about a little bit

18  of seriousness of signing off on these forms and what they mean

19  when you sign off on them.

20         At what point do we have enough?  Because if we're just

21  layering on another layer of knowledge and intent, and I would

22  suggest that knowledge and intent is certainly shown by the

23  statements of the defendant, in deposition, and by his forms --

24  once we start getting to what someone else said that sued him

25  in a civil context, the probative value of that begins to wane

1    a little bit, in my view, and truthfully, I don't know that you

2    don't already have quite a bit of material here to show his

3    state of mind.

4        So at the risk of opening up the door to a

5    back-and-forth -- because I have to say, if this came in, I

6    think Mr. Samuel is right.  They should be allowed to rebut

7    this as essentially a non-starter for state-of-mind evidence

8    because he had independently checked, and it generated no

9    leads, and the case went away.  We all know that a lot of

10   people posture in civil lawsuits all the time.  I'm going to

11   have to give a very strong curative so that jurors don't

12   believe that the Aleems are the ones who have all the

13   intelligence here and can determine what happened.

14       So does the government feel that this is really that

15   critical with everything else they're getting in on this?

16       MS. GURSKIS:  I think the short answer is yes, but it

17   requires a little bit more explanation, Your Honor.

18       I think that in crafting the brief in terms of the two

19   sections, this one regarding the -- Mr. Aleem's affidavit, and

20   then the following section, which is relating to the threat for

21   the plaintiff of the lawsuit, these two sort of go hand in

22   hand, and that's why this particular issue is distinct from the

23   transcript citations and distinct from the 855 forms that Your

24   Honor was just mentioning.

25       THE COURT:  So you need this more because you believe

1  it's required context for when you are requesting that I let in

2  this discussion or the defendant's request that

3  Co-conspirator 2 physically harm the civil plaintiff.  Is that

4  why you believe you need this portion?

5       MS. GURSKIS:  That's correct, Your Honor.  It all goes

6  to the defendant's efforts to control the facets of the

7  conspiracy, his efforts to run a conspiracy where things were

8  kept secret, where there was an acknowledgment by the decision

9  to enlist a business associate with ties to organized crime to

10  make a threat against somebody who was making these types of

11  accusations, perhaps bringing things to light that he didn't

12  want coming to light.  It all goes hand in hand and really goes

13  to the heart of the knowledge issue that will be the forefront

14  of this case.

15       THE COURT:  Well, more than that, right?  You're really

16  doing it less for knowledge, at that point.  You're really in

17  there for consciousness of guilt.

18       MS. GURSKIS:  Yes, Your Honor.

19       THE COURT:  I mean, that's what you're really trying to

20  advance.

21       Do I really need the full affidavit to get there?  And

22  we're going talk about this purported threat.  But it seems to

23  me that we could, in a somewhat cursory way, talk about the

24  fact that he faced a civil suit from the Aleems, which alleged

25  either illegal business practices, or payoffs, whatever it may

1   be, which prompted him then to ask another co-conspirator to

2   physically harm the Aleems and shut down these allegations.

3   I'm just trying to figure out how much time am I going to spend

4   with this affidavit and parading it in front of the jury.  I

5   don't know how much I need that, I guess.

6         MS. GURSKIS:  Yes, Your Honor, understood.

7         I think there are two proposals regarding that:  One

8   would be a redacted form of the affidavit.  Another option

9   would be, as I believe Your Honor was alluding to, the

10  existence of the lawsuit, the fact that there were accusations

11  made regarding anti-kickback statute violations, regarding

12  compensating physicians for specimen, which Mr. Patel himself

13  acknowledged in his deposition was wrongful.

14        THE COURT:  And can you tell me how this -- I want to

15  make sure I understand.  The Co-conspirator 2 portion of this,

16  is this coming in because we expect Co-conspirator 2 to

17  testify?

18        MS. GURSKIS:  Yes, Your Honor.

19        THE COURT:  So the way this is going to play out is

20  Co-conspirator 2 would be the conduit, right?  Because one

21  thing we talked about earlier is, you know, summary witnesses

22  and this affidavit.

23        If the Court went ahead and partially permitted

24  mentioning of the affidavit, we would say something to the

25  effect of, during Co-conspirator's testimony, he would be

1    asked, you know, what was the request made by Mr. Patel?  It

2    was to harm the Aleems.  Why would that be?  Because the Aleems

3    had filed a lawsuit against him and exposed or noted a number

4    of dubious business practices at LabSolutions.  I mean, that

5    would not necessitate really the -- I mean, it wouldn't really

6    need the affidavit, would it?  He could just say that, and that

7    would be -- and again, it's party opponent, right?  That's why

8    it's coming in under the threat, right?

9          MS. GURSKIS:  Yes, Your Honor.

10          THE COURT:  So Mr. Samuel and Mr. Sadow, tell me how --

11    obviously, it's a little intertwined.  I'm willing to scale

12    back the use of this affidavit because I'm with you, that I

13    don't necessarily want it paraded around because we have enough

14    here, evidence of knowledge and intent from everything else.

15          Their big concern is this needs to be mentioned as

16    backstory to substantiate their request that Co-conspirator 2

17    be permitted to mention this physical threat of harm because

18    it's, you know, indicative of consciousness of guilt.

19          What's your position, perhaps, on the threat?  Maybe we

20    start there first and we work our way backwards.

21          MR. SAMUEL:  Well, we think the threat is not really

22    relevant to anything we're dealing with in our case.

23          THE COURT:  Okay.

24          MR. SAMUEL:  The threat didn't involve anything, as I

25    understand it.  It was one conversation that lasted all of, you

1    know, a few minutes, according to the government's version.

2    You know, it's not recorded or anything, and the guy said no.

3              THE COURT:  Right.

4              MR. SAMUEL:  And that was it.

5              Well, how far does that move the ball in deciding any

6    issue in this case other than that Mr. Patel, you know, lost

7    his temper, if it's true, or had a stupid idea, if it's true?

8              THE COURT:  Or if he even meant it seriously, right?

9    I'm sure the context matters.  I'm assuming, in any kind of

10   cross-examination or rehabilitation, you would ask

11   Co-conspirator 2, do you think he really meant this?  I mean,

12   come on.  They were upset about a lawsuit and, you know,

13   watched one too many Godfather movies and he made a joke.  I

14   don't know.  That's probably what's going to come out of this,

15   right?

16             MR. SAMUEL:  I prefer your solution to this whole

17   problem with number 4 and 5, or 3 and 4, to what we're looking

18   at in the beginning.  I would like to talk to Mr. Sadow and

19   Mr. Rafferty a little bit before we concede it, but I think

20   that's the right path to go now, which is to limit this

21   cabinet, make sure it's not, you know, becoming a sideshow, as

22   I said before, so...

23             THE COURT:  Yeah.  I think I'm going to do this:

24             MR. SAMUEL:  And keep that in a --

25             THE COURT:  Yeah.  And, look, we can fine-tune it.

 1        MR. SAMUEL:  Yes.

 2        THE COURT:  But I think for purposes of the Court's

 3   ruling, I think -- I am not a fan -- and I think what I heard

 4   the government was initially proposing was bringing in that

 5   affidavit through a summary witness.  We're not going to do

 6   that.  We're not going to have that affidavit paraded around.

 7   I mean, at the end of the day, it's a civil suit.  I understand

 8   that it may be probative to certain issues in the case, but I

 9   do think it could be a bit misleading.  And I am concerned, no

10   matter how strong the curative is, the jury is going to look at

11   this affidavit and think it is gospel from a non-party, who's

12   not here, and I'm worried about that because the government

13   needs to carry the burden of proof and not rely on extraneous

14   civil case affidavits to carry that burden.

15        Now, the way the government has framed it, their bigger

16   concern is they need it for context because they're worried

17   about the consciousness-of-guilt evidence by statements made

18   between Mr. Patel and the co-conspirator, Co-conspirator No. 2.

19        So the way I see it is, the affidavit -- well, the

20   affidavit will not come in, but discussion of the civil lawsuit

21   filed by the Aleems can be explained or detailed by

22   Co-conspirator 2, presumably would know enough about it to be

23   able to testify competently about what the Aleems were

24   alleging, and that that would be permitted, and that in that

25   line of questioning, because it's part of the narrative, I

 1    don't have a problem with the government following up on that

 2    last category of evidence and saying, well, did he ask you to

 3    do anything?  He said, yeah, he wanted me to take care of the

 4    Aleems.  And obviously, you need to understand why that would

 5    be.  It's because we have a pending civil suit.  And you can

 6    get some of that in there.

 7         Does that work in the sense that it gives the

 8    government some guidance on how they're going to be able to

 9    reference the Aleem lawsuit without necessarily parading the

10    affidavit?

11         MS. GURSKIS:  Yes, Your Honor.  And one other proposal,

12    if this would give the Court and the defense more comfort on

13    that issue is:  We could draft a stipulation regarding the

14    existence of the lawsuit that would not be admitted for its

15    truth, and then it wouldn't be the co-conspirator's summary of

16    the lawsuit; it would be something that we could agree upon

17    with the defense, an agreed statement.

18         THE COURT:  Yeah, it might not be a bad idea just so

19    that we don't have Co-conspirator 2 mistakenly characterize a

20    lawsuit into something it wasn't.  So perhaps -- I don't have a

21    problem, for example, reading to the jury a stipulation that

22    the Aleems, the former business partners, filed a civil suit

23    alleging X, Y, and Z, against Mr. Patel.  That could be read.

24    That lawsuit's in existence.  We know what it was.  And then

25    that frames the testimony of Co-conspirator No. 2.  I don't

 1    have a problem with that either.

 2         But I think what this does is it avoids parading an

 3    affidavit around as gospel, with the allegations here, and

 4    having jurors just substitute the government's burden by way of

 5    a sworn affidavit from Mr. Aleem.  I think that's safer.

 6         MR. SAMUEL:  If I could just make sure you understand

 7    what the civil lawsuit was actually about.

 8         THE COURT:  Sure.

 9         MR. SAMUEL:  The civil lawsuit was the Aleems claiming

10    that they owned half of LabSolutions.

11         THE COURT:  Right, that they got stiffed for money.  It

12    was a breach of contract, right?

13         MR. SAMUEL:  That was the case.  It wasn't that there

14    were crimes going on.

15         THE COURT:  Right.

16         MR. SAMUEL:  That wasn't the essence of the complaint.

17    That was the extortion they were using -- again, my phrase.

18    That was the threat they were using to say this is why you're

19    going to have to pay me, because otherwise I'm going to expose

20    all these things you're doing, which is kind of ironic because

21    they're claiming that they were the half owners.

22         THE COURT:  Right.

23         MR. SAMUEL:  In fact, their lawyers had set up the

24    structure of the company.  So it gets very complicated.

25         But I don't want you to think that this lawsuit was

1   you're violating the law, you're committing AKS violations, and

2   that's why we're suing you, and Mr. Patel said, well, we need

3   to get rid of those guys.

4        THE COURT:  I think one way to do it, to your point,

5   though, is to simply state something along the lines, in the

6   stipulation, that the parties stipulate and recognize that

7   there was a lawsuit by the Aleems for breach of contract where

8   they maintained they owned half of LabSolutions, and in that

9   lawsuit, allegations were made regarding improprieties at

10  LabSolutions, including but not limited to whatever, whatever,

11  whatever.  And that way, we simplify it.  It doesn't get so

12  detailed like this affidavit does.

13        It's almost just a laundry list of things that I don't

14  think keep us on track.  I think we can do that, and then we

15  can take some of the issues out of it, and then that is read to

16  the jury and permits us to then have some context when

17  Co-conspirator 2 is asked about it.  And then they'll be able

18  to rehabilitate or clarify what that conversation was like.  So

19  that makes sense.

20        MR. SADOW:  Your Honor, briefly.

21        THE COURT:  Yes.

22        MR. SADOW:  I know you're working through a solution.

23  I don't think we have a problem with the solution in theory,

24  but I'm going to suggest -- this is coming from a witness, and

25  before we actually get to that, maybe the Court -- when the

 1    witness is called, the Court can actually hear what the witness

 2    is going to say about the context before we begin to stipulate

 3    to context.  That way, we know for sure what the alleged

 4    co-conspirator understood it to be as opposed to how, maybe, we

 5    or the government want to characterize it.

 6         We're talking about, if that witness is about to take

 7    the stand, the government could put him up and say, all right,

 8    would you tell the Court what you remember about so and so.

 9    And then Your Honor would have a full context of the way it's

10    coming out.  I'm not sure that -- the stipulation kind of gives

11    it meat, which is concerning to us.

12         THE COURT:  Okay.

13         MR. SADOW:  I mean, if you were to say during the time

14    period there was a lawsuit by the Aleems against LabSolutions

15    and the defendant, and there were allegations made of

16    impropriety or unlawful conduct -- and that's it.  It stopped

17    with that.

18         But getting into the alleged violations -- for example,

19    one of the things, paragraph 15 in the affidavit is,

20    defendant's illegal actions have been noticed by other states.

21    Well, of course, there's no proof of that.

22         So I'm just suggesting that maybe on this issue,

23    because we're talking about an alleged threat, which is

24    separate and apart from other things, that maybe the Court hear

25    a little something on that before we make a final decision on

1   it.

2            THE COURT:  Are you thinking -- I guess my question

3   is -- because I want to make sure I understand the request.

4            I certainly don't have a problem with having the

5   witness proffer, outside the presence of the jury, any

6   information about the purported statement from Co-conspirator 2

7   about taking care of the Aleems.  I mean, I can ask that and

8   get some context.

9            You're saying you'd prefer, perhaps, not to have a

10  stipulation about the lawsuit and more so to just hear the

11  characterization by Co-conspirator 2 of the Aleem suit first?

12  Am I understanding that right?

13           MR. SADOW:  And then we can get a full idea of the

14  context in which the alleged co-conspirator understood the

15  statement as opposed to here's how the statement was made, in

16  what context, because that supposedly is -- it's the

17  co-conspirator who is suggesting that this may have been a

18  threat.  It's not Mr. -- obviously, it's not the Aleems and

19  it's not Mr. Patel.  And if the government is going to prove

20  that for purposes of, let's say, 403 analysis, I think you

21  ought to know exactly what has been said.  Because when you

22  look at the statements, the interviews, it doesn't come off

23  quite so strong, let's put it that way.

24           THE COURT:  Okay.  I think the best way to do it then

25  is, when we have Co-conspirator 2, let's go ahead and have a

1    little bit of a proffer beforehand just to get some context.

2    If the parties have agreed by then on how they want me to

3    characterize the lawsuit by way of stipulation, that's fine.

4    Or if we prefer to hear the characterization by Co-conspirator

5    2 first, outside the presence of the jury, and we decide that

6    that is an accurate understanding of the lawsuit, so that it

7    gives context to the statements or requests from Mr. Patel

8    regarding what he wanted to be done to the Aleems -- either one

9    of those provides a solution.

10        I think for purposes of the 404(b), under Docket

11   Entry 292, the Court will essentially permit that this line of

12   questioning regarding the lawsuit come in through the testimony

13   of Co-conspirator 2, and it will not be allowing the use of the

14   affidavit that's been attached -- I think it's 330, is the

15   docket entry, -17.  I won't allow that to come in, wholesale,

16   with a curative.  It's easier to just get into

17   Co-conspirator 2.

18        I will allow the questions regarding the purported

19   statements made by Mr. Patel to Co-conspirator 2, about what he

20   was asking to be done to the Aleems.  But we're going to get a

21   sense of how that will play when that witness is here on the

22   stand.

23        But certainly, this will then conclude the 404(b)

24   request, and subject to some of the caveats on the record, the

25   Court is going to grant or permit most of it in.  And then it's

1    going to be a granted in part ruling, and part -- I'll word it

2    in a paperless other.  But the Court will permit the majority

3    of what's been requested, absent the affidavit, with some of

4    the qualifications regarding expert witnesses that we talked

5    about.  So I think that takes care of 292.

6           Was there something else on the government's end?

7           MS. GURSKIS:  Just one small point, Your Honor.

8           THE COURT:  Sure.

9           MS. GURSKIS:  With regard to the stipulation, it could

10   also be helpful for the jury to give context for the deposition

11   transcript as well, so -- just one point that we wanted to add,

12   Your Honor.

13          THE COURT:  Okay.  I think the important thing is, on

14   that, just you guys know that you're going to have to come up

15   with a way to present this that doesn't rely on the affidavit.

16   I mean, that's really the guidance I can give you today.  I

17   think no matter what, we're going to want to talk to our

18   witness a little bit before we let him present his theory to

19   the jury.  So that makes sense.  All right.

20          Okay.  So that takes care of 292.  That's the 404(b)

21   issue.

22          The next thing we need to address is, we'll move to the

23   motions in limine, and we'll deal with -- first, it might be

24   easiest to go through the defendant's omnibus motion in limine,

25   and that is Docket Entry 308.

1          So we're going to go ahead and turn there next, and

2     we'll go through -- there's really four general categories that

3     are being requested here.  The first one is dealing with

4     evidence of a meeting between Mr. Patel's lead defense

5     attorney, evidence of that meeting.  Then we have evidence of

6     prior drug use or convictions related to drug use.  Then we

7     have evidence of Mr. Patel's wealth and spending, and evidence

8     relating to Marc Sporn and Christian McKeon.  Those are the

9     main categories.

10          So I think we can move through this at a good pace.  I

11    have a good sense of the issues here.

12          So let's talk about this first one, motion to exclude

13    evidence of the meeting with Mr. Patel's lead defense attorney.

14          So this kind of dovetails into the government's appeal

15    because the concern here is there was a meeting with -- and

16    again, you all know the record better than I, but I'm going to

17    restate what I think we have here so we make a good record.

18          So Tobin Watt, as I understand it, is LabSolutions'

19    regulatory lawyer.  He's kind of the man on the regulatory

20    side.  Throughout at least -- I think even before, but

21    certainly throughout the purported window of the conspiracy,

22    Mr. Sadow was the lead criminal defense counsel for Mr. Patel.

23    There is purportedly this meeting that is involving one of the

24    cooperators, Christian McKeon, Mr. McKeon's lawyer, Mr. Patel,

25    Mr. Patel's lead defense attorney, Mr. Sadow, and the

1    LabSolutions attorney, Mr. Watt.

2        Now, the substance of this meeting is somewhat in

3    dispute, as far as I can tell, and some voices were raised,

4    issued were stated.

5        We know, from my magistrate's colloquy, that there has

6    been, at least in theory, a suggestion that we can scrub, for

7    lack of a better word, Mr. Sadow's involvement and presence in

8    certain meetings so as not to find ourselves in a conflict

9    position and get into Sixth Amendment concerns.

10        I guess my issue here, if I understand it right, is I

11    don't believe that the defense is taking issue with the

12    discussion of what happened during the meeting for advice of

13    counsel.  I mean, I don't know how, for example, we would not

14    want, for purposes of advice-of-counsel defense, Mr. Watt's

15    discussion or what he may or may not have said to Mr. Patel to

16    come into evidence.  My understanding is the government wants

17    to get into this meeting, and certainly there were

18    communications there.

19        But the defense is concerned that looping in --

20    Mr. Sadow into that meeting in a substantive way, not just as a

21    bystander, would essentially convert him into a fact witness,

22    and then we run into some problems, which the government has

23    emphasized in their appeal from Magistrate Judge Reinhart's

24    ruling, that he is not to be conflicted out.

25        So I guess -- Mr. Sadow, Mr. Samuel, whoever is taking

1    the lead on this, am I understanding it right, that you don't

2    necessarily have an objection with the government's desire to

3    get into this meeting or at least ask Mr. -- because that's

4    what's going happen, right?  I mean, this is going to come up

5    either through questioning of Mr. McKeon or questioning of Mr.

6    Watt.  I mean, that's what's going to happen.

7            So what I'm trying to figure out here is the major

8    concern that a curative or an instruction is given to these

9    witnesses that make clear that what you may have said,

10   Mr. Sadow, is not at issue, or that your presence at these

11   meetings is minimized.

12           How do you foresee this?

13           MR. SADOW:  Well, first, what the magistrate suggested

14   was I could be scrubbed, so to speak.

15           THE COURT:  Correct.

16           MR. SADOW:  I don't have any problem with the evidence

17   coming in that I was there.

18           THE COURT:  Right.

19           MR. SADOW:  The only question becomes what it is that

20   the witness can testify about what I said.

21           Now, if it was something substantive, that's one thing,

22   but that's not what we've been told.  What we've been told is

23   that my behavior was inappropriate.  I'm not sure that that's

24   relevant to the issues in this case.

25           And we don't have just Mr. Watt.  We also have, as

1   you've indicated -- there's two Raskin attorneys, Mr. and Mrs.

2          THE COURT:  Right.

3          MR. SADOW:  And there's another co-defendant by the

4   name of -- unindicted co-conspirator named Orr.

5          So to the extent that the government wants to introduce

6   what took place there, as long as it doesn't put substance in

7   my mouth that hasn't been testified to, I don't have a problem

8   with it, so -- I don't see that as a problem.

9          THE COURT:  Let me ask you, Mr. Sadow.  Sorry to

10  interrupt you.

11         MR. SADOW:  Sure.

12         THE COURT:  What happens if I let -- McKeon get up

13  there -- I mean, again, this is totally hypothetical.  What

14  happens if he says Mr. Sadow, who's sitting right there, said

15  nothing that was done in LabSolutions was illegal?  What am I

16  going to do if that bomb goes off and now drags you in as a

17  fact witness in the presence of the jury?  I mean, I can sit

18  there, and I can tell these guys what they can and cannot say,

19  and I can try to make it very clear that nothing that you

20  contributed to the meeting is going to be on the table.

21         But let's assume that I even do that, and McKeon or

22  Watt says to me, well, Your Honor, Mr. Sadow clearly gave

23  specific instructions to Mr. Patel that this conduct was going

24  to run afoul of the anti-kickback statute.  Let's just say they

25  say that.  What am I going to do for you?

1           Because I'm concerned -- this was the government's

2    point on appeal.  What do we do, at that point, if we have

3    that?  How do I even navigate the conflict part?  Because I'm

4    very concerned that that could happen.

5           MR. SADOW:  Well, you know, I can't say it won't happen

6    other than it would be absolutely untrue.  But again, that's --

7           THE COURT:  Right.  And I'm not doubting -- but let's

8    say they made it up, whatever.  But the fact is, they say it.

9           MR. SADOW:  But they haven't.  See, that's the key

10   here.

11          THE COURT:  Are we sure?  I mean, the government seems

12   to think that's coming.  I mean, I'm guessing, but I don't

13   know.

14          MR. SADOW:  We've gotten statements from McKeon and

15   we've gotten statements from Orr.  We got multiple statements.

16   Not one time have they said anything other than -- apparently,

17   that my behavior was inappropriate.

18          So if the government's got that, they haven't put that

19   forward either today or in the past --

20          THE COURT:  Right.

21          MR. SADOW:  -- or through a witness.  And we have the

22   Raskins on our witness list.  Apparently, they're now on -- at

23   least one of them is on the government's.  Tobin Watt has been

24   interviewed.  He didn't say any such thing.

25          And I understand what you're saying --

1           THE COURT:  I'm just trying to get ahead of it.

2           Look, I think in a perfect world, they testify as you

3   suggested, yes, Mr. Sadow was assisting -- he was there, that's

4   it.  You were there.  It doesn't mean anything.  We're not

5   conflicted.  We don't have to worry about anything.  We're

6   fine.

7           My only concern -- and I agree with you.  I mean, the

8   government has positioned it in their appeal.  It's a little

9   bit of a parade of horribles about what could happen.  If

10  there's nothing there, then I don't have anything to worry

11  about.

12          My fear, of course -- and this is the unknown -- is

13  that one of these witnesses either has a change of heart or

14  change of memory, and suddenly, now, you contributed to advice

15  in that meeting, and now I have to figure out how to extricate

16  you from it because you're being dragged in as a fact witness.

17  That's my only concern.

18          Because I'm with you a hundred percent.  If they say

19  you're there, and you were a bystander -- even if they were to

20  say that you got mad about something you heard, it's of no

21  moment, and we could instruct them not to get into that.  So

22  I'm not worried about that.

23          My only concern is, because advice of counsel can be

24  sort of a shield here, I can't have a situation where we only

25  let advice of counsel open the door to whatever Watt or someone

1    else said on the regulatory side, but then when it comes to

2    anything you may have said, we maintain our attorney-client

3    relationship and don't have a waiver.  And it may be a moot

4    point, but that is the only thing I'm worried about.

5         I'm with you.  If there's nothing of substance that you

6    contributed to this meeting, arguably anything that went to the

7    case or any advice you gave, then we're going to be fine.  But

8    that's my only concern.

9         MR. SADOW:  And I understand that.  I think that's a

10   valid concern.

11        So why don't we do this:  Why don't I sit down and let

12   the government stand up and tell you whether or not the

13   witnesses have even approached such a thing.

14        THE COURT:  Sure.  I think that's a fair point.

15        So, guys, this is the substance of your appeal.  I

16   mean, your appeal is the magistrate judge did not come up with

17   enough of a prophylactic method or inquire of Mr. Patel enough

18   to confirm that he was comfortable with the potential of this

19   becoming a complete problem at trial.  I'm hearing that this is

20   not going to happen, but I'm obviously very concerned because

21   once this comes out, it dramatically impacts the defense.  It

22   impacts Mr. Sadow's ability to be a part of certain segments of

23   the case.

24        You suggested, and this is something that I thought

25   about, that maybe, let's say, when it comes to McKeon or Watt,

1    that maybe Mr. Sadow should not be the one doing the

2    cross-examination of those witnesses; maybe we should have

3    Mr. Rafferty or Mr. Samuel do it.  That may be an option.  I

4    mean, I don't know that that cures the problem of someone at

5    counsels' table being implicated as a witness.

6           But what's your sense, Ms. de Boer, on this?  Because,

7    obviously, this is my biggest concern right now.

8           MS. DE BOER:  Thank you, Your Honor.  And I think

9    there's a few different issues going on here.

10          So one, of course, is the conflict issue.  And then I

11   think the other is, as Your Honor mentioned, the potential that

12   the advice-of-counsel defense and the privilege waiver is being

13   used as both a sword and a shield in this case.  So let me

14   speak to, kind of, both of those things and address all the

15   points that Your Honor hit, that Mr. Sadow hit as well.

16          So, number one, I just want to be clear:  We are not

17   intending to present evidence of Mr. Sadow's attitude or

18   presentation at this meeting.  That was something a witness

19   said in an interview.  Witnesses say all kinds of things that

20   are not admissible in court at an interview.  That's not the

21   purpose -- I understand why they are bringing it up, to ensure

22   that it doesn't happen, but that's not the purpose of this

23   testimony.

24          The May 2019 meeting actually ties into the effort to

25   -- this is a meeting at -- in an attempt to consolidate the

1    telemarketing operation and telemedicine operation under one

2    roof.  That's the probative value of this meeting.  And so I

3    think it has been over -- this particular May meeting has been

4    overblown as it relates to the broader conflict and

5    advice-of-counsel issues.

6            So it's -- of course we're concerned about the way a

7    jury might interpret Mr. Sadow's presence at a meeting, right?

8    The presence of criminal counsel and the lack of an objection

9    by criminal counsel to hearing about telemarketing and

10   telemedicine, to hearing about that being consolidated under

11   Mr. Patel's operation, and then that same criminal defense

12   counsel being the one to -- be the lead at the table advancing

13   this defense, that's inherently prejudicial to the government,

14   particularly where there's an advice-of-counsel defense being

15   asserted where that the main argument to the jury from the

16   defense is this guy had lawyers.  The lawyers said it was okay.

17           The jury's going to connect the dots there and say,

18   yeah, not only did he have Toby Watt, he had Steve Sadow, the

19   criminal lawyer, who sat at this meeting and didn't object.  So

20   even if there's no testimony regarding Mr. Sadow saying

21   anything, the conflict and the problem and the prejudice and

22   the fairness of these proceedings is there.

23           But let's put aside the May 29th meeting because, like

24   I said, I think that's overblown in the broader discussion.

25   The broader issue is the potential that the advice-of-counsel

1    defense is being used as both a sword and a shield in this

2    case, that the distinction that the defense has continued to

3    draw that there is a difference when it comes to the

4    presentation of advice-of-counsel defense between compliance

5    advice and criminal advice.

6            We disagree.  In fact, advice from a criminal defense

7    attorney, who's experienced in defending healthcare fraud

8    cases, might actually be more probative to the defendant's

9    intent, his knowledge, and his understanding of the law and why

10   he made certain decisions, than even a regulatory attorney.

11   And we have not been permitted to explore Mr. Sadow's advice,

12   obviously, in any great detail.

13           And Mr. Sadow made a comment that, well, we know what

14   Mr. Watt said at this meeting.  Yes, we know what Mr. Watt said

15   at the May 2019 meeting.  We know a lot about Mr. Watt's

16   advice.  But when we interviewed Mr. Watt, there were

17   limitations on things that -- of what we could talk about

18   Mr. Watt with in terms of his interactions with Mr. Sadow.

19           And let me give the Court a little additional context

20   here:

21           So in February of 2019, LabSolutions is served with two

22   subpoenas, from the Southern District of Florida and from South

23   Carolina, both dealing with conduct of marketers, but other

24   investigations.  The subjects of those investigations were not

25   Minal Patel.

1          Then, over the course of responding to those subpoenas,

2   both the regulatory lawyers and Mr. Sadow become involved, and

3   we detailed what we know about that in the timeline presented

4   in the appeal.

5          Over time, they become aware of a potential criminal

6   investigation of Mr. Patel.  And when in particular they became

7   aware of that, I don't know, but I believe it was in August

8   of 2019.  But the fact that there's now some heat, right,

9   regardless of whether they know if Mr. Patel's under

10  investigation, or if there's just simply, you know, potential

11  enforcement in this area, and they're bringing in a criminal

12  defense attorney who's part of the advice, when Mr. Watt takes

13  the stand, we are going to cross-examine him on his

14  conversations with Mr. Sadow, on Mr. Sadow's involvement in

15  developing the advice that was being rendered.

16         And as just one example, our understanding is that

17  Mr. Sadow requested an affidavit to be drafted by Mr. Watt that

18  pertained to his legal advice, but the defense has asserted

19  privilege over the draft of that affidavit.  We don't have it.

20  That would be something that would be extremely relevant to the

21  cross of Mr. Watt, what he said about his advice in that

22  affidavit, if anything, why that affidavit was created, who

23  assisted in creating that affidavit.  That's just one example

24  of where this could go and how this problem could arise.

25         But like we said in our appeal, there are facts that we

```
 1    just don't know, the extent of Mr. Sadow's advice, the extent
 2    of his involvement, how he was potentially interpreting the
 3    advice of regulatory attorneys when advising his client
 4    separately about potential criminal exposure here, and all of
 5    that is occurring before the government brought charges in this
 6    case.
 7            THE COURT:  May I ask you a question, Ms. de Boer?
 8    Just practically speaking, or maybe from a very big picture,
 9    when someone invokes advice of counsel as a defense -- and I've
10    seen it before, and I've seen it in this context -- is it the
11    government's belief that that invocation applies to all lawyers
12    that have been used by the particular defendant?  Because one
13    of the things that I understand this could be is the
14    advice-of-counsel defense is being focused on regulatory advice
15    as opposed to criminal defense advice.  And I think you're
16    pointing out that that is a distinction without a difference,
17    that all -- that counsel is somewhat intertwined and,
18    therefore, you can't carve it up that easily.
19            I guess the only reason that becomes an issue in the
20    case is, as you proffered, Mr. Watt is going to get into some
21    of the criminal defense advice given by Mr. Sadow or at least
22    elude to those conversations.
23            But you could understand my concern.  I don't know that
24    necessarily the advice of counsel, as a defense, would trigger
25    kind of almost a blanket waiver of all lawyers that were
```

1    involved.  Do you understand what I mean?  I'm trying to figure

2    out if you can parse it out.

3            I think your point is, maybe in some cases, but not

4    this one because they're too intertwined?

5            MS. DE BOER:  I think it's that, but I also think, Your

6    Honor, yes, it is -- but not a blanket waiver, right?  We're

7    not asking what did the real estate lawyer say, for example.

8            THE COURT:  Right.

9            MS. DE BOER:  But all lawyers who advised on the

10   subject matter of the anti-kickback statute, of healthcare

11   fraud, right, what claims are being submitted to Medicare, and

12   whether the lab is using a process that is likely to generate

13   false submissions to Medicare, any lawyer who advised on

14   that -- because that is waived, the subject matter of that

15   advice.

16           And I think Your Honor is correct, that that is now

17   intertwined.  It's not just silos of lawyers, one gives this

18   advice, one gives this advice.  They're meeting, they're

19   talking about the advice, and presumably both are advising

20   Mr. Patel.  We know what one says, but we don't know what the

21   advice of the other is.

22           And you could imagine a situation -- I'm not saying

23   that this is this case because we don't know all the facts.

24   But you could imagine a situation where a criminal defendant

25   goes to Lawyer 1 and says, hey, I want to do this.  Is this

1   okay?  Lawyer 1 says, no, and I'm not taking this matter.

2          Lawyer 2 says -- maybe by the time you get to Lawyer 2,

3   the defendant has evolved what he shares and what he doesn't

4   share.  And Lawyer 2 says, okay, the way you've explained it to

5   me, that sounds workable.

6          Of course, the government would be able to put in the

7   evidence of what Lawyer 1 said.  The entire purpose of

8   advice-of-counsel defense is to prove what was in the

9   defendant's mind.

10          THE COURT:  Right.

11          MS. DE BOER:  So anything else that relates to that

12   same subject matter, which could include Mr. Sadow's advice,

13   bears on what was in Mr. Patel's mind.

14          THE COURT:  And what, if anything, would the Court be

15   able to do here looking at Mr. Watt?  And again, we're

16   proffering what Mr. Watt is going to say.

17          Your understanding is Mr. Watt is going to touch on --

18   is it specifically advice that was given by Mr. Sadow, or is it

19   more that he was present during conversations?  How do you

20   foresee that playing out?

21          MS. DE BOER:  So Mr. Watt will give -- I think will

22   testify regarding earlier advice he gave, when Mr. Sadow was

23   not involved, or at least I don't know Mr. Sadow to have been

24   involved with Mr. Watt.  But then come 2019, as Mr. Watt -- and

25   one thing I think is important for the Court to know is, at

1    least what Mr. Watt has told the government, when we

2    interviewed Mr. Watt in the presence of defense counsel, he did

3    not know that the lab was using telemarketing and telemedicine,

4    and when he became aware of it, he believed that it was a

5    prospective venture and that he was evaluating the prospect of

6    using this going forward.  And over time, particularly in 2019,

7    he is learning more facts about this, at the same time that it

8    appears Mr. Sadow is learning more facts about this.

9         And the invoices -- Mr. Watt's invoices reflect a

10   number of calls and meetings involving Mr. Sadow, sometimes

11   involve -- also involving the defendant or other officers of

12   the lab, about these very issues.  So I do think it's going to

13   come up.  And what Mr. Sadow's comments or advice, and how that

14   influenced Mr. Watt's advice, is naturally going to come up.

15        And then the flip side of that is, we're entitled, once

16   this defense is asserted, to investigate it fully and to ask

17   questions about what advice from other lawyers was rendered.

18        THE COURT:  Now, is there a problem -- you've pointed

19   out -- and I know this is kind of intertwining both the motion

20   to exclude the evidence, but it really is all the same thing

21   because it goes to Mr. Sadow's involvement in the case.

22        You have pointed out in your appeal that there wasn't

23   enough, at least in the government's view, enough of a colloquy

24   into what this could mean for Mr. Patel, right, that we haven't

25   explored enough the possibility of Mr. Sadow becoming

1    essentially a key witness in the case in the middle of the

2    trial.  I mean, there is a fear that that could manifest

3    itself, right?  And you believe that -- I don't know that a

4    colloquy has been established enough that Mr. Patel understands

5    what that could mean for him, right?

6         MS. DE BOER:  Yes.  And I think the colloquy conducted

7    by Judge Reinhart was quite thorough in many regards.

8         THE COURT:  Yeah, I read it.  I thought it was very

9    thorough.

10        MS. DE BOER:  I think the one area where we had some

11   concern is, if Your Honor is inclined to allow Mr. Sadow to

12   continue to represent the defendant in this proceeding, we

13   would probably need to discuss what prophylactic measures we're

14   going to use.  And the defendant -- and those could be

15   substantial, like, for example, as Your Honor mentioned,

16   limiting Mr. Sadow's role in questioning some of the

17   potentially key witnesses in this case.  And that was not --

18   you know, what exactly -- how this is going to work

19   operationally, the defendant was not colloquied on that, and I

20   think, for purposes of the record, we ought to.

21        THE COURT:  We have to.  I mean, we have to.  That's

22   why we're gating this out today, so we don't find ourselves in

23   the middle of trial.

24        Tell me, Ms. de Boer, what do I do?  Let's walk through

25   this situation.  I mean, let's walk through Watt testifying and

1    --

2         MR. SADOW:  Your Honor, can I be heard, though, on

3    this?  Because there are just representations being made that,

4    with all due respect, are just so inaccurate.

5         THE COURT:  Well, I guess, Mr. Sadow, let me ask you

6    this:  And again, I don't know how it's going to play, right?

7    So I'm trying to get ahead of it.

8         My concern is, what do you want me to do if Mr. Watt or

9    someone else gets up there and says, well, my advice was framed

10   by what I spoke to Mr. Sadow, the criminal exposure --

11        MR. SADOW:  And I'm telling you, with all due respect,

12   that never is going to happen because it never took place.  And

13   that's why Mr. Watt could testify all day long to every

14   interaction he ever had with me, and the only thing he's going

15   to say is that I suggested something about responding to

16   subpoenas, and that's it.  That's the entire interaction that I

17   had with him until the search of LabSolutions on August

18   the 16th of 2019, and we began to prepare our motions for

19   return of seized property on the seized currency.

20        THE COURT:  And let me ask you this, Mr. Sadow:  What

21   happens -- just the big picture.  The government is

22   maintaining, when advice of counsel issued to LabSolutions

23   triggered -- let's hypothetically walk through this.

24        So it was prospective, when it came to telemarketing or

25   telemedicine, in the view of Mr. Watt.  He doesn't think

1    there's any red flags.

2            Ms. de Boer is pointing out when we should give an

3    example of Lawyer 1 and Lawyer 2.  I think it's the

4    government's belief that at some point, after the regulatory

5    lawyer gets involved, Mr. Patel goes to you.  And presumably --

6    and again, this is all hypothetical.

7            MR. SADOW:  And that's the problem.  It's just nothing

8    beyond presumably.  I never give -- I've never given advice on

9    what constitutes criminal conduct and what doesn't constitute

10   criminal conduct.  I am a criminal defense lawyer.  I don't

11   judge the conduct of my clients.  They come to me, and they ask

12   me to represent them.

13           The only reason I was involved is because there were

14   grand jury subpoenas, and there was being -- obviously,

15   production was being done, and they wanted my input -- that is,

16   Mr. Patel -- on the productions on the grand jury subpoenas.

17           THE COURT:  What about this affidavit?  Do I need to

18   worry -- there was a mention of an affidavit that was prepared.

19           MR. SADOW:  And Mr. Watt will testify that I reached

20   out, or someone else reached out -- I think it was me --

21   reached out and said, can you give us an affidavit that we can

22   use on the seizure of the currency.  And at that point in time,

23   that's the only thing that we did, and then we received an

24   affidavit.

25           I actually -- the only problem that I have is it was a

 1   draft affidavit.  I think there's a signed affidavit.  And if

 2   there's a signed affidavit, clearly, there's no question of

 3   whose it is.  But I had nothing to do with its drafting.  I had

 4   nothing to do at all with its inner workings other than sending

 5   an email saying tell us what it is, if you can say this

 6   supports this.

 7          And by that point in time, as Your Honor may

 8   understand, it's not regulatory advice anymore.  We're not

 9   talking about a search of LabSolutions, and interactions that

10   I'm now having with the prosecutor in the case, Mr. Loper,

11   about trying to get the money back, and then another AUSA from

12   Miami.  So at that point, I'm in full criminal defense --

13          THE COURT:  Mode.

14          MR. SADOW:  -- mode.

15          THE COURT:  You're not in an advice-of-counsel mode.

16          MR. SADOW:  Nothing to do with regulatory at all.  It

17   has to do with representing someone who clearly, at that point,

18   is a target --

19          THE COURT:  Target, right.

20          MR. SADOW:  No question about it.  So no advice is

21   being given at that point.

22          Again, I don't have any problems with any of this, as

23   far as I've just said, coming out.  I'll testify to it under

24   oath before Your Honor.  I'll testify if the government wants

25   to ask me the questions.

1              But this idea, presuming that I'm giving criminal

2     advice?  If you were to talk to a hundred lawyers in Atlanta

3     about what I do and what I don't do, every one of them would

4     say, he never gives advice on the conduct of his client.  No

5     one comes to me and says, hey, could I do this?  Because I

6     don't get involved in that.  My job is to represent somebody

7     that's in trouble, or potentially in trouble, not to give

8     advice.  And if you want, Mr. Watt can testify to that.

9     Mr. Peterson can testify to that.

10             So this whole idea about lawyering advice and what

11    Mr. Patel may have told me, with all due respect, he didn't

12    tell me, but I didn't ask.  That wasn't my job.  My job was to

13    look after his interests in a potential criminal case.

14             THE COURT:  So I guess, Ms. de Boer -- I mean, at this

15    point, you know, we obviously have to see how this develops,

16    but I don't know -- I mean, I would be the first to say there's

17    a need for a prophylactic measure if indeed I saw some

18    overlapping advice.  Again, it's difficult for the Court to sit

19    here and design a measure that's perhaps even unnecessary until

20    I at least maybe proffer -- maybe I could have Mr. Watt in here

21    first, just so I get ahead of it, and see what he's going to

22    testify about.  Certainly, we have no problem instructing the

23    witness, or any witness that was at this particular meeting,

24    going back to the defense's motion, that they should limit

25    their conversations in substance about what advice was given.

1    And to the extent they want to mention Mr. Sadow's presence,

2    they're free to do so, but we don't need to get into a whole

3    back-and-forth about what he may have contributed to the

4    meeting in as much as it has no bearing on advice of counsel.

5           But it sounds to me -- and I think this is what

6    happened with my magistrate.  It sounds like we're not at a

7    place where we need an additional measure.  For example, I

8    don't know that it would be appropriate to say to Mr. Sadow

9    that you can't cross-examine.  I mean, I know it's a little

10   awkward if he's asking about his own presence in the

11   examination.

12          And by the way, Mr. Sadow, I meant to ask you that.  Do

13   you guys have a strong position of whether or not you even

14   think that's necessary?

15          Let's assume your name is going to come up in

16   questioning of some of these witnesses, like McKeon or Watt, do

17   you have any concern about you doing an examination of the

18   witnesses or maybe Mr. Rafferty?  How do you foresee that --

19          MR. SADOW:  I have been prepping to do the examination

20   of every unindicted co-conspirator in this case for months.

21   The collection of documents that I have put together to go with

22   Mr. McKeon or Mr. Orr, or whoever, that's going to be my role.

23   I will not be examining Mr. Watt.  I will not be examining

24   defense witnesses.  Mine is the unindicted co-conspirators.

25          THE COURT:  So that's actually -- I mean, that's a fair

1    point.  We're not even going to have you -- to the extent

2    there's this concern about optics and fairness, we're not

3    having you asking questions to a witness about, well, I was at

4    that meeting, and I didn't say anything, did I?  I mean, we're

5    not going to get into --

6         MR. SADOW:  My ability, with all due respect, to take

7    apart Mr. McKeon, has got nothing to do with what took place

8    during that meeting.  We have emails leading up to the meeting.

9    We have Mr. Watt sending an email right after the meeting,

10   basically saying we didn't get anything accomplished, the

11   lawyers that came in, the Raskins didn't really have a hold on

12   this.  So they have the whole context of what took place.

13        So with all due respect, to suggest that at this point

14   I would even think about handing that off, on McKeon and Orr,

15   Mr. Rafferty is already giving me a look like, oh, my God I'm

16   not in a position to be able to do that.  There are probably a

17   hundred documents that I will use to cross-examine Mr. McKeon.

18   None of them's got something to do with what actually took

19   place at that meeting.  And that's the only interaction I ever

20   had with Mr. McKeon and Mr. Orr, was that day.

21        Again, if Your Honor wanted to see all those, we can

22   give them all to the government.  We made one of them an

23   exhibit.  But they've left out all of the emails from

24   Ms. Raskin to Mr. McKeon, all of Mr. McKeon's emails about why

25   he was going there, they've left all of that out.  It's coming

1    in, though.  I'm telling you, it's coming.  But I'm not going

2    to be in a position of saying, well, I was at the meeting and I

3    didn't say anything.  It doesn't make a difference that I was

4    at the meeting.

5         THE COURT:  So back to your motion, your motion -- I

6    think, from what I understand, the way your motion is framed is

7    that you want no evidence or reference to a meeting that

8    involves you.

9         MR. SADOW:  No.

10        THE COURT:  I think you're comfortable, from what I'm

11   hearing, that if there's a mention of you being present, that's

12   fine.  It's not about that we have to completely pretend you

13   weren't there.  It's just -- because there's literally nothing

14   to discuss.  But there is no problem with generally referencing

15   your presence at the meeting because there really is nothing

16   that's going to flow from that that's problematic.

17        Is that fair?

18        MR. SADOW:  I have no problem with my presence being

19   mentioned at the meeting.  When I asked the government, through

20   Your Honor, to lay out what might substantively be said, the

21   response is, there isn't anything.

22        THE COURT:  Yeah, I don't think they know.

23        I think, Ms. de Boer, going back to you on this, look,

24   I feel -- I know that some of this could change.  I mean,

25   things happen at trial.  But I feel at least a little better,

1    with some of the discussion here today, that if we're allowed

2    to mention him in passing, that he's there, but he's not really

3    getting involved in advice-of-counsel matters at a preliminary

4    -- preinvestigation, pretarget phase, that I feel that we can

5    draw a distinction between Mr. Watt and company.

6          And if they mention Mr. Sadow -- I mean, I may ask him,

7    just in an abundance of caution, so I get ahead of it, if

8    something's going to be asked before they testify, and I would

9    ask you all, remind me and prompt me so that we make sure

10   everyone in this meeting, McKeon and others, I get a little bit

11   of a sense of what we're going to talk about.  But I don't

12   think we have a major problem here.  At least as to the motion,

13   we are allowed to mention the fact that he was present at this

14   meeting.

15         But just generally, going back to your appeal, I don't

16   think there's really much more to colloquy Mr. Patel on.  I

17   mean, before I'm done today, I'll put him under oath again and

18   make sure he understands that I can't game out every scenario,

19   but right now, I don't see a reason, for example, to keep

20   Mr. Sadow out of the ability to cross-examine any of these

21   witnesses.  I think that a lot of this is -- it's really not

22   borne out, at least from the facts I'm hearing.

23         What do you think?

24         MS. DE BOER:  Let me just make one additional point,

25   Your Honor, which is:  One thing Mr. Sadow said is, I get

1    involved when my client is either in trouble or there's

2    potential exposure.  LabSolutions became aware of potential

3    exposure in February of 2019, when they received two subpoenas

4    dealing with two of the marketers that they were using.

5           And contrary to Mr. Sadow's statement, this wasn't just

6    about subpoena response.  It wasn't just about here's

7    documents, here you go.  There were conversations with the

8    prosecutors about the nature of the allegations and those

9    underlying investigations and the extent to which the

10   prosecutors may or may not have been looking into LabSolutions

11   and what the conduct was at issue.  So potential exposure is on

12   the table, in February of 2019, which is the same time when

13   Mr. Sadow resurfaces in these conversations with a compliance

14   attorney.

15          And from February, March, April, May, June, July,

16   LabSolutions continues to submit false billing to Medicare.  So

17   there must have been some conversation beyond just -- or there

18   may have been some conversation beyond just, here's a Bates

19   prefix to use.  Yes, include these five documents in the

20   production.  There must have been some conversation about

21   potential criminal exposure and how, if at all, to manage that

22   within the lab or, individually, with Mr. Patel.

23          And what we're asking the Court to do -- and I think

24   this would be a simple exercise -- is to inquire.  This could

25   be outside of our presence.  We'd have no problem with that.

1    We have a filter team attorney here in case this happened.

2    Inquire, what were the conversations and the nature of the

3    conversations between Mr. Sadow and Mr. Patel, the nature of

4    the advice being provided at that time, the advice being

5    provided to the lab at that time.  And potentially -- I mean,

6    Mr. Sadow has his invoices.  That might assist the Court in

7    making this determination.

8            MR. SADOW:  And that is just the essence of why this is

9    misdirected.  You know the last time I sent an invoice?  It was

10   in the '80s, in the 1980s.  I don't invoice.  I don't do

11   anything like that.  I set a fee, and my fee is paid, and then

12   I'm the lawyer.  I don't do any invoicing.  I don't do any

13   hourly billing.

14           And my advice?  I don't have any problems in front of

15   the government.  I didn't tell them what documents should or

16   shouldn't be turned over.  My advice was simple.  You turn the

17   documents over.  You don't give them communications beyond what

18   they've asked for.  And it was middle of May -- actually, the

19   third week in May -- when it became clear that there was a

20   problem because there was a superseding indictment out of the

21   Southern District of Florida against another individual who's

22   going to be a witness.  And in that indictment, there was a

23   paragraph, and that paragraph made reference for the first time

24   to LabSolutions being involved.

25           So the idea of subpoenas indicating that there was a

1   problem, third week in May, indeed, at that point, they have

2   all these communications.  That's what I don't understand.

3   They have Mr. Peterson's interactions with the AUSA.

4        I spoke to no one, no one from the United States during

5   this time period, and I was not advising Mr. Patel on what he

6   should or shouldn't do.  I was keeping an eye on what was going

7   on so that I would be up to date on what was being potentially

8   alleged along the way.

9        THE COURT:  Well, the important thing here is -- I

10  mean, as far as my understanding of the case law and the

11  defense, I mean, it is to be looked at, and not in a defensive

12  posture, but it's in that preemption phase, meaning, the advice

13  of counsel, to simplify it, really is was there a moment when

14  Mr. Patel came to you, Mr. Sadow, and said, if I do X, will I

15  face some criminal liability or exposure.  And what I am

16  hearing proffered by Counsel, an officer of the court, is that

17  his involvement was limited to after-the-fact activities,

18  subpoenas, and the like.

19       At that point, this conduct, according to the

20  government, it had been going on for quite some time.  He

21  already sought some input from the regulatory attorneys, like

22  Mr. Watt.  And we're not in a situation here where there's been

23  a representation that Mr. Sadow gave direct advice to his

24  client, Mr. Patel, stating that further conduct in this regard

25  will subject you to criminal liability, or, what you're doing

1    is going to run afoul of the anti-kickback statute, the type of

2    testimony or evidence that would suggest that clearly Mr. Patel

3    had the state of mind and knew that what he was doing would

4    subject him to criminal exposure.

5         What I'm hearing from his defense counsel is that his

6    involvement did not get to that level of advice and how to run

7    the business.  Once LabSolutions came under the watchful eye of

8    the government, once he became a target, at that point he is

9    playing the role of defense counsel.  But I don't have any

10   record evidence in front of me, or a suggestion, that would tip

11   the scales to find that Mr. Sadow is part of the

12   advice-of-counsel defense and that he's transformed himself

13   from lawyer to fact witness.  I just don't -- I don't have it.

14        I understand the government's concern.  I understand

15   the government wants a deeper dive.  Certainly, I think what

16   we're doing today is satisfying the Court.  I mean, he's being

17   very direct with the Court.  I have no on reason, or any other

18   evidence, or any record evidence from any other witnesses, to

19   suggest that there was a different level of advice being

20   provided or that this is misstating his involvement in the case

21   at the early stages of the purported conspiracy.

22        So, I guess, going back to it, if we look at the

23   motion, the motion -- it really is just to keep out mentions of

24   Mr. Sadow.

25        But it's a bit of moot point.  I mean, we can make it

1   very clear that the meeting that took place on that date,

2   between the Raskins and everyone else, there's no issue with

3   mentioning Mr. Sadow's presence at that meeting.

4       And when it comes to the appeal, because that's what

5   we've really kind of been focusing on now, and it was part of

6   my to-do list today, it certainly doesn't appear, at least to

7   me right now, that we have a situation where further analysis

8   is warranted beyond what the magistrate judge did.

9       I mean, I don't have a reason -- I know that the

10  government finds it hard to believe, but I'm hearing from

11  defense counsel directly that this was not his level of

12  involvement in the defense so that he would be part of the

13  advice-of-counsel phase of it.

14      So I don't know, Ms. de Boer, what else you would have

15  me do in this regard.  I certainly don't think I'm in a

16  position to do more than allow him to continue in his role.

17  And I think the only way this changes is, if when we have Watt,

18  or Raskin, or someone else here, I am told something different.

19  And at that point -- I mean, I think Mr. Sadow knows the

20  repercussions of that.  If I get in here -- and maybe there's a

21  dispute about what was said.  But until I'm confronted with

22  testimony from a witness that would actually implicate that he

23  gave advice of counsel prior to being a target, and he truly

24  was advising Mr. Patel, there's not really much more for me to

25  do other than allow this to be questioned through Watt and let

1    him do the cross-examination.  I don't know that I have more in

2    front of me.

3         I mean, what does the government think?  I just think

4    that's the record I have.

5         MS. DE BOER:  We understand, Your Honor.  And I would

6    just make two additional requests.

7         THE COURT:  Sure.

8         MS. DE BOER:  One is that this draft affidavit, any

9    drafts of this affidavit that were drafted by Mr. Watt be

10   produced to the government.  This is obviously squarely

11   relevant to his anticipated testimony in this case.

12        And at least as of this morning, in conversations with

13   Mr. Watt's attorney from Rothschild, who has been incredibly

14   cooperative in dealing with this -- I want to make that

15   clear -- they're just asserting on behalf of Mr. Patel.  And

16   that's Mr. Patel's position.  We would request the production

17   of those drafts and unredacted versions of those drafts.

18        THE COURT:  Tell me, again, so I'm very clear.  This is

19   -- in particular, so I know exactly what document you're

20   seeking.  This is the draft affidavit prepared by who?

21        MS. DE BOER:  Tobin Watt.

22        THE COURT:  And this draft affidavit prepared by

23   Mr. Watt.  And I think Mr. Watt has waived -- there's been a

24   waiver of privilege -- I don't know about everything, but for a

25   lot of documents, right?

```
 1           MS. DE BOER:  Right.

 2           THE COURT:  So has -- this is something prepared by

 3   Mr. Watt?

 4           MS. DE BOER:  That's the government's understanding,

 5   Your Honor.  But the entire document is redacted, so we don't

 6   know what the affidavit says or -- if there were drafts ever

 7   prepared by someone else, our understanding is Mr. Watt

 8   prepared -- perhaps the defense could shed a little more light

 9   on it, but we would request the production of that document.

10           And the government --

11           THE COURT:  What's your understanding that the document

12   pertains to?

13           MS. DE BOER:  My understanding is that it pertains to

14   advice Mr. Watt provided, based on an email that has been

15   produced to the government, between Mr. Sadow and Mr. Watt,

16   where Mr. Sadow requested this affidavit to be drafted.  And

17   Mr. Watt suggested that while he was not wavering on his prior

18   legal advice, he questioned the strategy of employing an

19   advice-of-counsel defense at that moment in time or saving it

20   for later.

21           THE COURT:  And Mr. Watt has stated what about this

22   affidavit in terms of privilege?  I mean, he's acknowledged it,

23   he prepared it, but he just is refusing at this point to

24   provide it as part of the waiver?

25           MS. DE BOER:  Two things, Your Honor:  One, at the time
```

1    we interviewed Mr. Watt, the defense was asserting privilege

2    more broadly about this time period, so we did not ask him

3    about this.  And our understanding was that we weren't

4    permitted to ask him about this.  We stayed within the grounds

5    of their privilege assertions at that time.

6         And then, two, as of this morning -- last night I had

7    requested the production of a specific document from Fox

8    Rothschild, and Mr. Watt's attorney from Fox Rothschild has

9    indicated that -- he's repeating the defendant's assertion of

10   privilege back to me as of this morning.

11        THE COURT:  And why -- I mean, other than you want to

12   cross-reference it -- I mean, there has been no -- as far as I

13   can tell, Mr. Watt has not provided any resistance to

14   testifying about its preparation in substance.  I mean,

15   everything but actually seeing it, he has confirmed its

16   existence, what it was, what was done with Mr. Sadow, or has

17   that not happened?

18        MS. DE BOER:  That hasn't happened simply because we

19   stayed away from this entirely when we interviewed him about a

20   month and a half ago or so.  Since then, we've simply requested

21   the production of the document.

22        THE COURT:  Does the defense have a position on this

23   particular document?  I've all but said that I'm not going to

24   go beyond my magistrate judge's colloquy.  I may just

25   double-check, before we're done, so Mr. Patel understands that

1    I can only game out so many scenarios here.  But as it stands

2    right now, I feel comfortable that Mr. Sadow is fair game in

3    terms of conducting cross-examinations, and not transforming

4    into a witness, and his mere mention of his presence at a

5    meeting will not change that analysis, and we're going to be

6    fine on that motion.  But this affidavit in particular, it

7    seems to be a sticking point for the government.

8            Any position from the defense on this?  Truthfully, it

9    sounds like it's Mr. Watt's affidavit.  I don't even know if

10   it's in the custody and control of the defense camp.

11           But where are you on it?

12           MR. SADOW:  Essentially, last time we dealt with this,

13   we had waived privilege over almost everything except those few

14   documents that the magistrate upheld as still being privileged.

15           I can tell the Court, because I'm able to pull up the

16   email, on August the 26th of 2019, which is now in the throngs

17   of trying to get the money back or being before a judge --

18   magistrate judge on the money, Mr. Watt put together an

19   affidavit in an email from Steven Peterson sent to me, with a

20   copy to Mr. Watt.  That affidavit is not signed.  I think I've

21   seen a signed copy.  But to be perfectly honest, I don't have

22   any problem with that affidavit being disclosed.  I just think

23   it should be the signed affidavit as opposed to --

24           THE COURT:  A draft.

25           MR. SADOW:  -- a draft, if there's a signed one.  I'm

1   trying to see -- that's what I told counsel for Mr. Watt, that

2   an unsigned one is problematic because I don't know if that was

3   a final or not.

4          THE COURT:  Okay.

5          MR. SADOW:  So the answer to that is, in order to make

6   this an easier process, if that's what they want from Mr. Watt,

7   we're on the record right here saying we no longer claim

8   privilege, to the extent we have one, over Mr. Watt's

9   affidavit.

10         THE COURT:  Okay.  And so, Ms. de Boer, is really the

11  only step then to get the affidavit, for me to make a ruling as

12  to Mr. Watt's counsel at Fox Rothschild, so they understand

13  that the Court is asking for its production, or what's left?

14         MS. DE BOER:  Yes, I think that's the next step, and I

15  can communicate the Court's ruling to Fox Rothschild's

16  attorney.

17         THE COURT:  And the only thing I can tell you in

18  communicating that ruling is, if there's another concern,

19  right, for it, I don't have a problem with it being sent to me

20  in camera first.  So let the lawyer know.  The record is clear.

21  My court reporter will get you a rough if you need it, if you

22  need to show it to Counsel.

23         But the reality is, the Court thinks that, at this

24  point, given Mr. Sadow's waiver of any privilege attached to

25  it, if there is a signed copy of that affidavit, then it should

1    be produced to the government.  I think that will further quell

2    any concerns about Mr. Sadow's involvement in the

3    advice-of-counsel defense.

4         And to the extent there's still a concern from Fox

5    Rothschild's counsel as to producing it, the Court is

6    comfortable with first reviewing it in camera.  And then, if I

7    am satisfied there's nothing there -- and, quite frankly, even

8    if I think there's an objection from Fox Rothschild, if I think

9    it's material to the advice-of-counsel defense, I'll simply

10   overrule and then I'll produce it.

11        So I don't think there's much else for me to do, but

12   you can communicate that to him, and we'll see what it says.

13        MS. DE BOER:  Will do, Your Honor.  Thank you.

14        THE COURT:  So one of the things I will do to kind of

15   advance the ball is, the Court -- I mean, I'll draft something

16   brief.  But I don't think -- having gone into it a little bit

17   more, regarding the advice of counsel and the potential or

18   purported conflicts of Mr. Sadow and the appeal, the Court will

19   be denying the appeal.

20        I think that I am satisfied -- and to a certain extent,

21   Ms. de Boer, I think part of your appeal really was they need

22   to make a more fulsome record, in your view, about what

23   Mr. Sadow did or did not know for advice-of-counsel purposes.

24        So, perhaps, you may even agree with me now, that we're

25   in a much better position, at least a little more comfortable

1    than we were after the magistrate judge's colloquy.  Is that

2    fair?  We got more now than we did back then.  You were worried

3    that we hadn't done enough of a questioning back then.

4         MS. DE BOER:  I think we've taken a step in that

5    direction, Your Honor.  I think this may just be a point of

6    disagreement.

7         THE COURT:  Sure, yeah.

8         MS. DE BOER:  We would suggest a further colloquy of

9    Mr. Sadow regarding his statements of his advice to the

10   defendant, not just with regards to his communications with

11   Mr. Watt, and we would continue to request that Mr. Sadow not

12   be permitted to cross-examine or examine -- or direct witnesses

13   on things that he was a percipient witness to.  We think that's

14   a recipe for disaster, and it's going to invite the very

15   problems that we've been suggesting have a potential to develop

16   here.  I understand the Court overruled the government's

17   objection to that.

18        I might suggest that the Court -- the Court has

19   indicated it will colloquy the defendant again, in light of his

20   discussion.  I would suggest that, you know, things may happen

21   at trial where the Court changes your mind --

22        THE COURT:  Of course.

23        MS. DE BOER:  -- on what needs -- what prophylactic

24   measures have to happen.  At this point, the jury is sworn.

25   We're in trial.  I think the defendant should be colloquied on

1    the fact that some other measures may have to be put in place

2    at some point, including X, Y, and Z, and, you know, is he

3    comfortable with that possibility.

4          THE COURT:  I think that's fine.  In fact, why don't

5    we -- because we're on the topic, before I move to the rest of

6    the defense's motion in limine, Gracie, can we swear in

7    Mr. Patel, please?

8          Mr. Patel, stand up for a minute, and let me swear you

9    in just to make sure we're all on the same page.

10         (Defendant, MINAL PATEL, duly sworn.)

11         THE COURT:  Thank you, Mr. Patel.  Grab a seat.  You

12   don't have to stay standing.  Just talk in the microphone for

13   me.  I know you're a bright guy, so you're following along.  I

14   don't want to belabor it.

15         The real concern I have, and the only one I want to

16   raise is, right now, I'm quite satisfied, as the magistrate

17   judge was, that we're not going to have any problem with your

18   counsel of choice.  I think -- you know, I'm very invested in

19   preserving your Sixth Amendment right and having Mr. Sadow be

20   your lead on significant portions of your trial.

21         The government is raising a situation that I am just as

22   concerned with, and I want to make sure we're all on the same

23   page.  There could be, hypothetically, the scenario where some

24   of these witnesses, such as the Raskins or Mr. Watt, were to

25   essentially inform the Court that there has been -- and I know

1    that your position and that of your counsel has been this did

2    not happen.  But to the extent a situation arises where there's

3    a difference of opinion and people begin to identify legal

4    advice presented to you by Mr. Sadow, advice of counsel becomes

5    a bigger issue again in his ability to represent you.  And

6    there could be, hypothetically, a situation where the Court is

7    compelled to remove Mr. Sadow from cross-examining or examining

8    certain witnesses simply because he is now a fact witness in

9    conversations or was present in certain meetings outside of the

10   ones that we've discussed.

11         Do you understand what my concern is?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Okay.  So what I want to make sure you're

14   comfortable with -- because I know he's your counsel of choice

15   -- is there could be a situation where I have no option but to

16   ask another one of your lawyers to take the lead on certain

17   parts of the trial if indeed Mr. Sadow is involved, or was

18   involved, in providing advice or that certain witnesses bring

19   him into the orbit of becoming a fact witness.

20         So with that possibility in mind, do you have any

21   concerns, or are you fully prepared and comfortable with

22   allowing Mr. Sadow to continue to be your lead counsel?

23         THE DEFENDANT:  Yes, I am.

24         THE COURT:  You are.  Okay.

25         So you understand there could be a situation where I

1   have to limit his involvement, but you still want to have him

2   as your point person in this trial; is that right?

3           THE DEFENDANT:  That's right.

4           THE COURT:  Okay.  Ms. de Boer, I don't know if there's

5   anything else you want me to ask him.  He understands there

6   could be a limitation on his preferred counsel of record at

7   this point.  I can't do more than that today.  I think the

8   important thing for me is to see how this line of testimony

9   plays out.

10          And Mr. Sadow, you've kind of answered the question, I

11  mean, quite directly already.  I know the government wants me

12  to inquire further, but as far as I can tell, your comments and

13  proffer to me have been very clear that at no point did you

14  provide any advice to Mr. Patel and to LabSolutions, that your

15  involvement and your legal assistance was focused on, once they

16  became a target, the subpoenas were out, and that it wasn't a

17  situation where it was, for example, advice requested of you in

18  what Mr. Patel and LabSolutions could and could not do.  Am I

19  right, that that characterizes your representation here?

20          MR. SADOW:  You are correct, Your Honor.

21          THE COURT:  All right.  So the Court is satisfied with

22  the follow-up proffer, and from the questioning that I posed to

23  Mr. Patel under oath, and Mr. Sadow, as an officer of the

24  court.  I am not concerned that the magistrate judge found that

25  we can allow him, with this waiver, to continue as counsel of

1    record.

2          Certainly, if things change, Mr. Patel has been advised

3    that the Court may have no choice but to take certain

4    prophylactic measures limiting Mr. Sadow's ability to conduct

5    examinations and to place certain rules in the trial.  But he

6    knows that.  He knows that possibility is out there.  The Court

7    doesn't see it, and I'm advised by Mr. Sadow it's not going to

8    happen.  But things change at trial, as we know.

9          The only thing I will add on this point is that when we

10   have Mr. Watt and the Raskins and folks that did interact with

11   Mr. Sadow, that I will probably just briefly colloquy them to

12   make sure that we don't have any surprises on Mr. Sadow's

13   involvement with those witnesses when it comes to giving legal

14   advice.  Once I get that out of the way, I think I'll be

15   further satisfied.

16         And certainly, with the affidavit being produced,

17   that's another level of assurance that I'm getting when it

18   comes to Mr. Watt's involvement with Mr. Sadow earlier on in

19   the case.

20         So I think with this, Ms. de Boer, I feel better that

21   we've walked through some of the permutations.  I don't know

22   that I can do much more than what I've done today until I see

23   things play out.  But certainly, if things change, then I'll

24   have to revisit some of these issues.

25         I hope that everything that has been represented today

1    is how things are scripted at trial.  If they change, certainly

2    then Mr. Patel is put on notice that despite his waiver today,

3    he's going in eyes wide open, that his preferred counsel may be

4    limited if people begin to bring him into the discussions when

5    it comes to legal advice.

6         MS. DE BOER:  I agree, Your Honor, and the government

7    appreciates you conducting the additional colloquy.

8              One other request is, if the defense has a copy of the

9    affidavit now, if they could give it to us or, at minimum, the

10   Court.  While we're here, my colleagues can be looking at it

11   just in case there's something in there that could bear on some

12   of the discussions we're having, so we don't have to rehash

13   this again, you know, while we're trying to pick a jury or

14   something like that.

15        THE COURT:  I don't know if you guys have it.  I'd

16   prefer you give it to me.  But if you have one unredacted, even

17   if it's an unsigned one, I'd like to take a look at it because

18   it would give everybody a level of comfort, if you have it.

19        MR. SAMUEL:  I have an unsigned one.

20        THE COURT:  Do you want to just email it to me,

21   Mr. Sadow?  We've done that before.  I'll just take a look at

22   it for substance.  We can deal with the signed one later.  But

23   that way, I'll feel better.  And to the extent I've done almost

24   an in-camera review first, that's better.  Let me take a look

25   at it.  It will further support my analysis of it.

1          So going back to what we were saying, the Court will

2      deny the appeal, although I think we've still advanced some of

3      the government's interests on that.  I will prepare a simple

4      order on that, take care of that pending appeal.

5          Moving forward, we are going to go ahead and really

6      grant in part and deny in part the first motion in limine from

7      the defense, in that it's almost -- I don't want to say

8      withdrawn, but there can be discussions in Mr. Sadow's presence

9      at the meeting, so it's less of an issue when it comes to this

10     first argument about the advice of counsel and disqualification

11     because of what I've heard.

12         So given that Mr. Sadow has no objection to being

13     mentioned -- his presence being mentioned, the Court will not

14     have to necessarily make a ruling on that.  I can simply say

15     that we could talk about that meeting, and to the extent

16     discussions or things shared by Mr. Sadow are raised, that the

17     Court will try to address that outside the presence of the jury

18     to ensure that we don't have any problems.  So that, I think,

19     is no longer really an issue.

20         The second motion was excluding evidence of prior drug

21     use.

22         Now, on this one, I have to say, you guys already --

23     the defense has a motion to exclude evidence of wealth or

24     spending, and the government is seeking to have a discussion

25     about wealth or spending.

1          Certainly, if the Court is willing to allow discussion

2    of spending sprees, boats, you know, planes, whatever it may

3    be, cars, I don't really understand, from a 403 perspective --

4    and certainly, you know, just from the characterizations that

5    can be taken from the jury -- why in particular drug use or

6    buying drugs with the money wouldn't really tilt the scales in

7    terms of creating something prejudicial.

8          There are a lot of ways to show that Mr. Patel was

9    spending a lot of money, and they don't have to get into the

10   fact that he may have partaken in drug use with his friends.  I

11   mean, I get why you need it, but if I'm already willing to

12   entertain extravagant spending, do I really need the extra part

13   of the drug use?

14         Government's view on this?  I don't really know why we

15   need to go this route.

16         MS. DE BOER:  I understand, Your Honor.  And you're

17   right.  The bigger point is the spending, which is going to be

18   at issue.

19         THE COURT:  Yeah.

20         MS. DE BOER:  And a bigger -- you know, the spending

21   itself on -- you're right.  Cars --

22         THE COURT:  Houses.

23         MS. DE BOER:  Right.  All that, yes.  That's going to

24   be the bigger issue, which I think, and as Your Honor is

25   suggesting, I think that is squarely relevant to the

1    allegations at issue in this case; goes to motive; goes to the

2    money laundering; the kickbacks themselves were paid with

3    Medicare proceeds.  The drug use -- let me just put a finer

4    point on it, Your Honor.

5           THE COURT:  Yeah.

6           MS. DE BOER:  This is not for the purpose of showing

7    that the defendant is a drug user.  The purpose of this

8    evidence is because the defendant was doing this with his

9    co-conspirators to keep them in the fold, to -- this is how he

10   developed trust with them.

11          His primary role at LabSolutions, this is what the

12   evidence is going to show at trial, is not running a lab, it's

13   handling the marketers.  And this is -- we're not going to put

14   in evidence of any prior trouble he may have gotten into with

15   the law with respect to drugs.  This is about him getting

16   together with his marketers, spending money on drugs together,

17   and this is how they interacted.

18          So I do think it's -- and we'll keep it very contained

19   and limited.  We're not looking to make this a feature of the

20   trial.  I just think it's a natural part of the story, and this

21   is one way in which the defendant exercised control and kept

22   his marketers in the fold.

23          THE COURT:  Okay.  That's a little different than what

24   was advanced in the motion.  I mean, the motion made it more

25   like blowing money fast, and high -- and lifestyle drug use.

1          I mean, look, I don't know that -- and Mr. Rafferty,

2     I'm sure you'll point this out.  I don't know that we

3     necessarily have an narrative here of, you know, keeping your

4     marketers and partners hooked in the enterprise by taking you

5     out to parties and using drugs together.

6          Again, I just think that the temptation of a jury to

7     mischaracterize Mr. Patel and lose site of the case and start

8     focusing on his personal habits is not going to advance any

9     theory of the case from the government.  And if anything, from

10     a 403 perspective -- really, a 401, even, I don't know how

11     relevant it is.

12          What's the defense's points of view?  Because I'm not

13     inclined to let in any of the discussion of drug use in.  If

14     they want to talk about him going to bars, going to parties,

15     going to clubs with his friends and kind of being the lynchpin

16     of the group, you could do that.  You could talk about the

17     spending, but I don't know why we're going to be talking about

18     buying drugs with his friends.  I don't see a reason for that.

19          MR. RAFFERTY:  Your Honor, we agree completely with the

20     Court.  There's really no relevance whatsoever to the fact that

21     Mr. Patel, with some of the individuals in this case, where

22     co-conspirators might have socialized, might have used drugs.

23     We see the only purpose of bringing out the fact that he was

24     using drugs, or that some of these other folks were using

25     drugs, is to prejudice Mr. Patel.

1          There's a whole lot of other evidence that the

2     government can present in this case if they think they can

3     prove the case against Mr. Patel.  I don't think they need to

4     introduce evidence of his use of drugs to further their

5     efforts.

6          On the spending piece, Your Honor, I would just say

7     this:  The government has produced summary charts that show,

8     according to the government, $463 million was billed and

9     $187 million was paid to LabSolutions, of which $22 million was

10    apparently paid to Mr. Patel.  I think those figures themselves

11    are eye-popping enough to establish what the government says

12    they need to prove here, which is -- the motive is to show that

13    Mr. Patel purportedly engaged in this to make money.  I think

14    the inquiry ends there.

15         But what the government has done on their exhibit

16    list -- and some of the summary charge goes beyond that.  You

17    know, some of the exhibits that I've seen include a stock

18    photograph of a Ferrari Spider.  There are 32 photographs of

19    Gucci shirts that were apparently texted to Mr. Patel by a

20    Gucci salesperson.  I think those types of things go beyond and

21    are clearly designed to appeal to class.

22         And the last thing I'll say is, one of the cases that's

23    cited by both sides in the briefing on this is the *Hope* case.

24    And I can speak to that factually because I tried that case for

25    the government.

1          With respect to the spending and wealth evidence that

2    was introduced in that case, Your Honor, we introduced that

3    evidence because it specifically proved some of the fraud in

4    the case, specifically, some of the wealth that was introduced

5    related to wealth spending by the defendant in that trial when

6    at the same time she was submitting claims to Medicaid.  So it

7    not only was shown to show that motive was to make money, but

8    it also proved, by virtue of the fact that she was at a hotel,

9    eating shrimp cocktail at some pool down in Key Biscayne, at

10   the same time that claims were being submitted to Medicaid to

11   bill for underprivileged kids for nutritional services.  That's

12   what the evidence was introduced to in the *Hope* case.

13          Here, Mr. Patel's purchase of a Ferrari, somebody

14   sending him photographs of Gucci shirts.  There's additional

15   evidence related to a Jaguar or a Range Rover.  There's really

16   no purpose beyond showing motive of -- this was all about

17   getting money, which they've already established through some

18   of the charts showing $463 million billed, $178 million paid,

19   $22 million of which went to Mr. Patel.  I think the Court can

20   see the distinction there.

21          And we would object to the evidence related to the

22   Ferrari, the stock photographs, the photographs of the Gucci

23   shirts, and that sort of evidence.

24          THE COURT:  Okay.  I'll tell you what I think we need

25   to do here.  I'm not going to permit discussions of prior drug

1    use.  I don't think that that's necessary, truthfully, for what

2    the government is advancing in terms of wealth evidence.  I

3    don't believe that it does anything other than inflame the

4    passions of the jury.  Truthfully, it's just not a key part of

5    the government's presentation.  It's an ancillary matter and

6    has very little of any probative value, and is far outweighed

7    by the prejudice under 403 simply to make it look like he's

8    living fast and mischaracterizing or at least casting

9    aspersions on his lifestyle choices.  I don't think that's

10   necessary.

11          But I do disagree to a certain extent with the

12   defense's request that the Court exclude any evidence of wealth

13   or spending.  I understand the *Hope* case does have some

14   distinguishing characteristics.  But we do know that when the

15   wealth is directly connected to the offense for which a

16   defendant is standing trial, wealth evidence is permitted.

17   There's a lot of discretion to the Trial Court in that regard.

18   And it can aid in proving a fact at issue.

19          Certainly, I think the numbers are eye-popping.  More

20   than 14 million in bribes or kickbacks; Medicare claims

21   totaling 416 million; reimbursements of more than 187 million.

22   But I think when we talk about the money laundering charge and

23   some of the other accounts here, it's clear that the money and

24   the movement of money paid to Medicare that was purportedly

25   used to enrich -- paid by Medicare, excuse me, to purportedly

1    enrich a defendant and then further it by paying patient

2    recruiters, brings that money into the ambit of admissible

3    evidence.  Certainly, it was funding his lifestyle.  It's got a

4    lot of luxury purchases.

5         Now, the defense has pointed out, and I think rightly

6    so, that there could be an argument that some of this money was

7    actually made separate and apart from what happened in this

8    case.  Let the jury hear that and decide it.  I mean, at the

9    end of the day, the government's going to talk about concealing

10   of proceeds, and, to me, expenditures such as, you know, over

11   $10,000, to me seems pretty clear that they should have the

12   opportunity to present some of the luxury purchases because

13   they further intent and motive and they do clarify some of the

14   fraud.

15        So I understand *Hope* may be a little bit exaggerated in

16   its support for the government's request, but funding the

17   lifestyle and paying for luxury expenses is fair game.

18        So the Court is going to deny that request by the

19   defense, but I am going to grant the defense's request that we

20   don't make any mention of using that money to go buy drugs as

21   part of a way to keep the company together or bond with fellow

22   folks at the company.  So I think we can do it that way.  All

23   right?

24        So moving on, we have one last point on the motion from

25   the defense.  This really is dealing with Sporn and McKeon.  I

1    mean, I don't want to belabor this too much.  We've talked

2    about this quite a bit in the lead-up to trial, and the Court

3    is very much aware of the rolling production and how voluminous

4    it's been.

5         I will note -- and it's not to make light of how tough

6    it was to consume these materials, but my understanding is that

7    the majority was made available at least two months before the

8    scheduled trial date.  We had had -- pursuant to our last

9    status conference, we've put together draft witness lists,

10   lists of unindicted co-conspirators, which assists or has

11   assisted the defense in crafting searches.

12        And when you look at the timeline and how things have

13   been produced and the method in which it has been produced by

14   the government, I don't believe that it would be appropriate

15   for the Court to find any sort of discovery violation here.

16   Certainly, I don't think it rises anywhere near that level.

17        The filter team, I think, has done what it could.  And

18   in fact, in some cases, as the government has noted, the

19   government got the material at the same time the defense did,

20   after the filter team got through it all.

21        So to me, I don't believe that we have a fact pattern

22   here that would rise to the level of finding a discovery

23   violation.  Certainly, no one's disputing that it's voluminous.

24   But when I know there's, for example, portable cases for the

25   defense to get the data, and searches and tag documents, and

1    efforts have been taken to try to focus on what's really

2    needed, I -- don't rise to the level of a drastic remedy like

3    excluding anything regarding Sporn and McKeon.

4           So I don't necessarily have to get into the alternative

5    argument about how to find a better remedy, but the Court is

6    going to disagree, just so we can advance the ball here and

7    finish up the motion, with the defendant's characterization of

8    the production inasmuch as it justifies, under 16(a)(1)(E),

9    that somehow we eliminate all of this testimony.

10          So I don't want to belabor it.  You guys have made your

11   record on that.  And that will be denied.

12          So to summarize the defense's motion in limine, it's

13   going to be granted in part, denied in part.  I'll put it in a

14   paperless order.

15          No discovery violation on productions, so Sporn and

16   McKeon are fair game.

17          Wealth evidence is fair game, understanding, of course,

18   let's not belabor it too much.

19          Drug use is not going to come in.

20          And we don't really have a concern anymore with that

21   meeting that Mr. Sadow has conceded he was present at.  We can

22   talk about that and mention he was present.

23          So with that being done, with the fact that I ruled on

24   the appeal, with the fact I ruled on the 404, I believe the

25   last thing I need to rule on right now is the government's

1    motion in limine.  There, we have a number of subparts.

2         The good news is, I think the defense, with certain

3    exceptions, was kind enough to go through and let me know where

4    they really take issue and where they can live with it,

5    provided the Court gives them some leeway, so I don't think

6    it's going to take me too long to get through it.

7         Does anyone -- I know that I'm going for a while.

8    Ilona, before I do the government's, do want to take a brief

9    five-minute break?

10        THE COURT REPORTER:  Sure.

11        THE COURT:  Let's do that.  So we'll take a five-minute

12   break, and we'll come back and do the government's motion.  And

13   then -- I think the only thing we have to talk about after that

14   is the 806.  That might be the last thing.  I'm sure I'm going

15   to get an update on that.  I don't know if the government --

16   maybe I'll turn to my defense team.

17        Are we aware of any updates in terms of what's been

18   explained?

19        MR. RAFFERTY:  Your Honor, my understanding is that

20   Mr. White's counsel has spoken with the government.

21        THE COURT:  So you guys know what's coming?  All right.

22        So we'll talk about that when we get back too, all

23   right, make sure we're all on the same page.

24        Let's go ahead and take a five-minute break, and we'll

25   be right back.  Thank you, guys.

 1          MS. DE BOER:  Thank you, Your Honor.

 2          THE COURT:  You got it.

 3          THE COURT SECURITY OFFICER:  All rise.

 4      (Court recessed at 12:32 p.m.)

 5      (Back on the record at 12:45 p.m.)

 6          THE COURT:  Okay.  Let's pick up where we left off.

 7  We're now on the government's omnibus motion in limine.

 8          As we stated before we took our break, I think there is

 9  some agreement on a couple of these points, but we'll go

10  through them together.  I think it's just a matter of the Court

11  putting a finer point on some of them.

12          So the first one the government has raised is blaming

13  the victims.  Look, this is a very common request.  I think

14  what -- to give a finer point on it, because I looked at the

15  defense's response -- and I want everyone to understand that

16  what we don't want to have is testimony that essentially

17  characterizes the Medicare system as feckless, or negligent, or

18  essentially incapable of looking at some of these expenditures

19  and doing a thorough investigation.  There's a number of cases

20  that stand for this proposition.

21          Now, to the defense's point, I think we're passing each

22  other here and speaking past each other.  The defense, I think,

23  can raise the idea that they should be allowed because it would

24  go towards knowledge or intent, that Mr. Patel would believe

25  that if Medicare was continuously paying these claims, that he

1    wasn't doing anything wrong.  I'm not disagreeing with that.  I

2    agree.  I mean, that goes to state of mind.

3         What I think we don't want to have is, for example, as

4    the government stated, arguments that, you know, the insurance

5    companies weren't catching it, you know, they're a mess, it's

6    their obligation to make sure these -- certain types of claims

7    are not paid.  And that's really what I think the government is

8    worried about.  Am I right on that, on the government's end,

9    that that's really what you want to get out?

10         MS. DE BOER:  That's correct, Your Honor.

11         THE COURT:  So that's going to be granted.  We don't

12   need to have a situation here where that kind of testimony is

13   elicited from witnesses.  It just has no bearing.  The fact

14   that Medicare is unable -- as we know, it's a trust-based

15   system, and these things happen, is really of no moment when it

16   comes to a defense.  So I think that's fine.

17         But again, the reasonableness or the belief --

18   Mr. Patel's belief that there was -- that this was a reasonable

19   request from Medicare and that it was not prohibited, that's

20   not being captured by the Court's ruling in this regard.  So

21   it's fine on the defense side.  You still have that

22   availability, so don't worry about that.

23         MR. SAMUEL:  Your Honor, I just want to point out that

24   -- I mean, that is what we argued and I appreciate that.  And

25   I'd feel much more comfortable, except the government denounced

1    everything we said in our response, so we were wrong about

2    everything.  And if we're wrong about everything, it sounds

3    like they don't agree that --

4         THE COURT:  It's a good point.  I mean, I don't think

5    -- do you guys take issue --

6         MR. SAMUEL:  Why didn't they -- I'm sorry.

7         THE COURT:  No, no, it's a good thing.

8         MR. SAMUEL:  Why don't they just say Mr. Samuel's

9    right?  That can argue that it goes to his state of mind, but

10   they can't argue that, you know, the government has stopped

11   claiming that the payments were correct.

12        THE COURT:  Well, I think it's a fair point.  I mean, I

13   don't think -- just so I can put a clean pin on it, the

14   government is with me, though, that to the extent that it could

15   be state of mind, there's not an objection or motion in limine

16   to prevent that line of questioning.  It's more about the fact

17   that insurers pay fraudulent claims, that that somehow

18   automatically means that they were legitimate or that the

19   insurance purported negligence should be factored into the

20   analysis, right?

21        MS. DE BOER:  Exactly.  I think Your Honor summarized

22   it well, that the fact that they were paid does not

23   automatically mean that they were legitimate.

24        And of course, if the defense has evidence that

25   Mr. Patel believes specific claims or all claims were

1  legitimate, we're not seeking to exclude that evidence through

2  this motion.

3          THE COURT:  Okay.  I think -- I am going to let you

4  guys get into state of mind, so I'm not worried about that.

5  It's more that, quote, unquote, "blame the victim" motion that

6  I'm comfortable with, and so I'll grant that one.

7          The next one is the good conduct.

8          So as far as I understand this concern, you know, there

9  are a number of marketing entities that Mr. Patel, when he

10  became aware of their practices, he essentially terminated

11  them.  They weren't playing ball the right way.  He was

12  worried.  He terminated them.

13          My understanding is the government has no issue, to the

14  extent that they start getting into some of these entities, for

15  Mr. Patel to mention, through his testimony or someone else's

16  testimony, that ultimately he terminated relationships with

17  some of these entities because they were not playing by the

18  rules.

19          What the government is really seeking here is, separate

20  and apart from the marketers that he terminated, or the ones

21  that are at issue -- so, for example, if the government raises

22  some issue with marketing firm X, he's able to get into the

23  fact that he didn't like what he saw; he terminated marketing

24  firm X.  You're worried that there's other things he may have

25  done, maybe a different marketing firm or some other compliance

1    moves that he made that, would be improperly advanced as

2    essentially good conduct evidence.

3           Is that the government's concern?

4           MS. DE BOER:  That's correct.  And I can put an even

5    finer point on it.

6           THE COURT:  Sure.

7           MS. DE BOER:  Because there were some compliance

8    efforts that applied across the board, that would have applied

9    to marketers that we are putting at issue.  We're not objecting

10   to that type of evidence.  That's not what this motion is

11   about.  What this motion is about is exactly what Your Honor

12   stated, which is, if there are specific actions taken with

13   respect to marketers that are not put at issue, that those

14   specific acts of good conduct should not come into evidence.

15          And I will say, there is at least one marketer that we

16   will put at issue, or that we expect to put at issue, where

17   there were specific compliance steps taken, and we're not

18   seeking to exclude that in this motion.

19          THE COURT:  I think -- guys, to me, I think we're going

20   to be fine on this.  Because the way I see it is, I'm not

21   preventing you guys from anything that is brought in or

22   questioned, compliance, marketing, that is at issue.  Any steps

23   as part of what was done to bring them in line or terminate

24   them are fair game.  I think if you guys decided to go out and

25   pluck some sort of regulatory compliance act done by Mr. Patel

1    that has no bearing to what's in trial, right, just -- I mean,

2    I'm being a bit facetious, but it's like Mr. Patel walks old

3    ladies across the street when they need guidance, and we want

4    to bring in all of those.  Right?  It's something, like, so far

5    afield to show good conduct, that it has no bearing on the

6    issues in the case.

7              But I don't think you guys need it because there's more

8    than sufficient evidence about steps taken for compliance

9    within what the government's going to raise, and they're not

10   seeking to prevent you from doing that.

11             So I think it's much ado about nothing.  I just want to

12   make sure we don't get away from relevancy and talk about steps

13   taken by Mr. Patel in his business that have nothing to do with

14   the issues in the case.  That's all I'm talking about.

15             MR. SAMUEL:  I'm okay with that.

16             But again, the government's motion and my response, and

17   their reply, doesn't match up in my mind with they're in

18   agreement with you.

19             THE COURT:  That's why I'm here.  That's what I'm here

20   for.

21             MR. SAMUEL:  But that's okay.  I mean, I'm afraid

22   you'll say, well, I'm going to grant the motion --

23             THE COURT:  It's for the reasons stated on the record.

24   We can go back and pull it.  I'll remember what I'm granting,

25   trust me.  I'm not going to let them backdoor in and stop all

 1    the things Mr. Patel may have done with marketers that were

 2    misbehaving, that were raised by the government, you know, when

 3    they talk about these relationships.  If he took steps to fix

 4    these things, he's allowed to talk about it.  I mean, that's

 5    fair game, absolutely.

 6         What I'm hearing from the government is they agree with

 7    me.  It's just something that's completely outside of the scope

 8    of the narrative of the case.  So obviously let's just make

 9    sure that we all understand that ruling going forward, and

10    we'll stay within those lines.

11         Now, the next few -- I don't think there's a lot of

12    disagreement.  You know, self-serving hearsay, the defense has

13    acknowledged that they're not aware of any that's going to be

14    introduced, and they know it's not admissible, so I don't think

15    I need to belabor that.

16         MR. SADOW:  If --

17         THE COURT:  Yeah.

18         MR. SADOW:  I want to make sure we're clear here.

19    Because the government, in its 8,000 exhibits, appears to be

20    introducing one after the other after the other, of emails or

21    text messages or documents from LabSolutions, which it can do.

22    We're going to introduce the same kind of material.  And if the

23    government's version or belief that that's somehow

24    self-serving, or is not admissible under the same bases that

25    they are seeking to introduce it, then we may have some

1    difficulty.

2         So I want to make sure, you know, if we have emails

3    that are favorable or positive, that were kept in the normal

4    course of business, which I'm assuming is the way they're going

5    to introduce them as well, that those come into evidence.

6         What I understand is a self-serving statement would be

7    if Minal Patel, in communications with someone, for example, in

8    June of 2019, said, you know, I've done everything I can

9    possibly do to be compliant, and I don't understand why the

10   government is going against me, they're all wrong, that's a

11   self-serving statement.

12        THE COURT:  Right.

13        MR. SADOW:  But not documents or records or material

14   that comes from the seizure that took place at LabSolutions or

15   all the other information in the 25-plus million documents that

16   the government's turned over to us.  So as long as we're

17   understood there, then we don't have a problem.

18        THE COURT:  Look, I think it's a fair point.  I don't

19   think the government, at least the way I read the motion, is

20   concerned about that back-and-forth in the emails as much as

21   what you just characterized, in your view, as self-serving, a

22   statement from Mr. Patel that essentially is one that solely is

23   supportive of his defense, and that is trying to extricate

24   himself from what happened, that it's purely a self-serving

25   statement.

1           Now, certainly I know that the government was concerned

2     about self-serving statements in the form of testimony, emails,

3     or text messages, and they cited the *Willis* case, but I read --

4     there's definitely a line to be drawn there.  There's going to

5     be some back-and-forth evidence in communications with

6     LabSolutions that to me isn't squarely the type of self-serving

7     statements that the government seeks to exclude, right?

8           So I think as far -- again, it's hard without seeing

9     it, but I tend to agree that if it's something about Mr. Patel

10    truly attempting to distance himself from the conduct in a

11    completely, you know, self-serving way, then that's not going

12    to play.  But certainly, there's going to be other messages and

13    statements that I think would complete the narrative.  And some

14    of them will include, I'm sure, out-of-court statements by the

15    defendant, oral statements, statements and emails, statements

16    and text messages.  There's some back-and-forth, I'm certain

17    there, that wouldn't run afoul of the self-serving statement

18    bar, right?

19          What's the government think about that?

20          MS. DE BOER:  I think it is a bit -- we're talking in a

21    vacuum here --

22          THE COURT:  Yeah, it's hard without seeing it.

23          MS. DE BOER:  -- without seeing the specific documents.

24          So, I guess, let me put a little more -- and I know our

25    motion on this was short, although we did file the motion to

1    compel on 806 issues that gets into this a little bit more.

2         But I think one thing Mr. Sadow said that I do think

3    needs to be aired with the Court, is he asserted that the

4    government is seeking to admit business records -- emails as

5    business records and text messages as business records.

6    Generally, emails and text messages are not business records

7    and are not exempt from the hearsay rules as business records.

8         So, sure, an invoice, you know, or compliance manual,

9    that kind of thing could be a business record.  And I suppose

10   if it's just a transmission of an invoice from A to B, that

11   might be a business record.  But a statement in an email --

12   that email might be authentic, right?  It might be an actual

13   LabSolutions email.  For that, you know, I agree, we're not

14   going to have disputes about authenticity in that regard.  But

15   we will have disputes about hearsay, and we're going to be

16   relying on exceptions that are available to the government,

17   like 801(d)(2)(E), and the defendant's own statements, that are

18   not available to the defense.

19        So I think that's where the issue is going to arise.  I

20   agree, there could be some that we all agree fall on one side

21   of the line or the other, but I'm trying to draw that line in a

22   bit of a hypothetical way for the Court.

23        THE COURT:  Yeah.  I don't know -- look, Mr. Sadow, I

24   want to hear your point on this.  I think we need to just be

25   aware.  Certainly there are going to be gateway issues under

1    801, and a party opponent, the government, can utilize that

2    aren't necessarily available.  We've talked a little bit about

3    806's ability for impeachment, and that still is somewhat of a

4    fair game.

5         But I do want to make sure that we don't believe --

6    unless, of course, we can lay a predicate, right?  I could

7    imagine a situation, not knowing what all these emails say,

8    where a business record predicate could be laid in a way in

9    which certain invoices are processed, I think.  I'm just trying

10   to think of how that would play.  I can see that in some

11   instances.  You know to lay a predicate for it.  I mean, that's

12   all I can say.  I mean, there's not much else to do on that

13   front.

14        MR. SADOW:  My thought is this.  For example, there are

15   a number of emails that do not include Mr. Patel --

16        THE COURT:  Right.

17        MR. SADOW:  -- and do not include the government's

18   claim to be unindicted co-conspirators, okay?  They're

19   involving LabSolutions employees.

20        THE COURT:  In the regular course, right?  Just regular

21   course communications regarding the process or tests.

22        MR. SADOW:  And they're intending to introduce those.

23   And if my position is, if those are coming in, then ours would

24   come in under the similar theory.  They're not coming in as

25   admissions.

1          THE COURT:  Right.

2          MR. SADOW:  They're not coming in as unindicted

3   co-conspirator 801(d)(2)(E)s.  They're coming in as business

4   activity.  Some of have them have to do with testifying

5   unindicted co-conspirators, but some do not.

6          THE COURT:  Right.

7          MR. SADOW:  I'm just saying that when you have -- if

8   you have two-thirds of an email that the government wants to

9   use, and then there's an email before and an email afterwards

10  that puts it in context, I don't deem those to be self-serving

11  emails.

12         THE COURT:  I think that's a good point.  I mean, I

13  think, Ms. de Boer, the point is that is an exception that may

14  be readily available to both sides on a business record.  It

15  may not fall under 801.

16         Now, there's a completeness problem, too, that

17  Mr. Sadow is raising.  And I can deal with that too, right?

18  I'm not going to allow evidence to be cherry-picked.  Even if

19  you get it in, I need to make sure we get the full picture.  So

20  I have to make rulings on that too.

21         But I don't think there's any disagreement that to the

22  extent business records are introduced, that rule applies

23  equally to both sides.  That's something that we just have to

24  lay a predicate on, right, Ms. de Boer?  I mean, I don't think

25  there's a problem with that.

1          MS. DE BOER:  I agree that that's available to both

2    sides.  I think, you know, the emails and text messages often

3    are not business records.  There could be situations in which

4    they are.  We'll just have to see what the document is.

5          THE COURT:  We just have to wait and see.

6          MS. DE BOER:  And I would add that the majority of the

7    communications on our exhibit list actually do involve either

8    the defendant or a co-conspirator.  There may be other people

9    involved as well.

10          And I take Mr. Sadow's point that, well, maybe a

11    non-co-conspirator responds, and we ought to be able to put

12    that in.  That's fine.  But in terms of drumming up additional

13    evidence under the theory that it's all a business record, we

14    dispute that.

15          THE COURT:  Well, I think the important thing is -- I

16    don't disagree.  The defense knows that if indeed they want to

17    characterize, for admissibility purposes, certain emails as

18    business records, they'll have to lay the predicate on that.

19          And the first part of your point, that in the situation

20    where we do have an 801 co-conspirator email or text message,

21    to the extent that they're in isolation, then the government

22    just has to be prepared that the Court will require, under an

23    analysis of completeness, to give us some more context.  I can

24    allow that.  And that may be something that cures some of these

25    concerns.

1          MR. SADOW:  Right.  And obviously, that's a 106

2     analysis, so the Court understands.

3          THE COURT:  Right.

4          MR. SADOW:  The other part of this that is not being

5     touched on, which needs to be, the government is going to be

6     introducing recordings, audio recordings and transcripts, that

7     were done by at least one particular government witness during

8     the time period of, let's say, July -- maybe late June, into

9     August of 2019.

10          To the extent that portions of those contain

11     self-serving statements of the defendant, if the government is

12     trying to put in some portions, we're going to seek to put in

13     all of them.  Because it's only self-serving in the sense of

14     the government's recording it, attempting to elicit

15     incriminating information, but isn't getting it.  And that

16     holds true with a witness whose initials are B.H., who will

17     testify, and a witness by the name of C.M., who I understand is

18     not testifying.

19          MR. RAFFERTY:  C.W.

20          MR. SADOW:  No, C.M.  Last name is M-I --

21          MR. RAFFERTY:  Okay.

22          MR. SADOW:  Okay.  But what I'm saying is, if the

23     government goes down that path, that they want to introduce

24     communications during that time period, we certainly are going

25     to seek to introduce all of the communications that take place

1    not only of Mr. Patel, but as to other individuals -- now we're

2    back into 806 -- that were employees of LabSolutions that were

3    communicating with these same people during that time period.

4    Because if not, you're only going to get half a story.  So I

5    want the Court to know that that's coming.

6         Because the government tried to -- so you understand,

7    they tried to set up Mr. Patel to do something illegal in these

8    communications.  It didn't work.  It didn't fly.  And as a

9    result of that, there are things in there that are positive for

10   us, and we do intend to seek their introduction if the

11   government intends to try to introduce its portion of them.

12        THE COURT:  And that would be more for completeness, I

13   would imagine, right?

14        MR. SADOW:  Completeness and in context.

15        THE COURT:  Or 806.

16        MR. SADOW:  Clearly context.

17        To give you an example, they had C.M. --

18        THE COURT:  Right.

19        MR. SADOW:  I don't know why I'm just not giving his

20   name.  But they had C.M. speak to at least two representatives

21   of LabSolutions in which C.M. was trying to put forth a

22   position that would be illegal.  Both of those representatives

23   said, no, we don't do it that way.

24        So if they're going to introduce something about C.M.

25   and his communications, we're going to be seeking those under

1    either the admissibility of -- probably 806, but -- because of

2    their attacks on those individuals.  It's very difficult to

3    understand in a vacuum.

4         THE COURT:  In a vacuum, right.

5         MR. SADOW:  Let's just say we know the transcripts, we

6    know the tape recordings.  So I don't want there to be any

7    misunderstanding.  We don't consider those to be self-serving.

8    Those weren't done other than at the behest of government

9    witnesses attempting to implicate someone.

10        THE COURT:  All right.  And I think -- again, it's a

11   little bit in a vacuum, but I think we can let those play out

12   and see how much the government intends on using them.  And

13   then at that point, if it's an issue of 806 completeness, I'll

14   address it.

15        MS. DE BOER:  Understood, Your Honor.

16        And just to address one thing that Mr. Sadow brought up

17   very briefly, I'm not sure the rule of completeness would

18   sanction the introduction of two dozen recordings if the

19   government plays a portion of one.  So I'm just putting out

20   there that there are limits to the rule of completeness.  But

21   certainly, there could be additional information that is

22   admissible under the rule of completeness depending what we

23   present to the jury.  So I'm not disputing that.  I'm just

24   saying, of course, in a vacuum, it's difficult to decide.  But

25   I'm just putting it out there that we wouldn't necessarily

1    agree that everything then comes in.

2         THE COURT:  Sure.  And again, I think we have to look

3    at it situationally.  The Court's ready for that.

4         But I think the important thing is that we understand

5    at least today -- our notion of self-serving, I think we're all

6    in agreement of what that looks like.  And to the extent

7    there's -- so that's going to be granted, but with the caveat.

8    And that's why, you know, any orders that I enter today are all

9    for -- all of the qualifications stated on the record are

10   recorded.  It does not prohibit the defense from addressing the

11   rule of completeness arguments or the potential for 806.  We're

12   thinking really more about kind of the textbook self-serving

13   characterization, which the defense also agrees with, and

14   that's what you're looking to keep out.

15        So with that being said, that'll be granted, with that

16   caveat, and that's point three of docket entry -- excuse me --

17   the government's motion in limine.

18        So now I'm on number four.  Defendants should be

19   precluded from improperly impeaching government witnesses with

20   agents' interview reports.  The defense has agreed to that.

21        Again, that's not the verbatim language, right?  I

22   mean, we talked about this.  I think we maybe even discussed

23   this a little bit at our last hearing, under *Jencks*.

24        But we know that it doesn't prevent, just so the

25   defense understands, doesn't prevent asking a witness whether

1    he or she made a statement reflected in an agent interview

2    report, which I oftentimes have no issue with.  It's more about

3    whether or not -- and by the way, let me take a moment and step

4    back.  It doesn't mean if the defense isn't satisfied with that

5    answer, we publish a reading.

6         But what I want everyone to understand is, these

7    reports are written after the fact.  They have thought

8    processes of the agents.  They're not a verbatim recital of

9    witness testimony, and, as such, they're not going to be coming

10   in.

11        So I think that is recognized by the defense, with that

12   one exception that I just mentioned on asking a question for

13   purposes of cross-examination, but we're not going to

14   improperly impeach with those.

15        Am I clear?  I think the defense is with me on that,

16   right?

17        MR. SADOW:  I can pretty well assure you that we do

18   know how to use the material in the appropriate fashion.

19        THE COURT:  Okay.  I appreciate that.

20        MR. SADOW:  We can do it under 613, by asking the

21   witness, and we can do it under 612 for refreshing recollection

22   without making it his statement.

23        THE COURT:  There you go.  And that's -- we just need

24   to make sure we go into it understanding our limitations on the

25   interview reports.  So that will be granted, again, with that

1    exception and understanding.

2         Now, evidence or argument regarding the decision not to

3    call a witness.  This is pretty standard.  Witnesses available

4    to both sides, we're not going to make a comment as to why that

5    witness was or was not called.

6         MR. SADOW:  Well --

7         THE COURT:  I mean, tell me on the defense side.  You

8    guys have made it clear, you don't plan on doing any improper

9    arguments on that front.  But what did you want to add on that?

10        MR. SADOW:  It depends on whether a certain witness

11   chooses to take the Fifth Amendment, and we can't call that

12   witness, but the government can call him, and, therefore, he is

13   uniquely within the bounds of the government having the

14   authority or power to call this witness.

15        And there are several of those.  In fact, many of the

16   unindicted co-conspirators, who will not testify, will take the

17   Fifth Amendment if called as a witness by the defense, and if

18   called by the government, they would have to testify.  So they

19   are only available to the government and not to us.  But I

20   speak in terms of one in particular, with the initials of C.W.

21        THE COURT:  Right, right.  I guess my question to you

22   on this point -- again, it's very situational.  But for

23   purposes of arguments being made, I mean, I think the

24   government is just more concerned about a closing argument that

25   talks about why didn't the government bring in Johnny and

1    Robert, and, you know, that kind of line of -- we can get a

2    finer point on this if we find ourselves in a Fifth Amendment

3    situation.  I would ask, if we go that route, just let me know,

4    when we're getting to the end of trial, if you want that

5    leeway, we can talk about it.

6          But for purposes of today, I think the only thing that

7    they're really worried about is equally available witnesses and

8    the fact that no inferences can be drawn against the government

9    for failure to call one.  That's all we're dealing with.

10         So you guys understand where I'm going with that?

11              MR. SADOW:  Absolutely.

12              THE COURT:  All right.  So we can grant that one,

13   again, with that understanding.

14         Then we have collateral consequences argument.  Again,

15   this is specifically evidence alluding to collateral

16   consequences of a conviction, uncharged co-conspirators,

17   government charging decisions, or overreach.

18         I mean, look, I think obviously the collateral

19   consequences of a conviction are certainly irrelevant.  Getting

20   into some argument that this is, you know, overcharging or

21   characterizing, that it's been -- that the government is

22   certainly targeting some and not others, or -- you know, I'm

23   very sensitive to that kind of argument, so I believe that

24   really that is the thrust of the government's concern because

25   it's more along the lines of asking for jury nullification.

1          In the past, the way I've precluded it is any argument

2     that raises, for example, the possibility of a civil resolution

3     or suggesting that these things are often resolved civilly, and

4     that this is overcharged, you know -- again, the defense has

5     indicated they're not going to be making that improper

6     argument.  And they're going to argue that there is biases and

7     motivations to fabricate.  Certainly, I don't think we're

8     talking about the same thing.  I'm not preventing that.

9     Certainly, pointing out that witnesses here are cooperating

10    with the government, and their testimony should be looked at

11    sceptically by the jury, all of that is fair game.  I think

12    it's just more a big picture, overcharging, and sweeping types

13    of arguments.

14          Does that make sense for the defense?

15          MR. SADOW:  Yes, it does.

16          THE COURT:  So I think we can understand what we're

17    talking about there, and we're not going to get into that.

18          The volume -- the next one, number seven:  The volume,

19    nature, and timing of discovery and federal resources.  I think

20    the defense understands the point here too.  They indicated

21    they're not going to go that route.  The argument here really

22    is just the allocation of federal resources, you know, the big

23    bad government type of arguments, you know, anything -- you

24    know, trying to elicit jury feelings about timing or format of

25    discovery, things of that nature, their really is no place for

1    that.  And I don't think the defense is even looking to go

2    there.  But I just want to make sure we all understand what

3    we're talking about there on the defense side?

4            MR. SADOW:  Yes.

5            THE COURT:  All right.  So we're not going to get into

6    that either.

7            The safe harbor.  This is always a good thing to raise.

8    I want to make sure, with my defense team, we're not looking to

9    get into the safe harbor AKS argument, right?

10           MR. SAMUEL:  That's correct.

11           THE COURT:  So we don't have to worry about that.  I'm

12   glad the government raised it because sometimes they becomes a

13   whole animal, and that probably saved me an hour in charge

14   conference.  Because trying to design a safe harbor instruction

15   when there isn't one is a problem, and four or five of my

16   colleagues, including myself, have debated that.  At some

17   point, the Eleventh Circuit will see if I did it correctly on

18   the *Young* case, which I think is still up there.

19           All right.  So we don't have to worry about that

20   either, which is good, because that adds more work.

21           Then we have alluding to the advice-of-counsel defense

22   until we establish a factual predicate.

23           So on this one, if I understand it correctly, the

24   government -- and I find this -- this was an interesting one.

25           So the way the government has structured this --

1    correct me if I'm wrong, Ms. De Boer -- is that you want to

2    make sure that they lay a predicate or really proffer to me,

3    right, before they do it in opening.  I mean, is that really

4    all this is?  I mean, I don't know that I wouldn't call what I

5    have from Mr. Sadow today a proffer.  I probably have enough

6    today to say, go at it at opening.

7          But are you asking for something beyond that?  I want

8    to make sure I understand.

9          MS. DE BOER:  That's correct.  We're asking for the

10   defense to proffer to the Court, I guess, how they think

11   they're going to satisfy the elements in the advice-of-counsel

12   instruction.  Because we've met with the attorneys, and they

13   did not know about the telemarketing and the telemedicine and

14   how the tests were being procured; in particular, the direct

15   solicitation of patients by the marketers.  And so we think

16   that there were facts that were not properly disclosed to the

17   attorneys, and that the advice that they rendered depended

18   materially on those facts.

19         And so we're concerned that we're going to find

20   ourselves in a situation where, in opening statements and in

21   the cross of witnesses, the prospect of attorney involvement

22   and attorney presence has been presented to the jury.  And I

23   think there's a natural tendency for anyone to assume, oh,

24   well, if an attorney was involved, this is okay.  And then not

25   being able to fully connect that up at the end, we're going to

1    find ourselves in a situation where the government has been

2    prejudiced and the jury is confused and misled by just high

3    level testimony or argument about the presence of attorneys.

4              THE COURT:  Okay.

5              MR. SADOW:  So my suggestion to that is, we advance

6    that defense at our own peril, just like the government

7    advances 801(d)(2)(E) at its peril.  If they're unsuccessful,

8    the Court tells the jury that the government has failed to

9    prove this and strikes it.  If we're unsuccessful -- if Your

10   Honor said they've raised this, it's not a defense, you may not

11   consider it.  So this is kind of a different goose/gander rule,

12   but similar in the idea that each side is putting up its case.

13             With all due respect to the government, the questions

14   that they ask of the witnesses that they've interviewed, don't

15   encompass several of the things that were told to them.  That's

16   their interviewing process.  And there are differences.  And

17   we're confident that we'll be able to get the instruction, and

18   we certainly want to be able to raise it at the appropriate

19   time, touch on it on opening statement and any cross that winds

20   up happening.

21             THE COURT:  I mean, we know -- and the pattern

22   instruction tells us, right?  There's probably going to be a

23   debate here about whether or not the defendant made a full and

24   complete good-faith report of all material facts to an attorney

25   he or she considered competent.  So I'm already hearing that

1    that's probably going to be one of the sticking points where

2    some defense lawyers may say, well, I didn't get the full

3    picture.  And I think the defense's theory is that Mr. Patel

4    gave more than sufficient information to get a competent legal

5    opinion he can rely on.

6         Specifically then, did the defendant, before acting,

7    receive the attorney's advice as to specific course of conduct

8    that was followed, to delineate whether or not what they were

9    about to engage in was legal, and then reasonably relied upon

10   that advice.

11        I think -- you know, it's -- I thought the same thing,

12   Mr. Sadow, when you mentioned that kind of what we discussed in

13   our last status about what 801 permits you to do, right?  At

14   the end, the government then has to have shown it, and, if not,

15   the Court has to basically claw it back for the co-conspirator

16   statements.

17        I understand this idea of proffering it, but, to me,

18   I've seen enough, I think, that there can be a reference made

19   to good-faith reliance or advice of counsel being an issue in

20   the case at opening.  I mean, I don't know, for example, that

21   -- the government's position, that you have to spell it out in

22   detail before raising it is necessary.  I have to make sure

23   there's a good-faith basis.

24        And I think -- Ms. de Boer, I think the biggest issue

25   here is Mr. Sadow's point.  They're going to get the jury

1    instruction.  And if you elicit it, right, that only one side

2    of the story was told by Mr. Patel to these lawyers, and they

3    didn't know about telemedicine, and they didn't know about this

4    stuff, then certainly he's not unable to hang his hat on advice

5    of counsel.

6          So I think it is to their own peril.  But I don't know,

7    from a gatekeeping function, that more of a proffer is

8    necessary.  They certainly think that all the relevant

9    information was given.  The jury will make that call.  And

10   you'll be able to point out discrepancies in that by the time

11   they get to their case-in-chief.

12         So I don't know that I need more at this point.  They

13   can raise it as far as I'm concerned.  But they are, they are

14   at risk.  Because you heard the instruction -- and we all know

15   it.  And if they can't hit on all those points -- I mean, if

16   Watt gets up there and says I had no idea that he was doing

17   this telemarketing portion of it, or else I would have told him

18   something different, which is what I suspect is going to

19   happen, they'll have to deal with that answer.  And I'm sure

20   Mr. Sadow will get up on cross and explain, isn't it true that

21   Mr. Patel told you that they were using these telemarketers?  I

22   mean, that's going to be for them to decide, right?

23         MS. DE BOER:  I tend to agree, Your Honor.

24         And one thing that I, frankly, had not considered, that

25   both the defense and Your Honor pointed out, is similar to

1    co-conspirator statements.  If we don't connect it up, you

2    instruct the jury that that evidence is struck.

3         THE COURT:  Disregard it, yeah.  I'll do the same here.

4         Look, let's put it this way.  You don't get an

5    instruction, right, unless you've shown entitlement to it.  I'm

6    not going to give a good-faith instruction that relies on

7    counsel defense unless I see evidence of it.  So there is a

8    gatekeeping function.  If I don't think they've shown me

9    enough, then I'm not going to give it, the same way I would ask

10   them to strike 801.

11        But I think what's going to happen is, it will probably

12   be in the realm of the jury to decide whether there was a

13   good-faith report of material facts.  The jury's going to have

14   to make that call, and they're going to have to decide, did

15   Mr. Patel give enough, or did he hold back on some of the

16   details in getting his legal opinion.

17        But I will wait and see how it gets presented.  I just

18   don't want the defense to believe they have to go through a

19   special extra step before raising it in opening statement.  I

20   don't believe that.  I've seen enough.  Raise it.  You live by

21   it, you die by it.  Everyone's in the same boat.  All right?

22   So I think that's clear.

23        I will just point out that -- the way to word it is, I

24   believe that there's been enough of a factual predicate

25   established right now, that if they're not precluded from

1    making mention of it in opening statement, and that the Court

2    will continue to patrol that defense, and when we get to charge

3    conference and see if the evidence supports it, not unlike what

4    I would do at the end of the government's case under 801, if

5    they had not done what they need to do to show these are truly

6    co-conspirator statements or in furtherance of the conspiracy.

7            So with that, I have the last point, which is calling

8    the attorney or expert witness to opine on the legality of

9    healthcare practices.

10           So this last argument, I went back and I was looking at

11   the notice of intent to use expert witnesses, Docket Entry 328,

12   from the government.  I just want to make sure we're all on the

13   same page here.  Because there's certainly going to be some

14   expert opinion.  And I know there's dispute, a little bit,

15   about whether some of these guys are fact witnesses or really

16   experts.  But in an abundance of caution, the government was

17   right to designate them as experts.

18           I don't want to have a determination that is being made

19   by the jury, with the benefit of the jury instructions, to be

20   disregarded or substituted by an expert witness who gets up

21   here, right, and essentially says, you know, what Mr. Patel did

22   or did not do is legal.  I mean, that's a problem.  When we

23   start substituting in these determinations with the

24   instructions for an expert -- I know there's lines there.  I'm

25   not disagreeing.  Because there are going to be explanations

1    for why certain advice was proffered or given to the defendant.

2         There's going to be, as the government pointed out,

3    certain explanations of the legal implications, perhaps, of

4    your 855s and what that means.  I'm good with that.  I think

5    what this is worrying about is that someone gets up there and

6    essentially just says, you know, what he did was legal.  I

7    mean, I'm dramatizing it, but it's that kind of black or white.

8         So am I right on that, on the government's end?

9    Because you guys also want to get in a little bit of legality

10   talk, so it's kind of good for the goose here.  I want to make

11   sure I'm not missing it.

12        MS. DE BOER:  Yes, Your Honor.  And a couple of points.

13        With respect to the Medicare experts, first of all,

14   they were noticed.

15        THE COURT:  Right.

16        MS. DE BOER:  Second of all, it just happens to be that

17   Medicare's coverage is regulated by law.  If this were a

18   private insurance case, we would be bringing in a private

19   insurance representative to talk about policy, coverage,

20   guidelines, right?  So it's the same thing; it just happens to

21   be how it's done for a federal program.

22        But with respect to the attorneys, I think Your Honor

23   has hit the nail on the head.  Of course the attorney is going

24   to have to make mention of law and explain what they

25   understood, and explain the advice that was given, and explain

1    what they know, in their own personal knowledge, of whether and

2    to what extent the defendant complied with that advice.

3         But there is a line to be drawn in terms of especially,

4    sort of, post hoc, you know, after-the-fact opinion on the

5    criminality or non-criminality of certain things, anything

6    that's really taking away either the Court's function in

7    advising the jury on the law or the jury's function in applying

8    that to the facts of the case.

9         THE COURT:  It's one step too far, right?  Obviously,

10   we have an advice of counsel, so it's got to come up, I mean,

11   in terms of the landscape and what we thought about what was

12   okay or not okay.  But it's that last step of definitively

13   telling a jury what was done or not done was legal or illegal.

14   It's that final blessing of conduct by an attorney that I want

15   to avoid.

16        I have no problem, and I believe it would be a mistake

17   to prevent the defense camp from getting into why certain

18   advice was provided.  I mean, it makes sense.  You have to.  It

19   would be almost absurd for a lawyer to explain, on an

20   advice-of-counsel defense, without getting into the legal

21   landscape.

22        What I want to make sure we don't do is give

23   essentially a definitive legal opinion on the bench, where I

24   need to be doing that with the jury instructions.  Does that

25   make sense?  I think the defense camp gets what I'm saying.

1    It's levels.  So I want to make sure we're on the same page.

2         MR. SAMUEL:  The only thing I'll add is, as I put in

3    the brief, I'm concerned, as Mr. Sadow said, the goose/gander

4    goose/gander rule.  If Mr. Watt, for example, says I sent a

5    memo that X, Y, Z, is legal, in my opinion.  The law is

6    confusing.  It's a new law.  I'm not quite sure how it's going

7    to play out.  But X, Y, Z, is legal.  I don't think it would be

8    proper for the government to start cross-examining him to say

9    you were wrong.  Because the question is what did he tell

10   Mr. Patel, not whether the government --

11        THE COURT:  Whether it's right or wrong is not

12   relevant.

13        MR. SAMUEL:  That's right.

14        THE COURT:  I mean, the only thing would be if it's

15   reasonable, right?  Because the jury instruction says that.  I

16   mean, if his evidence was, well, you jump up and down on your

17   head outside of the courthouse, you're absolved.  I mean, it's

18   something ridiculous, right?  That's not what's happening here.

19        But you guys agree with that, right?  You're not going

20   to follow up and then say, well, isn't it true that that is

21   correct or an incorrect understanding?  It's more about what

22   was said and not said and whether it was reasonable to rely on

23   it.

24        What do you think about that?

25        MS. DE BOER:  I agree.

 1            And just to put a finer point on it, or attempt to, I

 2    think a lot of the memos we're talking about are pretty

 3    general.  So I do think we would be able to cross-examine the

 4    witness on what that meant, and that might --

 5            THE COURT:  Explaining it, yeah.

 6            MS. DE BOER:  Right.  And that might involve reference

 7    to the law, right, and the legal opinions or bases that are

 8    going into the memo.

 9            I also think, you know, there's a degree of potential

10    impeachment, right, that could get into this.  I just don't

11    know exactly where it's going to go.

12            I agree with the premise.  I do think that there's a

13    way in which -- you know, if someone just says in a generic

14    statement a very broad statement of the law, and they're trying

15    to make an argument that the defendant would have interpreted

16    this to mean A, and I'm saying, well, wait a minute, the

17    defendant would have interpreted this to mean B, that that's an

18    appropriate line of cross-examination.

19            THE COURT:  I think the key here is there needs to be

20    some leeway, when we talk about advice of counsel, to give some

21    context to the legal advice, to explain the landscape, and to

22    have an attorney explain why certain things were suggested.

23            To your point, Counsel, I think, Mr. Samuel, you're

24    right.  Going beyond that and saying, looking back at that now,

25    that was wrong, wasn't it?  Or that opinion wasn't

1    well-founded.  I don't know that attacking it makes a lot of

2    sense for relevancy.  It's what did you mean to tell Mr. Patel

3    by this, and then we can explore whether that was clear or

4    unclear.  I mean, that may be different.  And whether it's

5    right or wrong, it's did you give the guidance, is this what

6    was intended.  That leeway, I think, makes sense.

7              Does that satisfy your concern?

8              MR. SAMUEL:  It's a close call.  It's a real close

9    call.

10             THE COURT:  It is.  I agree.

11             MR. SAMUEL:  If a memo was given to Mr. Patel or phone

12   call or email, and it says here's the rules, and then the

13   prosecution cross-examining him says well, you didn't mean by

14   that, you know, and then posits the exact thing that

15   established that LabSolutions did, that's unfair because that's

16   not what was said to him.  So it's really what was said and not

17   the government convincing Mr. Watt or Mr. Peterson or

18   Mr. Holden, or -- you know, there's five of them altogether --

19   you know, what you meant by that was not, and then say what the

20   defendant did.

21             THE COURT:  Right.

22             MR. SAMUEL:  I mean, that's unfair because it's not

23   what was said to him.

24             MR. SADOW:  It's a communication to the defendant at

25   the time, which is important, not -- for example, if she were

1    to ask -- if the government were to ask when you gave him this

2    memo, did you explain this to him, and the answer is yes, then

3    obviously you could follow up.  If the answer is no, then you

4    only have what's in the memo.  You don't have, well, you could

5    have told him this and you could have told him that.

6          THE COURT:  No.  Being a Monday morning quarterback on

7    legal advice is not really relevant.  The key is, what was said

8    at the time and was it reasonable to rely on it.  I mean,

9    that's -- to me, a would have, could have, should have, on the

10   legal advice now, in hindsight, is of no moment, and, if

11   anything, it's going to confuse the jury.  We have to focus on

12   the communication and the advice presented at the time.

13         And I can draw the lines there.  I mean, I'll sustain

14   any objections that go a step too far.  But I think for

15   purposes of the motion in limine, it's just getting to the

16   final step of having any lawyer, on either side, definitively

17   say something is legal or illegal and substitute their judgment

18   for that of a jury following jury instructions is what I'm not

19   allowing.  I know it's hard, again, in a vacuum, but we can't

20   go a bridge too far.

21         But I am going to give a little bit of leeway on

22   lawyers explaining the nature of their advice at the time.

23   Going beyond that, on legal opinions as to present day, I think

24   is, to me, problematic.

25         So I grant that request in point 10 of the motion, but

1    certainly only with regard to that kind of final legal opinion.

2    All right?  Does that make sense?

3         So with that being said, I think the Court has now

4    cleared most of the motions.  We've taken care of the appeal.

5    We've taken care of 404.  We've taken care of government and

6    defense motions in limine.

7         The only other thing that I think we have as a pending

8    motion, or needs to be addressed, is our final point, I think,

9    for this afternoon, and that is the motion to compel and/or

10   exclude 806 evidence.

11        Look, I think that a lot has probably happened for

12   everybody in the last 12 to 24 hours that might crystallize

13   this concern a little more.  I think broadly, it's very hard in

14   a vacuum to start putting rules around the defense team on

15   what's 806 and what's not for impeachment.  So I don't want to

16   get into that.  I have to patrol it, like I do in every trial.

17        But I think that the motion to compel was particularly

18   focused on statements Mr. Sadow made at our last hearing where

19   he alluded to the fact that there may be another transcript or

20   another document that will be valuable 806 material.  And now

21   the government has requested that that be produced as part of

22   not only some of our pretrial rules, but just as a sense of

23   understanding whether it's proper 806 material.

24        Now, my understanding is the government has a much

25   better idea of what that is now, and that would be presumably

1   what you heard last night.

2       So I'll turn it to the government.  Before I say

3   anything, because obviously I was aware of this, presumably,

4   before you were, so what, if anything, is the government's

5   position on this today, and where are we after last night?

6       MS. DE BOER:  Yes.  Thank you, Your Honor.

7       I think we're still a little bit in the dark, but we

8   have been brought up to speed somewhat by Mr. White's counsel.

9   Thank you for allowing him to bring us up to speed on that.

10      I think this may be -- there may be an easy way to deal

11  with this issue.  Number one, Mr. White was removed from the

12  indictment.  He is not going to be called by the government as

13  a witness.

14      THE COURT:  That is a very easy way to take care of it.

15      MS. DE BOER:  Yes.  And then that leaves the question

16  of the 806 impeachment, and that would apply if the government

17  were to be introducing co-conspirator statements from

18  Mr. White.

19      THE COURT:  Correct.

20      MS. DE BOER:  I will say, Mr. White is not going to be

21  a feature -- a feature of this trial.  He may be referenced in

22  this trial, but this trial is not going to be about Mr. Patel's

23  relationship with Mr. White.

24      The only statement pertaining to Mr. White that we

25  would, at this point, expect to elicit is not, in fact, a

1    co-conspirator statement, and it will not be offered for the

2    truth of the statement.  Rather, it will be offered for the

3    fact that the defendant heard the statement and was okay with

4    the prospect of what the statement included, and that goes to

5    the defendant's intent.

6         So I'll give the Court -- I'll just proffer the Court

7    what it is.

8         THE COURT:  Sure.

9         MS. DE BOER:  So we expect Mr. McKeon and Mr. Orr, who

10   had a separate -- they worked together as marketers for

11   Mr. Patel.  Mr. White was a different marketer for Mr. Patel.

12   They did not work together.  McKeon, Orr, and White did not

13   work together.

14        At one point, Mr. Patel made comments to Mr. McKeon

15   concerning another marketer he had, referring to Mr. White, and

16   the volume of business that this marketer was generating for

17   Mr. Patel, and suggested to Mr. McKeon, he ought to talk to

18   Mr. White and get a sense of how Mr. White runs his operation

19   so Mr. McKeon can increase his volume.

20        At Mr. Patel's direction, Mr. McKeon and Mr. Orr had a

21   conversation with Mr. White in the form of a phone call wherein

22   Mr. White described that he would send test kits out to

23   patients before getting a doctor's signature on a requisition

24   for those tests, because when you mail a test kit out to a

25   patient, you're only going to get so many test kits back.  And

1   so why pay for a doctor's order if you're not even going to get

2   the test kit back?  That's money, you know, with no purpose.

3        Mr. McKeon and Mr. Orr found that to be a bit too open

4   and obvious a fraud.  They reported that to Mr. Patel.

5        So we are not going to offer Mr. White's description of

6   his process to prove that that's how Mr. White operated his

7   process.  We are going to offer that statement to prove that

8   that statement was made and heard by Mr. Patel, and that his

9   reaction to that was to -- you know, had no problem with that

10  potential process, and that's relevant to his intent.

11       So I don't think -- whatever these recordings and

12  transcripts may say, I don't believe that that properly

13  impeaches that statement, because that statement is not offered

14  for its truth, and Mr. White's credibility is not being put at

15  issue by the government.

16       THE COURT:  Okay, that's important.

17       MR. SADOW:  That's really parsing it about as thin as

18  you can parse it.  Because what they want to do is attribute to

19  Mr. White a practice that McKeon and Orr think is illegal.

20  That's the thrust of this.

21       And then, when they speak to Patel, to Mr. Minal Patel,

22  McKeon and Orr disagree with that practice and somehow indicate

23  there's a problem with it, which basically means, if this is

24  what Mr. White is in fact doing, it's wrong, and you shouldn't

25  be doing it.  His credibility is at issue in that.  And you

1    can't just say we're not offering it for the truth, because the

2    Court would have to say what you just heard that Mr. White

3    supposedly said to these people is not being offered for the

4    truth of it, it's just being offered that he said it.

5          THE COURT:  No, it's being offered for effect on the

6    listener, right?  Because the argument here is that Mr. Patel

7    would say I'm not with that either, that's a problem.

8          MR. SADOW:  But what if Mr. Patel is with it because

9    it's legal?

10         THE COURT:  Well, that may be true, but --

11         MR. SADOW:  And why wouldn't we be able to introduce

12   evidence to show that Mr. White fully believed that what he was

13   doing was legal?

14         MS. DE BOER:  To substitute it as the defendant's

15   intent?  I mean, that's squarely case-in-chief substantive

16   evidence at that point.

17         THE COURT:  Yeah.  I have to tell you, Mr. Sadow, I

18   don't know -- I mean, listen, I'm much more intimately familiar

19   with what impeachment material is out there for Mr. White.

20         If what I'm hearing from the government is true, that

21   it's only limited to this particular piece of evidence from

22   Mr. White, about what he said and its effect on the listener,

23   what Mr. White believes or doesn't believe is not the issue.  I

24   mean, whether he thinks it's legal or not, to me, is of no

25   moment.  When someone else advises Mr. Patel that this doesn't

1    sound right, which is what I'm told is going to happen,

2    Mr. Patel's reaction is either to agree with that or not.

3         Now, I don't want to make this more than what it is.  I

4    mean, I'm sure there's more context to this, as to how

5    Mr. Patel reacted to it.  Maybe he didn't appreciate exactly

6    what it was or how it was explained, but certainly we're

7    talking about a very attenuated piece of testimony from

8    Mr. White's credibility.  It's simply his description of what's

9    a way to expedite, or make more money, or save money, that two

10   other witnesses felt was not a good idea, and when they shared

11   this with Mr. Patel, his reaction is not to agree that it's a

12   bad idea, but essentially suggest that he has no problem with

13   what potentially could be an illegal way of doing business.

14        I mean, that's -- I just don't see why we're going to

15   get in, under 806, some of what's happened with Mr. White

16   because it's -- whether or not he's credible is not the issue.

17   It was what was Mr. Patel's reaction when he heard this.

18        Now, Mr. Patel could easily say nothing about it

19   sounded wrong based either on my legal opinion, or I didn't

20   have all the details.  There's a lot of ways to explain why

21   Mr. Patel didn't react in alarm for it.  But to say that that's

22   back-dooring for the 806, I have to tell you, I'm not so sold

23   on it.

24        MR. SADOW:  And I don't want to try to sell something

25   out of context.  I think my best position here is to wait and

1    see how this actually plays out and see if it comes in quite as

2    smoothly as the government is suggesting it is.  Because with

3    all due respect, I've been through all of what Mr. Orr said and

4    all of what Mr. McKeon has said, and they haven't said that in

5    any of the interviews that we have.

6             THE COURT:  Okay.

7             MR. SADOW:  So this is -- well, it'll be interesting to

8    see how that developed timing wise, circumstances, and text

9    messages or emails between Mr. White and Mr. Patel during the

10   same posture -- during the same period.

11            So I don't -- I'm not going to be mentioning anything

12   about 806 in the matters until we hear how this comes in.  But

13   there are other emails that are in the exhibits list of

14   Mr. White.

15            THE COURT:  Sure.  I think the important thing is, for

16   purposes of the motion -- because it's framed as a motion to

17   compel.  The Court at least is comforted by the fact that if

18   we're going to use anything from Mr. White, at least in the

19   government's case, that it is one isolated statement that you

20   shared and proffered.  The problem is, if more of Mr. White's

21   testimony is implemented or used, there is a substantial amount

22   of impeachment material that could be utilized, and it could

23   open the door to that under 806.

24            I don't believe -- again, it's in a vacuum -- that what

25   I've heard now raises to that level.  So I don't think we're

1   going to have a problem, because Mr. White is no longer really

2   a major player in any regard to this case as to what is out

3   there regarding statements he may have made during this entire

4   investigation.

5        That being said, I think to Mr. Sadow's point, might

6   just be a wait-and-see approach.  I would just ask, when we get

7   to this 806 and we have something that looks problematic, ask

8   for a sidebar, ask for a brief recess.  Let's just talk about

9   it before we open up the door to an 806.

10        But certainly, things that are out there already, we

11   know they're out there, right?  The purpose of this motion, I

12   thought, was the government was concerned we had some other 806

13   material floating around out there that you didn't know was

14   there.

15        Mr. Sadow's pointing out, there's plenty of what he

16   believes to be potential 806 already produced in emails and the

17   like, and that's not what you guys are worried about.  I was

18   worried about making sure that if it was going to be in play, I

19   was going to require its production to the government, so that

20   we all knew what we were dealing with here and we can get ahead

21   of it.  But now that Mr. White is not necessarily going that

22   route, some of this is moot, at least in my view.

23        Does that make sense for the government?

24        MS. DE BOER:  Yes.  And we are hoping to ensure that it

25   is moot.  And I was hoping that, you know, this proffer of

1    really how limited Mr. White is going to be featured in this

2    trial would accomplish that.

3          I would also say, you know, we don't know, and what we

4    do know is secondhand, if not thirdhand, all the facts as to

5    how these recordings were obtained.

6          THE COURT:  You don't want to go there.

7          MS. DE BOER:  Okay.

8          THE COURT:  Don't even worry about that.

9          MS. DE BOER:  I would just say, we would likely move to

10   exclude them on those grounds as well.  I don't know that we

11   have enough facts to do that, but to the extent we're in the

12   middle of Mr. Orr and McKeon's testimony, and this comes up,

13   and they're trying to put this in, we're going to move to

14   exclude on those grounds.  And we, frankly, don't have all the

15   facts.  We would be asking the Court to gather those facts so

16   we could make an appropriate motion.

17         I would also say, I have a little bit of concern in

18   even receiving those recordings at this point, so --

19         THE COURT:  Here's what I will tell you.  I think the

20   way to handle this -- and it's not an easy decision for the

21   Court by any stretch, but the way to handle this is to moot it.

22   I mean, frankly, there are problems.  And I have addressed this

23   and looked at this already.  I think that the best way to

24   handle this is to not make it an issue.  And to me, if

25   Mr. White's testimony is limited to what you said, then I don't

1    believe -- my opinion is none of this other 806 material that

2    is not in possession of the government would be viable for

3    impeachment, if it's limited to just that.  That's my take on

4    this.

5           Again, situationally, to Mr. Sadow's point, let's see

6    how it comes out.  But if it dovetails as cleanly as the

7    government has said, I do not expect that any of the 806

8    material that has been brought to my attention will play a role

9    at all.  So we're not going to have to worry about it.

10          Now, there may be other things the defense feels are

11   806 worthy, right?  But that's in the universe; we know that's

12   out there.  My concern is preventing any new 806 material the

13   government does not have in its possession that you've asked to

14   compel.  And I don't believe, right now, from the very limited

15   role that Mr. White plays, that any of that's going to be used.

16   And if none of that is used, then we're going to be fine.  It's

17   not going to be an issue at trial.

18          I mean, are you following me on that front?

19          MS. DE BOER:  Yes.  I appreciate it.

20          And I might also inquire if the government may move to

21   unseal the proceedings that have happened on this.  Again,

22   we're not asking for a copy of the recordings, to the extent

23   those have been transmitted, but move to unseal any filings and

24   any orders or transcripts of hearings that have been conducted

25   on this issue.  If the point was to, you know, raise this issue

1   and vet it before trial, I think the government should know

2   what's been said about it in the event we do find ourselves in

3   a situation where we have to make a motion to exclude on some

4   of these other grounds.

5          THE COURT:  What's the defense's view on that request,

6   right now, where we're at?  I don't know that we need it right

7   now, so I'm hesitant to go there.

8          MR. SADOW:  We oppose the unsealing.  That's one of the

9   things that was raised, you might remember.

10         THE COURT:  Yeah.

11         MR. SADOW:  And the gentleman, Mr. White's counsel, was

12  free, should he have chosen to, to disclose one particular

13  piece.

14         THE COURT:  Yeah.

15         MR. SADOW:  Whether he chose to do it or whether the

16  government has asked for it, that's between the two of them.

17         THE COURT:  Yeah, I agree.  Right now, with the

18  situation I have in front of me, and the fact that this might

19  be a moot point, I would prefer not to unseal it.  I think if

20  it becomes an issue -- and, knock on wood, I don't think it

21  will be.  From what I'm hearing, I don't think any of this will

22  manifest itself because of Mr. White's limited involvement.

23         But to Mr. Sadow's point, I had informed counsel for

24  Mr. White that he had the green light to go directly to the

25  government.  When the hearing concluded yesterday, there was an

1   understanding that he would.  Whether or not that conversation

2   has continued, I don't know, but he has his own client's

3   interests that he has to look out for, and I leave that between

4   him and you all.  He does have in his possession enough that he

5   can share his position, and I leave that up to him.  I

6   understand he may not feel comfortable, but I'm not going to

7   unseal at this point.  There's just really no need.  If there

8   becomes something during trial that rises to that level, trust

9   me, I'll excuse the jury and we'll talk about it.  But I think

10  right now, this is going to be a non-starter, so we should be

11  okay.

12          MS. DE BOER:  Understood, Your Honor.  Thank you.

13          THE COURT:  So with that being said, I think what I'll

14  do, Ms. de Boer, just to be formal on it, I think we can deny

15  the motion to compel as moot, is that fair, on the 806, because

16  that's not really an issue right now?

17          MS. DE BOER:  Correct.

18          THE COURT:  I'll deny that as moot.

19          I think I have now pronounced rulings on all pending

20  motions.

21          Mechanics-wise, just so we all know, we start on Monday

22  the 28th.  Gracie, my CRD, is going to go out and get me as

23  many bodies as she can.  We know that it is a longer trial.  I

24  know that we have all thrown out date ranges for this trial.  I

25  tend to beat lawyers' expectations on how long things take, but

1    I want to, you know, in an abundance of caution, prepare my

2    jurors, when I go through my selection, what they're in for,

3    just to give them a sense of range.

4         I do think that this trial ends before the Christmas

5    holiday.  I don't see a universe where three almost

6    uninterrupted weeks doesn't get us where we want to go.  And if

7    we spill a little bit past that, we're still well in advance of

8    the holidays.  I know that that will give jurors comfort.  I

9    don't want jurors to essentially advance reasons not to be

10   selected because they think it's going to run into their

11   holiday.  So I'd like to promise them on Monday that that's our

12   target, to try to finish in about three weeks, maybe spill over

13   a little bit, but that everything will be done to try to get

14   them out before the holiday.

15        I will obviously attempt to pick several alternates

16   because it's a longer trial.  The trial will take place in this

17   courtroom, so you guys can be comfortable here.

18        I think I had a request, logistics-wise, to not start

19   as early as I normally do, or start every day -- if my memory

20   serves me right, I think we're starting every day at 10:00.  I

21   believe that we're still in agreement that that gives everybody

22   some flexibility in the morning, to avoid traffic and

23   everything.

24        Am I still on that plan?  I think we had talked about

25   this before.  I'm trying to remember.

1          MS. DE BOER:  That's correct, Your Honor, because we

2    have agents coming down from Broward and prosecutors as well.

3          THE COURT:  Right.  So I think we'll start right at

4    10:00.  It also gives jurors a chance to avoid any traffic,

5    deal with any drop-off of kids.

6          And then, I'm never going past 5:00, 5:30, since it's

7    getting darker.  That's kind of my timeline, with about an

8    hour, hour and a half at max, for lunch.

9          Without any major interruptions, as far as I can tell

10   right now, that three-week schedule starting on Monday is very

11   solid and very capable.  So I'm not concerned about timing.

12   Witness availability issues, I think we've taken care of by

13   starting a little bit later.

14         So that's my schedule.  And my plan on Monday, the

15   28th, post Thanksgiving holiday, is simply to impanel a jury

16   and only do openings.  There will be no witnesses called on

17   Monday.  Let's get our jury, and let's get openings done, and

18   we start with our first witness on Tuesday.

19         So if you want to plan ahead, on the government's end,

20   no one needs to be on standby.  If we finish a little early on

21   Monday, so be it.  I want the jurors fresh for the first bit of

22   testimony on that Tuesday.  So let's make sure that we all

23   follow that schedule.

24         Now, we've done a lot of work here today.  I will just

25   caution everybody, there are a lot of moving parts.  Let's be

1    careful, especially with 806 issues and other concerns.  I

2    don't want a chopped up trial, but when we start at 10:00 in

3    the morning -- if you want to come in around 9:30 the day

4    before because we have an evidentiary issue, let's take

5    advantage of that.

6         So one of the benefits is, if we start at 10:00 and

7    something blows up, you guys let me know, and we can all come

8    in at 9:00, and I can take care of any housekeeping before the

9    jurors arrive.  That's the benefit of opening up an hour before

10   each day starts.

11        But certainly, make use of sidebars.  Let's not run any

12   risks and put things out there unless we've vetted everything.

13   We have a lot of moving parts.  And I'll be watching it.

14        But I just don't want anyone to get cavalier on me.

15   Make sure you check with me, if you think this is getting close

16   to the third-rail ruling that I've made, so that we don't have

17   any problems.

18        You guys are all very seasoned and very experienced.  I

19   like to run a clean trial, and I like to minimize surprises.

20   To the extent I've been able to do so with today's rulings, I

21   think we've got a good sense of what's expected from the

22   parties and the theories that are going to be advanced.

23        So at this point, do I have any housekeeping issues,

24   any other concerns on scheduling I need to be aware of before

25   we wrap up?  Because this is kind of our last opportunity to

1    see each other before we reconvene after the holiday, and then

2    we're going to start on Monday.

3           So anything on the government's side I need to be aware

4    of?

5           MS. DE BOER:  Just a few things, Your Honor.

6           One is, Judge Reinhart had ordered pretrial compliance

7    with a Rule 17 subpoena.  And I admit everyone, including the

8    defense, was working very late last night, so maybe they're

9    going to tell me it's in my inbox and I missed it.  But I don't

10   believe we've received the response to that subpoena yet.

11   Again, I could have missed it overnight.

12          And then, a couple of other housekeeping matters:  If

13   we could just discuss briefly discuss the Court's process for

14   jury selection and strikes --

15          THE COURT:  Oh, yeah.

16          MS. DE BOER:  -- and including, kind of, the seating

17   arrangement for the panel, so we can be prepared.

18          I also just want to make a note that the fourth week,

19   he potential fourth week of trial, is Hanukkah, and that might

20   be something to address.

21          THE COURT:  Thank you.  You're right.  It starts that

22   Monday, I think, right?

23          MS. DE BOER:  The 16th, I think.

24          THE COURT:  Or maybe it's the Saturday before?

25          MS. DE BOER:  The 18th, sorry.

1          THE COURT:  Okay.

2          MS. DE BOER:  So I just wanted to make the Court aware

3     of that.

4          And then, I believe the defense, if there is a

5     conviction in this case, is going to request a jury trial on

6     forfeiture, which we have our forfeiture attorney,

7     Mr. Calderon, here as well, if the Court would like to hear

8     anything about that.

9          THE COURT:  Yeah.  So I got that -- I haven't had a

10    chance to read it.  I got that submission for the forfeiture

11    yesterday.

12         I just want to be clear:  That is my bench trial, and

13    that will be after we complete this case, right, Counsel?

14         MR. CALDERON:  Yes, Your Honor.  When the jury returns

15    the verdict, then the forfeiture trial would happen right after

16    that.

17         THE COURT:  Now, any objection to having that

18    forfeiture trial probably in January?  I don't know -- in terms

19    of timing, how long do you think it's going to take?  My only

20    fear is -- I think I can get this trial done in three weeks.  I

21    genuinely think there won't be a problem.  At this pace, I know

22    that everyone is expecting this to be longer, but I seriously

23    think I can get it done before the week of Hanukkah and before

24    the Christmas holiday.

25         My only concern is, obviously, taking a significant

1   break.  How long -- because these things, in my experience,

2   some of the forfeiture matters can take a while.  So I'm trying

3   to get a sense of what that's going to look like once we're

4   done with the trial.

5         Can you give me a sense of that?

6         MR. CALDERON:  Well, Your Honor, the same jury would

7   need to be retained for that jury trial, if it goes forward.

8         THE COURT:  But it is a jury trial?  It's not a bench

9   trial?  I thought it was a bench trial, for some reason.

10        MR. CALDERON:  So the defendant has the right to waive

11  the jury trial portion, but as of right now, the rule stands.

12        THE COURT:  Maybe when I saw -- you filed it yesterday.

13  For some reason, I thought I saw it as bench.

14        MR. CALDERON:  Yes, Your Honor.  So the parties can

15  waive the jury portion of the trial, and it can be a bench

16  trial.  The government, we are waiving that portion of the jury

17  trial.  The defense has let me know, as of today, anyway, they

18  are still retaining the right for a jury forfeiture trial.

19        Now, they have up until before the jury deliberates,

20  for the criminal charges, to make that decision.

21        So as of right now, again, they still intend on going

22  forward with the forfeiture trial portion.  If that is the

23  case, and the jury comes back with some convictions, any

24  convictions on the counts of the indictment, then the jury

25  would need to be retained for the forfeiture portion of the

1    trial depending on what they -- the jury verdict form says.

2         THE COURT:  But you would agree with me -- and again,

3    correct me if I'm wrong.  Let's assume that we finish within

4    the three weeks.  You know, maybe we spill over a little bit.

5    My hope is we don't, with the holidays.

6         I mean, look, I'm a believer in breaking that bad news

7    to the jury at the end, not at the beginning.  But I would be

8    prepared to them tell them, guys, I know that I told you that

9    we're going to be done, but there's one piece left, and you're

10   going to have to report after the holidays for that.

11        I mean, are you prepared for that?  Because I cannot

12   imagine how long that's going to take, but we're getting

13   dangerously close to the holidays at that point, and I think

14   we'll lose jurors.

15        MR. CALDERON:  That's fine, Your Honor.  I mean, the

16   jury can rely on all the evidence introduced in the criminal

17   trial.

18        THE COURT:  Right.

19        MR. CALDERON:  And quite frankly, most if not all of

20   the evidence we'd be putting forward would be from the criminal

21   trial.  Maybe we'll have a financial investigator come back up

22   just to go over some tracing.  So I don't think it will take a

23   full day or anything like that.

24        THE COURT:  I was going to ask you how long it takes to

25   put on your forfeiture trial.

1    MR. CALDERON:  As it stands right now, if everything

2    gets introduced that I expect to get introduced, half a day at

3    the most.

4    THE COURT:  All right.  So if I'm able to pull it off,

5    that I can get it done in three weeks, or maybe it spills over

6    a little bit, it's not the end of the world if I take an extra

7    day of their time that week before the holidays.  We're looking

8    at the 18th or 19th of December.  I'm still with enough time.

9    MR. CALDERON:  Yes, Your Honor.

10   THE COURT:  All right.  And obviously, on the defense

11   team, don't worry about making this election.  I mean, if you

12   guys want to do it with a jury, I'm fine.  I'm just trying to

13   get a sense of how long it would take.

14   You guys share in that, that it's probably a couple of

15   extra days, if it goes that way?

16   MR. SADOW:  We agree with that, Your Honor.

17   THE COURT:  Okay.  So then it's not the end of the

18   world.

19   All right.  So let's just plan right now on trying to

20   get this all done, and getting your portion as well done, on

21   the forfeiture, on the back end.  I'm fine with that.  Okay.

22   Very good.

23   So, Ms. de Boer, you had asked, I think, some mechanics

24   as well; is that what you wanted to know?

25   MS. DE BOER:  Yes.

1        THE COURT:  So it's a good question because I have not

2    had an opportunity to try a case in this courtroom yet.  I

3    presume that my CRD and I will set up another row of chairs

4    here in the front, almost in the well.

5        I would rather do that, Gracie.  I don't know how many

6    we're going to get.  And trying to put people in the pews, it

7    just becomes a little too unwieldy.  And if we do that -- I

8    mean, I don't know how many we're going to get.  We're going to

9    find out today and tomorrow, when we talk to the jury section.

10   But I assume we can fill up another row of chairs and have

11   everyone in one place for the selection process.  That's my

12   hope.

13       I'm trying to think.  If I can't do that, I probably

14   would take some of the pews over there, and then I would have

15   you all -- perhaps even -- instead of having the government

16   sitting at their current table, what I think I will probably do

17   is have the government here, next to the defense, facing out.

18   And that's only if, for whatever reason, I have to use the pews

19   behind the government.

20       So I can use that podium.  So whoever is doing

21   questioning, or who's going to be near the jury, is going to

22   have a seat or a spot in the well, and then I will fill these

23   two parts of the box, and I will use those pews.  That's

24   probably if I have too many because -- look, I'm going to go

25   for as many as I can.  So if I get a ton of bodies, that's how

1    I'm going to set it up.  I'm going to fill this, and I'm going

2    to fill that side of the courtroom.  So you'll have all of

3    that.

4           You'll get questionnaires beforehand.  You'll get

5    seating grids customized to what it is.  We're designing those

6    as we speak because we haven't used this courtroom yet.  So

7    we're going to do that.  So hopefully we get a good amount of

8    jurors, and we can fill all of this and fill the side you guys

9    are on.

10          So on that day, on Monday, just be prepared to set up

11   over here.  Gracie will let you know.  But this works out

12   pretty good, that you guys can be side by side, with space in

13   between, and then you don't have your backs to any potential

14   jurors.

15          The way in which I do things is, I have my own fairly

16   extensive voir dire, probably clocks in at about -- depending

17   how many people we have, I would say no more than an hour and a

18   half.  And if you haven't done so already, send me any proposed

19   questions.  The Court will entertain five a side.  Sometimes, I

20   feel that they're pre-trying and I won't ask them.  Sometimes,

21   I think they're smack on point.

22          I would suggest that you guys send in to me case

23   specific type questions regarding experience in the healthcare

24   space, issues with Medicare, et cetera, and I will happily work

25   those into my voir dire along with general concept questions

1    about right to remain silent and burden of proof, et cetera.

2         So I will go through all that myself.  I will go

3    through all the scheduling myself.  My goal is, oftentimes, to

4    try to sniff out the clear cause challenges.  Then, we will

5    take a brief break after I'm done.  We will meet and confer at

6    that point, and I will, to the extent we have major conflicts,

7    let you know right then and there who's out for cause.

8         So, for example, if someone says clearly they're out

9    with a medical appointment or whatever it may be, we're not

10   going to let them go.  But when you guys get your limited

11   questioning, you know to stay away from folks that are not

12   going to be selected.  So if someone airs out a conflict,

13   they're gone.

14        Now I turn it over to you guys.  I'm looking at about

15   15 minutes a side of follow-up.  I urge you to use it wisely,

16   draw questions from those folks that have not answered

17   anything, that have stayed silent.

18        I do a lot of participation with the audience and try

19   to get everybody relaxed.  My goal is to be an opening act of

20   sorts, get all of the principal concepts covered, loosen

21   everybody up a bit, get what I can get out of the jurors.  Then

22   you guys should, looking at the questionnaires, do a more

23   tailored, focused questioning, for those 15 minutes I give you

24   at the end.

25        After that, of course, we'll get together, and you'll

1   each have your set of peremptories.  Maybe a cause manifests

2   itself, but my goal is always that by the time I give it to you

3   guys at the end, we've all agreed on who's cause, and you can

4   just focus on how you're going to work your peremptories.  No

5   back-strikes permitted.  We'll give you, of course, the

6   questionnaires, as soon as we have them, along with the seating

7   chart.

8          So does that cover most of the questions for you,

9   Ms. de Boer?  Does that work?

10          MS. DE BOER:  Mostly, Your Honor.

11          How many peremptories for each side are you

12   envisioning, and how many alternates are you envisioning

13   picking?

14          THE COURT:  Well, alternates we're going to do -- I'm

15   thinking I would like to have 15.  I think it would be nice to

16   have 3.  That would be my goal.  I mean, look, if we haven't

17   burned challenges, and we have people, and we all like them,

18   the more, the merrier.  But I think when it's a little bit

19   longer -- we don't have the concerns we've had before on COVID,

20   but I think, in an abundance of caution, I am targeting 15.  If

21   my count is right, I think this box can seat that many.

22          THE COURT SECURITY OFFICER:  Nine in the back, 7 in the

23   front, I think, Judge.

24          THE COURT:  So we've got 16.  If we can go for it,

25   great.  But I would love to have a minimum of 3 alternates.  If

1    I can get 4, that would be wonderful.

2          And then, strike-wise, 10 and 6.  It's statutory

3    strikes.  Nothing else changing there.  No co-defendant,

4    nothing else to worry about.  So that's going to be by statute.

5          So I think that's about it.  I mean, I'm optimistic,

6    because we have a good window of time before the holidays start

7    to roll up, that we can get this done in that window and that

8    jurors will be willing to serve.  And starting at 10:00 gives

9    them a little bit more of a cushion to get in, so it should be

10   good.

11         Does that answer your question?

12         MS. DE BOER:  It does, Your Honor.  Thank you.

13         THE COURT:  Okay, good.

14         Any questions from the defense camp?

15         MR. SADOW:  I have a question.

16         THE COURT:  Yeah.

17         MR. SADOW:  I understand the concept of back-striking,

18   but does the Court go Juror 1, Juror 2, however your numbers

19   are --

20         THE COURT:  Yes, I don't randomize.

21         MR. SADOW:  Do you accept or you reject --

22         THE COURT:  Yes.

23         MR. SADOW:  -- and then you move on?

24         THE COURT:  Exactly.  I don't randomize.  I was a

25   lawyer not that long ago.  I remember judges that did that.  It

1    drove me crazy.  You couldn't keep track.  I understand the

2    concept was, oh, it keeps it more fair if we're jumping around

3    or rouletting on the list.  I don't do that.  You can plan

4    ahead.

5         But once you seat them, they're seated.  That's just

6    the goal.  But you're going to go straight down the numbers,

7    starting with number one, and we'll go numerical.  That way,

8    you can plan ahead.

9         MR. SADOW:  Okay.  That part, I understand that.

10        THE COURT:  Yes.

11        MR. SADOW:  Both sides have already submitted five

12   questions, but we have objections, unusually -- I almost never

13   object to voir dire questions, but I have objections to two of

14   them.  The question becomes when the Court wants to hear it.

15        THE COURT:  You know what?  Let's do that on Monday, on

16   the 28th.  I'll address it.

17        I'll tell you what, if it looks -- can you tell me very

18   quickly, Mr. Sadow, what they are?  I may be able to tell you

19   right now --

20        MR. SADOW:  I can tell you, Question No. 3 from the

21   government:  "Cancer genetic tests were only covered by

22   Medicare if they were medically necessary and ordered by a

23   physician who was treating the patient."  And then, there's the

24   question.

25        THE COURT:  Yeah, that's not coming in.  That's a jury

1   instruction.  That's not -- I appreciate the suggestion, but,

2   no.  I mean, I can talk -- I'll probably ask about anyone's

3   experience with genetic testing, I mean, generally, but that's

4   like -- medical necessity coming out in voir dire, to me that's

5   borderline pre-trying, and that's better left when we explain

6   to them what medical necessity is.  You don't have to worry.

7   I'm not asking that one.

8         MR. SADOW:  And No. 5 was:  "The government may present

9   testimony of cooperating witnesses who are knowledgeable of the

10   alleged crimes and may have pled guilty."

11         THE COURT:  It's a little too specific.  I think that

12   the one thing I may ask is, does anyone have a strong -- and

13   much open-ended, which benefits everyone -- anyone have any

14   strong feelings about cooperating witnesses, in exchange for

15   their testimony, may have struck a deal with the government.

16   Because if we've got someone that says I don't believe him as

17   far as I can throw him, right, we have the ability to make

18   judgment calls up front.

19         MR. SADOW:  We can take those?

20         THE COURT:  Right.  I know you want those, but I know

21   what the government's going to want to do with those.  So I'll

22   take that in concept, but I'm going to scale that back a bit.

23         MS. DE BOER:  And that's all we intended, Your Honor,

24   so that the issue is forward.  And having tried a genetic

25   testing case, I can tell you that the answers on people who

1   have dealt with these tests is very informative for both sides,

2   so --

3        THE COURT:  Sure.

4        MR. SADOW:  We're in agreement on that.  It's only the

5   legal ramifications.

6        THE COURT:  I just want to know -- generally, you know,

7   this case is going to feature a discussion about genetic

8   testing in the medical field.  Has anybody had any experience

9   with that?  Do you have any feelings about it?  What if someone

10  jumps out and says, yeah, I had genetic testing, and it tested

11  me for something I didn't have, right?  Or if someone had a

12  really bad experience with testing, they're probably not going

13  to serve.  So that's the kind of thing that I need to tease

14  out.  So I'll ask those things, but in a much softer way and

15  more open-ended way.

16       And then, of course, both sides should avail themselves

17  of their limited questioning to follow up on that if I don't

18  get into it as far as you guys would like.

19       MR. SADOW:  And then one other matter unrelated to jury

20  selection:  Published text -- there's several text messages

21  that are on the government's exhibit list.  I'm not suggesting

22  they won't be admissible.  The question becomes how they're

23  going to be presented.  If they're going to be presented by the

24  individual that was involved in the message, obviously, no

25  question.  But there appears to be some that may not be so.

1        I don't know whether the government intends -- it's

2   mentioned summary witness.  I don't know how you can do that

3   with a text message.  It's a little tricky because text

4   messages, you can read between the lines.  Sometimes they're

5   not quite as clear.  So I'm just throwing that out.

6        THE COURT:  Okay.  I don't know if the government has

7   any sense on that right now, how that's going to come in.

8        MS. DE BOER:  Well, I think what Mr. Sadow may be

9   referring to is text messages that the defendant sent or

10  received from people who won't be testifying.  And to the

11  extent we can authenticate those text messages and meet other

12  requirements for admissibility, I think it just comes in.

13  We're not going to have people talk about those text messages.

14  But it comes in.  At most, it's read to the jury, and then

15  connected up in closing argument to other evidence that's

16  presented in the case.

17        MR. SADOW:  And my problem is, read by whom?

18        THE COURT:  That's what I was going to say.  Who's the

19  vehicle for the text messages?  Because assuming you have no

20  problem with authenticity and admissibility, whether it comes

21  in under 801, if it's his own, or maybe even 801 if it comes

22  from a co-conspirator, I guess, how does that get presented?

23  Who's going to be the vehicle for that?

24        MS. DE BOER:  Well, I think some of them would simply

25  be admitted and used in closing argument.  And others -- to the

1    extent -- I think we have to take it on a case-by-case basis.

2    But suppose there's a text message -- and I don't have a

3    specific one in mind -- that talks about a transaction, well, I

4    think we can ask our financial analyst who's going to testify,

5    did you look for this transaction.  Yes, here it is.

6              THE COURT:  Okay.

7              MS. DE BOER:  That's one way which it might be used,

8    but it's not going to be back and forth, you know, role-play

9    type of situation.

10             THE COURT:  Right, like reading a depo transcript type

11   of situation, right?  We're not going to have this -- someone

12   is going to be standing in the shoes of sender on the text

13   message.  It would either get moved in independently, or it

14   would come in as a smaller piece of one of the analysts.

15             MS. DE BOER:  Under context of broader testimony,

16   that's right.  And then, of course, as Mr. Sadow is saying, if

17   there is going to be reading of text messages with a witness

18   who is involved and asking questions about that --

19             THE COURT:  Oh, I think he agrees with that.

20             MS. DE BOER:  Yeah.

21             THE COURT:  It's the ones that aren't from anybody

22   that's testifying, how do they come in.  And I think if you

23   satisfy the predicates, they get moved in as exhibits.  And

24   like you said, they may come up in closing, but they're not

25   going to be read in character, if you will, to a jury.

1          MS. DE BOER:  It's not going to be like a play.

2     They're not going to be acted out to the jury.

3          Another thing we can even do is, Your Honor could admit

4     these exhibits, and we can simply put them on the ELMO and flip

5     through it, allow the jury to read it, and that's it.  That's

6     one way to do it.

7          THE COURT:  Okay.

8          MR. SADOW:  I have no problems with any of those.  I

9     just didn't want the --

10          THE COURT:  The reading.

11          MR. SADOW:  -- the reading and the acting and the

12     emphasis.

13          THE COURT:  Right.  And I think we're avoiding that, so

14     that makes me feel better too.

15          Is there anything else, Mr. Sadow, that you wanted me

16     to touch on?

17          MR. RAFFERTY:  Just a couple of things, Your Honor.

18          THE COURT:  Yeah.

19          MR. RAFFERTY:  Opening statements.  Did you set how

20     long each side has for opening statements?

21          THE COURT:  I typically do.  But let me ask first, how

22     long do you think you need, and we can go from there.

23          What are you guys thinking?

24          MS. DE BOER:  We would request 30 minutes, Your Honor.

25          THE COURT:  Okay.  What about the --

1          MR. SADOW:  That seems fine.

2          THE COURT:  Okay.  I think that's fine.  I don't have a

3    problem with that.  And if it's 30 minutes, and you go over by

4    a minute, don't worry about it.  It's fine.  As long as you're

5    staying inside -- I'll give you about a 10-minute buffer, if

6    you need it, but let's just stay inside 30 to 40.  I have no

7    problem with that.

8          MR. RAFFERTY:  And then with respect to witnesses, can

9    we get an agreement on both sides the night before, or the day

10   before, we'll get witnesses for the next day so we can move

11   this along?

12         THE COURT:  Yeah, I would prefer that, please.  Let's

13   do that.  So when we finish with our openings on Monday, let's

14   have the lineup for Tuesday, absolutely.

15         MR. RAFFERTY:  On the defense side, we have some

16   investigators and other folks involved in the case who are

17   going to be coming to the courtroom.

18         THE COURT:  Sure.

19         MR. RAFFERTY:  They may have electronic devices.

20         Can we submit something to the Court to get an order --

21         THE COURT:  Yes, please.  File a motion, and I'll grant

22   it immediately.  File a motion that indicates who it is, who's

23   coming with devices -- and that applies for both sides.  I'll

24   grant it so that you don't have any problems with the marshals

25   bringing it in.

 1          MR. RAFFERTY:  And last, with respect to the conference

 2     rooms, I assume there will be a defense conference room

 3     outside.  If we have boxes or materials, are we going to be

 4     able to store those overnight?

 5          THE COURT:  It's a good question.  Let me find out from

 6     my CRD.  I would like that to be the case, because of the

 7     length of the trial, that I can commandeer some of the

 8     conference areas here.  I just want to make sure that I know

 9     exactly what I can use and where your stuff won't be disturbed

10     and you can meet.  But I would like to do that.

11          So what I can tell you is -- give me until Monday, when

12     you guys come in on Monday.  Bring your stuff.  But I'll find a

13     way.  I mean, this courtroom will be sealed every evening.  And

14     I don't anticipate -- other than the occasional change of plea

15     or sentencing I may have over the lunch hour, which won't

16     interrupt anybody when you're on break, I think you can keep

17     your stuff here safely throughout the three weeks.

18          But let me find out.  Gracie, can we find out today?

19          Let's find out.  My CRD will help you guys.  When you

20     come in on Monday, in the morning, we'll have a place we can

21     let you know that you can use.  I just want to check with the

22     magistrate next door to make sure we're not running afoul of

23     anything they need.

24          MR. RAFFERTY:  Thank you, Your Honor.

25          MR. SADOW:  One of the things, strange as it may sound,

1    I tend to like to work with paper when I'm examining.

2          THE COURT:  Sure.

3          MR. SADOW:  Would the Court have any problems if I move

4    one of the tables over here so I can lay all my stuff out?

5          THE COURT:  Not a problem, because we don't really have

6    -- my old courtroom in Fort Lauderdale had a place to lay stuff

7    out.  If we want to move one to there to have a little more

8    space for people to lay exhibits and papers, I think that's

9    fine.

10         So when we come on Monday, if you want -- just let me

11   know how you want to reconfigure.  I'm totally fine.  The only

12   thing we probably want is to keep this setup for the voir dire

13   because the government's going to need the tables.  But once we

14   break and everyone goes to lunch after voir dire, let me know

15   how you want to reconfigure.  Because you might as well move

16   one right here.  And the well is big enough.  If you want to

17   leave your notes and stuff like that, that's fine.  I don't

18   have a problem with that at all.

19         MR. SADOW:  Thank you.

20         MS. DE BOER:  Just to circle back to the Rule 17

21   subpoena, Your Honor, just to make sure we know where that

22   stands.

23         THE COURT:  I don't know what the latest is on that.  I

24   don't know if there's already been a response.

25         Does the defense know, on the Rule 17, what the latest

1   is?

2          MR. SAMUEL:  I believe they have absolutely everything.

3   I mean, we can waive with regard to the two big law firms.

4   Judge Reinhart excluded a few things that had nothing to do

5   with the advice-of-counsel defense, completely unrelated.

6   Eight items, I think.  And then gave us the subpoena that

7   afternoon.  I think there was nothing left.  I mean --

8          MR. SADOW:  That's the production that you -- you

9   received two productions, I believe, since that time.

10          MS. DE BOER:  None of those productions had

11   advice-of-counsel materials.

12          MR. SAMUEL:  I know that I have nothing at all.  I've

13   checked with the company.  They have nothing at all.  I just

14   don't know that there's anything else there.

15          THE COURT:  Okay.

16          MS. DE BOER:  Okay.  If there's nothing else, then

17   there's nothing else.

18          THE COURT:  And I will just say -- because, I mean, I

19   don't think -- I looked.  It's unsigned.  But I've looked at

20   this affidavit.  It's a nothingburger.  In case anyone needed

21   any more comfort, this just confirms that I am in no way,

22   shape, or form, worried about some of the issues we talked

23   about earlier with Mr. Sadow and Mr. Watt.  Certainly this

24   affidavit has nothing in here that would give me a cause for

25   concern that would affect, you know, the advice-of-counsel

1   issues that we discussed and Mr. Sadow's abilities to represent

2   Mr. Patel.

3          So I can tell you -- quite frankly, I don't think

4   there's anything in here of consequence, really.  I think it

5   can be produced, and there's not much to it.  So at least it

6   makes everyone feel comfortable that there's no concern here or

7   something that we weren't aware of.

8          MS. DE BOER:  Thank you, Your Honor.

9          THE COURT:  I looked at it already.  It's a non-issue,

10  so we're fine.

11         All right.  So I think we've done all our homework, and

12  we should be able to hit the ground running on Monday.

13         Anything else?  Obviously, if something manifests

14  itself unforeseen, please reach out to me by email, including

15  over the weekend or the holidays, and I will check it if

16  something is an emergency.  But my hope is that everyone will

17  hopefully -- now that we've done a lot of the work -- I know

18  it's not ideal to have such a large trial beginning after the

19  Thanksgiving holiday, but I do appreciate everyone sticking to

20  the Trial Court's schedule.  I hope that you will still all be

21  able to have a nice holiday with your families, and a nice

22  break, before everyone puts on their hats again and starts

23  working up the last few details before Monday.

24         If there's nothing else, I hope everyone has a great

25  Thanksgiving.  Thank you, guys, for your work.  I'll turn

1   around some paperless orders to memorialize what we've done

2   here today, but most of it will refer back to the record.  It

3   will not be anything earth-shattering.

4          MS. DE BOER:  Are we starting any earlier on Monday for

5   jury selection?

6          THE COURT:  10:00 a.m.  Let's do 10:00 a.m.  It gives

7   me enough time for my CRD and I to make copies of the

8   questions, get all the bodies here, set up the chairs.  That

9   way, we're not in a rush.  The courtroom should be open by

10  9:00, if you want to come in and start setting up, but I don't

11  plan on starting before 10:00.

12         MS. DE BOER:  Thank you, Your Honor.

13         THE COURT:  Anything else, guys?  We're all set?

14         MS. DE BOER:  Nothing from the government.

15         THE COURT:  Thank you, everyone.  We're in recess.

16  Happy Thanksgiving.

17         MS. DE BOER:  You too, Your Honor.

18         MR. SADOW:  Thank you, Your Honor.

19         THE COURT:  Thank you, guys.

20         (Court recessed at 2:12 p.m.)

21

                        C E R T I F I C A T E

22

23

24         I hereby certify that the foregoing is an

25  accurate transcription of the proceedings in the

1    above-entitled matter.

2

3

DATE:   November 25, 2022   /s/Ilona Lupowitz
4                              ILONA LUPOWITZ, CRR, RPR, RMR
                               Official Court Reporter
5                              United States District Court
                               299 East Broward Boulevard
6                              Fort Lauderdale, Florida 33301
                               (954) 769-5568
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 81:11
**$178** [1] - 79:18
**$187** [1] - 78:9
**$22** [2] - 78:9, 79:19
**$463** [2] - 78:8, 79:18

## '

**'80s** [1] - 58:10

## /

**/s/Ilona** [1] - 156:3

## 1

**1** [6] - 1:7, 45:25, 46:1,
46:7, 50:3, 143:18
**10** [2] - 118:25, 143:2
**10-minute** [1] - 150:5
**106** [1] - 98:1
**10:00** [8] - 131:20, 132:4,
133:2, 133:6, 143:8, 155:6,
155:11
**10:43** [1] - 1:5
**11** [1] - 14:8
**1170** [1] - 2:6
**12** [1] - 119:12
**12:32** [1] - 85:4
**12:45** [1] - 85:5
**14** [1] - 80:20
**1400** [1] - 1:15
**15** [5] - 29:19, 141:15,
141:23, 142:15, 142:20
**16** [1] - 142:24
**16(a)(1)(E** [1] - 83:8
**16th** [2] - 49:18, 134:23
**17** [5] - 16:6, 31:15, 134:7,
152:20, 152:25
**187** [1] - 80:21
**18th** [2] - 134:25, 138:8
**19-80181** [1] - 3:3
**19-CR-80181-RAR-1** [1] -
1:2
**1980s** [1] - 58:10
**19th** [1] - 138:8

## 2

**2** [23] - 21:3, 22:15, 22:16,
22:20, 23:16, 24:11, 25:18,
25:22, 26:19, 26:25, 28:17,
30:6, 30:11, 30:25, 31:5,
31:13, 31:17, 31:19, 46:2,
46:4, 50:3, 143:18
**20005** [1] - 1:16
**2017** [1] - 12:14
**2019** [12] - 40:24, 42:15,

42:21, 43:8, 46:24, 47:6,
49:18, 57:3, 57:12, 65:16,
92:8, 98:9
**2022** [2] - 1:4, 156:3
**2052** [1] - 1:18
**22** [1] - 1:4
**24** [1] - 119:12
**2400** [1] - 2:6
**25** [1] - 156:3
**25-plus** [1] - 92:15
**260** [1] - 1:18
**26th** [1] - 65:16
**28th** [3] - 130:22, 132:15,
144:16
**292** [4] - 4:18, 31:11, 32:5,
32:20
**299** [2] - 1:23, 156:5
**29th** [1] - 41:23
**2:12** [2] - 1:5, 155:20

## 3

**3** [4] - 24:17, 142:16,
142:25, 144:20
**30** [3] - 149:24, 150:3,
150:6
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**308** [1] - 32:25
**3131** [1] - 2:3
**32** [1] - 78:18
**328** [2] - 7:17, 112:11
**330** [1] - 31:14
**330-17** [2] - 16:6, 16:16
**3301** [1] - 1:23
**33301** [1] - 156:6

## 4

**4** [3] - 24:17, 143:1
**40** [1] - 150:6
**401** [1] - 77:10
**403** [5] - 14:12, 30:20, 75:3,
77:10, 80:7
**404** [2] - 83:24, 119:5
**404(b** [9] - 3:23, 5:13, 6:4,
7:20, 8:9, 14:16, 31:10,
31:23, 32:20
**404(b)** [2] - 4:4, 4:17
**416** [1] - 80:21
**417** [1] - 10:15

## 5

**5** [2] - 24:17, 145:8
**5:00** [1] - 132:6
**5:30** [1] - 132:6

## 6

**6** [1] - 143:2
**612** [1] - 102:21
**613** [1] - 102:20

## 7

**7** [1] - 142:22
**769-5568** [2] - 1:24, 156:6

## 8

**8,000** [1] - 91:19
**801** [8] - 95:1, 96:15, 97:20,
109:13, 111:10, 112:4,
147:21
**801(d)(2)(E** [2] - 94:17,
108:7
**801(d)(2)(E)s** [1] - 96:3
**806** [26] - 84:14, 94:1, 99:2,
99:15, 100:1, 100:13,
101:11, 119:10, 119:15,
119:20, 119:23, 120:16,
124:15, 124:22, 125:12,
125:23, 126:7, 126:9,
126:12, 126:16, 128:1,
128:7, 128:11, 128:12,
130:15, 133:1
**806's** [1] - 95:3
**855** [2] - 7:14, 20:23
**855s** [2] - 7:25, 113:4
**8th** [1] - 1:15

## 9

**954** [2] - 1:24, 156:6
**9:00** [2] - 133:8, 155:10
**9:30** [1] - 133:3

## A

**a.m** [1] - 1:5, 155:6
**Abdel** [1] - 16:16
**Abdel-Aleem** [1] - 16:16
**abilities** [1] - 154:1
**ability** [7] - 39:22, 54:6,
56:20, 70:5, 72:4, 95:3,
145:17
**able** [22] - 9:17, 25:23, 26:8,
28:17, 46:6, 46:15, 54:16,
65:15, 88:22, 97:11, 107:25,
108:17, 108:18, 110:10,
116:3, 123:11, 133:20,
138:4, 144:18, 154:4,
154:12, 154:21
**above-entitled** [1] - 156:1
**absence** [1] - 5:14
**absent** [1] - 32:3
**absolutely** [5] - 37:6, 91:5,

104:11, 150:14, 153:2
**absolved** [2] - 18:15,
115:17
**absurd** [1] - 114:19
**abundance** [4] - 56:7,
112:16, 131:1, 142:20
**accept** [1] - 143:21
**accomplish** [1] - 127:2
**accomplished** [1] - 54:10
**according** [3] - 24:1, 59:19,
78:8
**accounts** [1] - 80:23
**accurate** [2] - 31:6, 155:25
**accusation** [2] - 15:2, 15:10
**accusations** [3] - 17:20,
21:11, 22:10
**acknowledge** [1] - 12:17
**acknowledged** [5] - 9:18,
9:23, 22:13, 63:22, 91:13
**acknowledging** [3] - 9:10,
19:13, 19:16
**acknowledgment** [1] - 21:8
**acquiring** [1] - 15:2
**act** [2] - 89:25, 141:19
**acted** [1] - 149:2
**acting** [2] - 109:6, 149:11
**action** [1] - 16:8
**actions** [2] - 29:20, 89:12
**activities** [1] - 59:17
**activity** [1] - 96:4
**acts** [1] - 89:14
**actual** [1] - 94:12
**add** [7] - 9:22, 17:15, 32:11,
72:9, 97:6, 103:9, 115:2
**additional** [8] - 42:19, 53:7,
56:24, 62:6, 73:7, 79:14,
97:12, 100:21
**address** [7] - 32:22, 40:14,
74:17, 100:14, 100:16,
134:20, 144:16
**addressed** [2] - 119:8,
127:22
**addressing** [1] - 101:10
**adds** [1] - 106:20
**admissibility** [7] - 6:2, 8:20,
12:5, 97:17, 100:1, 147:12,
147:20
**admissible** [6] - 40:20,
81:2, 91:14, 91:24, 100:22,
146:22
**admissions** [1] - 95:25
**admit** [4] - 11:22, 94:4,
134:7, 149:3
**admitted** [2] - 26:14,
147:25
**ado** [1] - 90:11
**advance** [8] - 5:18, 21:20,
67:15, 77:8, 83:6, 108:5,
131:7, 131:9
**advanced** [4] - 74:2, 76:24,

89:1, 133:22
**advances** [1] - 108:7
**advancing** [2] - 41:12, 80:2
**advantage** [1] - 133:5
**advice** [106] - 5:15, 5:18, 13:14, 34:12, 34:14, 38:14, 38:23, 38:25, 39:7, 40:12, 41:5, 41:14, 41:25, 42:4, 42:5, 42:6, 42:11, 42:16, 43:12, 43:15, 43:18, 43:21, 44:1, 44:3, 44:9, 44:14, 44:15, 44:21, 44:24, 45:15, 45:18, 45:19, 45:21, 46:8, 46:12, 46:18, 46:22, 47:13, 47:14, 47:17, 49:9, 49:22, 50:8, 51:8, 51:15, 51:20, 52:2, 52:4, 52:8, 52:10, 52:18, 52:25, 53:4, 56:3, 58:4, 58:14, 58:16, 59:12, 59:23, 60:6, 60:12, 60:19, 61:13, 61:23, 63:14, 63:18, 63:19, 67:3, 67:9, 67:17, 67:23, 68:9, 70:4, 70:18, 71:14, 71:17, 72:14, 73:5, 74:10, 106:21, 107:11, 107:17, 109:7, 109:10, 109:19, 110:4, 113:1, 113:25, 114:2, 114:10, 114:18, 114:20, 116:20, 116:21, 118:7, 118:10, 118:12, 118:22, 153:5, 153:11, 153:25
**advice-of-counsel** [23] - 13:14, 34:14, 40:12, 41:5, 41:14, 41:25, 42:4, 44:14, 46:8, 51:15, 56:3, 60:12, 61:13, 63:19, 67:3, 67:9, 67:23, 106:21, 107:11, 114:20, 153:5, 153:11, 153:25
**advised** [4] - 45:9, 45:13, 72:2, 72:7
**advises** [1] - 123:25
**advising** [5] - 44:3, 45:19, 59:5, 61:24, 114:7
**affect** [1] - 153:25
**affidavit** [60] - 16:7, 16:10, 16:13, 16:15, 16:16, 16:20, 18:14, 20:19, 21:21, 22:4, 22:8, 22:22, 22:24, 23:6, 23:12, 25:5, 25:6, 25:11, 25:19, 25:20, 26:10, 27:3, 27:5, 28:12, 29:19, 31:14, 32:3, 32:15, 43:17, 43:19, 43:22, 43:23, 50:17, 50:18, 50:21, 50:24, 51:1, 51:2, 62:8, 62:9, 62:20, 62:22, 63:6, 63:16, 63:22, 65:6, 65:9, 65:19, 65:20, 65:22, 65:23, 66:9, 66:11, 66:25,

72:16, 73:9, 153:20, 153:24
**affidavits** [1] - 25:14
**afield** [1] - 90:5
**afoul** [4] - 36:24, 60:1, 93:17, 151:22
**afraid** [1] - 90:21
**after-the-fact** [2] - 59:17, 114:4
**afternoon** [2] - 119:9, 153:7
**afterwards** [1] - 96:9
**agent** [1] - 102:1
**agents** [2] - 102:8, 132:2
**agents'** [1] - 101:20
**ago** [3] - 7:16, 64:20, 143:25
**agree** [26] - 6:24, 15:4, 26:16, 38:7, 67:24, 73:6, 77:19, 86:2, 87:3, 91:6, 93:9, 94:13, 94:20, 97:1, 101:1, 110:23, 115:19, 115:25, 116:12, 117:10, 124:2, 124:11, 129:17, 137:2, 138:16
**agreed** [4] - 26:17, 31:2, 101:20, 142:3
**agreement** [6] - 85:9, 90:18, 101:6, 131:21, 146:4, 150:9
**agrees** [2] - 101:13, 148:19
**ahead** [18] - 4:12, 4:15, 7:7, 8:12, 17:15, 22:23, 30:25, 33:1, 38:1, 49:7, 52:21, 56:7, 74:5, 84:24, 126:20, 132:19, 144:4, 144:8
**aid** [1] - 80:18
**aired** [1] - 94:3
**airs** [1] - 141:12
**AKS** [4] - 4:23, 6:7, 28:1, 106:9
**alarm** [1] - 124:21
**Aleem** [6] - 12:24, 14:5, 16:16, 26:9, 27:5, 30:11
**Aleem's** [1] - 20:19
**Aleems** [22] - 12:21, 13:10, 14:2, 14:19, 17:21, 19:6, 20:12, 21:24, 22:2, 23:2, 25:21, 25:23, 26:4, 26:22, 27:9, 28:7, 29:14, 30:7, 30:18, 31:8, 31:20
**ALEEMS** [1] - 12:21
**Aleems'** [1] - 13:19
**allegation** [2] - 15:14, 15:20
**allegations** [11] - 5:7, 12:14, 12:19, 13:20, 14:9, 22:2, 27:3, 28:9, 29:15, 57:8, 76:1
**alleged** [8] - 14:2, 21:24, 29:3, 29:18, 29:23, 30:14, 59:8, 145:10
**alleges** [1] - 17:4

**alleging** [4] - 16:8, 16:21, 25:24, 26:23
**allocation** [1] - 105:22
**allow** [17] - 8:4, 8:11, 12:8, 12:12, 14:10, 14:14, 14:15, 31:15, 31:18, 48:11, 61:16, 61:25, 71:25, 75:1, 96:18, 97:24, 149:5
**allowed** [5] - 20:6, 56:1, 56:13, 85:23, 91:4
**allowing** [5] - 14:16, 31:13, 70:22, 118:19, 120:9
**alluded** [1] - 119:19
**alluding** [3] - 22:9, 104:15, 106:21
**almost** [10] - 19:4, 28:13, 44:25, 65:13, 73:23, 74:7, 114:19, 131:5, 139:4, 144:12
**alternates** [4] - 131:15, 142:12, 142:14, 142:25
**alternative** [1] - 83:4
**alternatively** [1] - 5:12
**altogether** [1] - 117:18
**ambit** [2] - 5:13, 81:2
**Amendment** [5] - 34:9, 69:19, 103:11, 103:17, 104:2
**AMERICA** [1] - 1:3
**America** [1] - 3:3
**amount** [2] - 125:21, 140:7
**analysis** [9] - 4:10, 17:20, 30:20, 61:7, 65:5, 73:25, 87:20, 97:23, 98:2
**analyst** [1] - 148:4
**analysts** [1] - 148:14
**ancillary** [1] - 80:5
**animal** [1] - 106:13
**answer** [8] - 11:12, 20:16, 66:5, 102:5, 110:19, 118:2, 118:3, 143:11
**answered** [2] - 71:10, 141:16
**answers** [1] - 145:25
**anti** [7] - 4:23, 5:20, 19:14, 22:11, 36:24, 45:10, 60:1
**anti-kickback** [7] - 4:23, 5:20, 19:14, 22:11, 36:24, 45:10, 60:1
**anticipate** [1] - 151:14
**anticipated** [1] - 62:11
**anyway** [1] - 136:17
**apart** [4] - 29:24, 54:7, 81:7, 88:20
**appeal** [20] - 3:25, 33:14, 34:23, 37:2, 38:8, 39:15, 39:16, 43:4, 43:25, 47:22, 56:15, 61:4, 67:18, 67:19, 67:21, 74:2, 74:4, 78:21, 83:24, 119:4
**appear** [1] - 61:6
**Appearances** [1] - 2:1

**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:5
**applied** [2] - 89:8
**applies** [3] - 44:11, 96:22, 150:23
**apply** [1] - 120:16
**applying** [1] - 114:7
**appointment** [1] - 141:9
**appreciate** [6] - 86:24, 102:19, 124:5, 128:19, 145:1, 154:19
**appreciates** [1] - 73:7
**approach** [1] - 126:6
**approached** [1] - 39:13
**appropriate** [6] - 53:8, 82:14, 102:18, 108:18, 116:18, 127:16
**April** [1] - 57:15
**area** [2] - 43:11, 48:10
**areas** [1] - 151:8
**arguably** [2] - 17:9, 39:6
**argue** [4] - 6:23, 87:9, 87:10, 105:6
**argued** [1] - 86:24
**arguing** [1] - 7:6
**argument** [21] - 4:6, 6:24, 41:15, 74:10, 81:6, 83:5, 103:2, 103:24, 104:14, 104:20, 104:23, 105:1, 105:6, 105:21, 106:9, 108:3, 112:10, 116:15, 123:6, 147:15, 147:25
**arguments** [6] - 86:4, 101:11, 103:9, 103:23, 105:13, 105:23
**arise** [3] - 9:11, 43:24, 94:19
**arises** [1] - 70:2
**arrangement** [1] - 134:17
**arrive** [1] - 133:9
**articulate** [1] - 14:24
**aside** [1] - 41:23
**aspersions** [1] - 80:9
**asserted** [9] - 15:25, 17:6, 17:23, 18:1, 18:11, 41:15, 43:18, 47:16, 94:3
**asserting** [2] - 62:15, 64:1
**assertion** [1] - 64:9
**assertions** [1] - 64:5
**assist** [1] - 58:6
**assistance** [1] - 71:15
**assisted** [2] - 43:23, 82:11
**assisting** [1] - 38:3
**assists** [1] - 82:10
**associate** [1] - 21:9
**association** [1] - 17:1
**assume** [6] - 36:21, 53:15, 107:23, 137:3, 139:10, 151:2
**assuming** [3] - 24:9, 92:4,

147:19
**assurance** [1] - 72:17
**assure** [1] - 102:17
**Atlanta** [5] - 1:19, 2:4, 2:7, 17:18, 52:2
**attached** [2] - 31:14, 66:24
**Attachment** [1] - 16:6
**attacking** [1] - 117:1
**attacks** [1] - 100:2
**attempt** [5] - 4:24, 8:16, 40:25, 116:1, 131:15
**attempting** [3] - 93:10, 98:14, 100:9
**attention** [1] - 128:8
**attenuated** [1] - 124:7
**attitude** [1] - 40:17
**attorney** [22] - 33:5, 33:13, 33:25, 34:1, 39:2, 42:7, 42:10, 43:12, 57:14, 58:1, 62:13, 64:8, 66:16, 107:21, 107:22, 107:24, 108:24, 112:8, 113:23, 114:14, 116:22, 135:6
**attorney's** [1] - 109:7
**attorney-client** [1] - 39:2
**attorneys** [7] - 36:1, 44:3, 59:21, 107:12, 107:17, 108:3, 113:22
**attribute** [1] - 122:18
**audience** [1] - 141:18
**audio** [1] - 98:6
**August** [4] - 43:7, 49:17, 65:16, 98:9
**AUSA** [2] - 51:11, 59:3
**authentic** [1] - 94:12
**authenticate** [1] - 147:11
**authenticity** [2] - 94:14, 147:20
**authority** [1] - 103:14
**automatically** [2] - 87:18, 87:23
**avail** [1] - 146:16
**availability** [2] - 86:22, 132:12
**available** [9] - 82:7, 94:16, 94:18, 95:2, 96:14, 97:1, 103:3, 103:19, 104:7
**Avenue** [1] - 1:15
**avoid** [3] - 114:15, 131:22, 132:4
**avoiding** [1] - 149:13
**avoids** [1] - 27:2
**aware** [17] - 9:13, 13:2, 13:10, 43:5, 43:7, 47:4, 57:2, 82:3, 84:17, 88:10, 91:13, 94:25, 120:3, 133:24, 134:3, 135:2, 154:7
**awkward** [1] - 53:10

## B

**B.H** [1] - 98:16
**babe** [1] - 7:4
**back-and-forth** [5] - 20:5, 53:3, 92:20, 93:5, 93:16
**back-dooring** [1] - 124:22
**back-strikes** [1] - 142:5
**back-striking** [1] - 143:17
**backdoor** [1] - 90:25
**backs** [1] - 140:13
**backstory** [1] - 23:16
**backwards** [1] - 23:20
**bad** [6] - 13:23, 26:18, 105:23, 124:12, 137:6, 146:12
**BAKER** [1] - 2:5
**ball** [4] - 24:5, 67:15, 83:6, 88:11
**bar** [1] - 93:18
**bars** [1] - 77:14
**based** [4] - 5:18, 63:14, 86:14, 124:19
**bases** [2] - 91:24, 116:7
**basis** [2] - 109:23, 148:1
**Bates** [1] - 57:18
**BEACH** [1] - 1:2
**bear** [1] - 73:11
**bearing** [4] - 53:4, 86:13, 90:1, 90:5
**bears** [1] - 46:13
**beat** [1] - 130:25
**became** [7] - 43:6, 47:4, 57:2, 58:19, 60:8, 71:16, 88:10
**become** [3] - 18:23, 43:2, 43:5
**becomes** [11] - 18:24, 35:19, 44:19, 70:4, 106:12, 129:20, 130:8, 139:7, 144:14, 146:22
**becoming** [4] - 24:21, 39:19, 47:25, 70:19
**bed** [1] - 10:2
**BEFORE** [1] - 1:10
**beforehand** [2] - 31:1, 140:4
**began** [2] - 13:10, 49:18
**begin** [5] - 3:21, 18:16, 29:2, 70:3, 73:4
**beginning** [3] - 24:18, 137:7, 154:18
**begins** [1] - 19:25
**behalf** [4] - 3:5, 3:12, 3:14, 62:15
**behavior** [3] - 9:14, 35:23, 37:17
**behest** [1] - 100:8
**behind** [1] - 139:19

**belabor** [7] - 4:6, 11:15, 69:14, 82:1, 83:10, 83:18, 91:15
**belief** [5] - 44:11, 50:4, 86:17, 86:18, 91:23
**believer** [1] - 137:6
**believes** [3] - 87:25, 123:23, 126:16
**bench** [6] - 114:23, 135:12, 136:8, 136:9, 136:13, 136:15
**benefit** [2] - 112:19, 133:9
**benefits** [2] - 133:6, 145:13
**best** [4] - 4:3, 30:24, 124:25, 127:23
**better** [12] - 7:4, 33:16, 34:7, 55:25, 67:25, 72:20, 73:23, 73:24, 83:5, 119:25, 145:5, 149:14
**between** [13] - 19:6, 25:18, 33:4, 42:4, 56:5, 58:3, 61:2, 63:15, 125:9, 129:16, 130:3, 140:13, 147:4
**beyond** [3] - 9:15, 50:8, 57:17, 57:18, 58:17, 61:8, 64:24, 78:16, 78:20, 79:16, 107:7, 116:24, 118:23
**biases** [1] - 105:6
**big** [7] - 23:15, 44:8, 49:21, 105:12, 105:22, 152:16, 153:3
**bigger** [5] - 25:15, 70:5, 75:17, 75:20, 75:24
**biggest** [2] - 40:7, 109:24
**bill** [1] - 79:11
**billed** [2] - 78:8, 79:18
**billing** [2] - 57:16, 58:13
**Biscayne** [1] - 79:9
**bit** [43] - 3:20, 3:24, 11:18, 12:22, 17:11, 19:8, 19:17, 20:1, 20:2, 20:17, 24:19, 25:9, 31:1, 32:18, 38:9, 56:10, 60:25, 67:16, 81:15, 82:2, 90:2, 93:20, 94:1, 94:22, 95:2, 100:11, 101:23, 112:14, 113:9, 118:21, 120:7, 122:3, 127:17, 131:7, 131:13, 132:13, 132:21, 137:4, 138:6, 141:21, 142:18, 143:9, 145:22
**black** [1] - 113:7
**blame** [1] - 88:5
**blaming** [1] - 85:12
**blanket** [2] - 44:25, 45:6
**blessing** [1] - 114:14
**blowing** [1] - 76:25
**blows** [1] - 133:7
**board** [1] - 89:8
**boat** [1] - 111:21
**boats** [1] - 75:2
**bodies** [3] - 130:23, 139:25,

155:8
**Boer** [20] - 3:7, 7:1, 40:6, 44:7, 48:24, 50:2, 52:14, 55:23, 61:14, 66:10, 67:21, 71:4, 72:20, 96:13, 96:24, 107:1, 109:24, 130:14, 138:23, 142:9
**BOER** [80] - 1:13, 3:7, 40:8, 45:5, 45:9, 46:11, 46:21, 48:6, 48:10, 56:24, 62:5, 62:8, 62:21, 63:1, 63:4, 63:13, 63:25, 64:18, 66:14, 67:13, 68:4, 68:8, 68:23, 73:6, 75:16, 75:20, 75:23, 76:6, 85:1, 86:10, 87:21, 89:4, 89:7, 93:20, 93:23, 97:1, 97:6, 100:15, 107:9, 110:23, 113:12, 113:16, 115:25, 116:6, 120:6, 120:15, 120:20, 121:9, 123:14, 126:24, 127:7, 127:9, 128:19, 130:12, 130:17, 132:1, 134:5, 134:16, 134:23, 134:25, 135:2, 138:25, 142:10, 143:12, 145:23, 147:8, 147:24, 148:7, 148:15, 148:20, 149:1, 149:24, 152:20, 153:10, 153:16, 154:8, 155:4, 155:12, 155:14, 155:17
**bologna** [1] - 18:22
**bomb** [1] - 36:16
**bond** [1] - 81:21
**borderline** [1] - 145:5
**borne** [1] - 56:22
**bottom** [2] - 9:20, 9:21
**Boulevard** [2] - 1:23, 156:5
**bounds** [3] - 6:14, 7:14, 103:13
**box** [2] - 139:23, 142:21
**boxes** [1] - 151:3
**breach** [4] - 12:16, 13:11, 27:12, 28:7
**break** [9] - 84:9, 84:12, 84:24, 85:8, 136:1, 141:5, 151:16, 152:14, 154:22
**breaking** [1] - 137:6
**Brian** [1] - 3:17
**BRIAN** [1] - 2:5
**bribes** [1] - 80:20
**bridge** [1] - 118:20
**brief** [8] - 16:17, 18:24, 20:18, 67:16, 84:8, 115:3, 126:8, 141:5
**briefing** [1] - 78:23
**briefly** [5] - 4:19, 28:20, 72:11, 100:17, 134:13
**bright** [1] - 69:13
**bring** [9] - 18:4, 18:19,

70:18, 73:4, 89:23, 90:4, 103:25, 120:9, 151:12

**bringing** [7] - 21:11, 25:4, 40:21, 43:11, 77:23, 113:18, 150:25

**brings** [2] - 5:16, 81:2

**broad** [1] - 116:14

**broader** [4] - 41:4, 41:24, 41:25, 148:15

**broadly** [2] - 64:2, 119:13

**brought** [5] - 44:5, 89:21, 100:16, 120:8, 128:8

**Broward** [3] - 1:23, 132:2, 156:5

**buffer** [1] - 150:5

**burden** [4] - 25:13, 25:14, 27:4, 141:1

**burned** [1] - 142:17

**business** [29] - 5:3, 9:2, 12:15, 12:20, 17:19, 18:3, 21:9, 21:25, 23:4, 26:22, 60:7, 90:13, 92:4, 94:4, 94:5, 94:6, 94:7, 94:9, 94:11, 95:8, 96:3, 96:14, 96:22, 97:3, 97:13, 97:18, 121:16, 124:13

**buy** [1] - 81:20

**buying** [2] - 75:6, 77:18

**BY** [1] - 1:20

**bystander** [2] - 34:21, 38:19

---

# C

**C.M** [6] - 98:17, 98:20, 99:17, 99:20, 99:21, 99:24

**C.W** [2] - 98:19, 103:20

**cabinet** [1] - 24:21

**Calderon** [1] - 135:7

**CALDERON** [8] - 135:14, 136:6, 136:10, 136:14, 137:15, 137:19, 138:1, 138:9

**camera** [3] - 66:20, 67:6, 73:24

**camp** [4] - 65:10, 114:17, 114:25, 143:14

**cancer** [1] - 144:21

**cannot** [3] - 19:16, 36:18, 137:11

**capable** [1] - 132:11

**captured** [1] - 86:20

**care** [12] - 5:7, 26:3, 30:7, 32:5, 32:20, 74:4, 119:4, 119:5, 120:14, 132:12, 133:8

**careful** [1] - 133:1

**Carolina** [1] - 42:23

**carry** [2] - 25:13, 25:14

**cars** [2] - 75:3, 75:21

**carve** [1] - 44:18

**CASE** [1] - 1:2

**case** [75] - 3:2, 5:14, 5:21,

8:21, 12:24, 14:10, 19:3, 19:4, 20:9, 21:14, 23:22, 24:6, 25:8, 25:14, 27:13, 35:24, 39:7, 39:23, 40:13, 42:2, 44:6, 44:20, 45:23, 47:21, 48:1, 48:17, 51:10, 52:13, 53:20, 58:1, 59:10, 60:20, 62:11, 72:19, 73:11, 76:1, 77:7, 77:9, 77:21, 78:2, 78:3, 78:23, 78:24, 79:2, 79:4, 79:12, 80:13, 81:8, 90:6, 90:14, 91:8, 93:3, 106:18, 108:12, 109:20, 110:11, 112:4, 113:18, 114:8, 123:15, 125:19, 126:2, 135:5, 135:13, 136:23, 139:2, 140:22, 145:25, 146:7, 147:16, 148:1, 150:16, 151:6, 153:20

**case-by-case** [1] - 148:1

**case-in-chief** [2] - 110:11, 123:15

**cases** [8] - 4:15, 15:6, 42:8, 45:3, 78:22, 82:18, 82:24, 85:19

**casting** [1] - 80:8

**catching** [1] - 86:5

**categories** [3] - 4:18, 33:2, 33:9

**category** [1] - 26:2

**caution** [2] - 56:7, 112:16, 131:1, 132:25, 142:20

**cavalier** [1] - 133:14

**caveat** [2] - 101:7, 101:16

**caveats** [1] - 31:24

**centralization** [1] - 9:3

**centralize** [3] - 4:24, 8:17, 8:24

**certain** [24] - 11:17, 25:8, 34:8, 39:22, 42:10, 67:20, 70:8, 70:9, 70:16, 70:18, 72:3, 72:5, 80:11, 84:2, 86:6, 93:16, 95:9, 97:17, 103:10, 113:1, 113:3, 114:5, 114:17, 116:22

**certainly** [50] - 7:13, 8:19, 9:13, 10:3, 10:12, 11:19, 12:8, 13:6, 13:9, 13:12, 13:18, 14:1, 16:4, 17:7, 19:22, 30:4, 31:23, 33:21, 34:17, 52:22, 60:15, 61:6, 61:15, 72:2, 72:16, 72:23, 73:1, 75:1, 75:4, 80:19, 81:3, 82:16, 82:23, 93:1, 93:12, 98:24, 100:21, 104:19, 104:22, 105:7, 105:9, 108:18, 110:4, 110:8, 112:13, 119:1, 124:6, 126:10, 133:11, 153:23

**Certainly** [1] - 94:25

**certifications** [1] - 5:25

**certify** [1] - 155:24

**cetera** [2] - 140:24, 141:1

**chairs** [3] - 139:3, 139:10, 155:8

**challenge** [1] - 6:2

**challenges** [2] - 141:4, 142:17

**chance** [2] - 132:4, 135:10

**change** [9] - 38:13, 38:14, 55:24, 65:5, 72:2, 72:8, 72:23, 73:1, 151:14

**changes** [2] - 61:17, 68:21

**changing** [1] - 143:3

**character** [1] - 148:25

**characteristics** [1] - 80:14

**characterization** [4] - 30:11, 31:4, 83:7, 101:13

**characterizations** [1] - 75:4

**characterize** [4] - 26:19, 29:5, 31:3, 97:17

**characterized** [1] - 92:21

**characterizes** [2] - 71:19, 85:17

**characterizing** [1] - 104:21

**charge** [4] - 78:16, 80:22, 106:13, 112:2

**charged** [2] - 5:11, 9:1

**charges** [2] - 44:5, 136:20

**charging** [1] - 104:17

**chart** [1] - 142:7

**charts** [2] - 78:7, 79:18

**check** [6] - 3:25, 9:16, 64:25, 133:15, 151:21, 154:15

**checked** [2] - 20:8, 153:13

**cherry** [1] - 96:18

**cherry-picked** [1] - 96:18

**chief** [2] - 110:11, 123:15

**choice** [3] - 69:18, 70:14, 72:3

**choices** [1] - 80:9

**chooses** [1] - 103:11

**chopped** [1] - 133:2

**chose** [1] - 129:15

**chosen** [1] - 129:12

**Christian** [2] - 33:8, 33:24

**Christmas** [2] - 131:4, 135:24

**circle** [1] - 152:20

**Circuit** [1] - 106:17

**circumstances** [1] - 125:8

**citations** [1] - 20:23

**cited** [4] - 4:13, 15:23, 78:23, 93:3

**civil** [18] - 5:2, 5:5, 5:7, 9:8, 16:7, 16:18, 19:25, 20:10, 21:3, 21:24, 25:7, 25:14, 25:20, 26:5, 26:22, 27:7,

27:9, 105:2

**civilly** [1] - 105:3

**claim** [2] - 66:7, 95:18

**claiming** [3] - 27:9, 27:21, 87:11

**claims** [9] - 45:11, 79:6, 79:10, 80:20, 85:25, 86:6, 87:17, 87:25

**clarification** [1] - 7:10

**clarify** [3] - 12:18, 28:18, 81:13

**class** [1] - 78:21

**claw** [1] - 109:15

**clean** [2] - 87:13, 133:19

**cleanly** [1] - 128:6

**clear** [19] - 35:9, 36:19, 40:16, 58:19, 61:1, 62:15, 62:18, 66:20, 71:13, 80:23, 81:11, 91:18, 102:15, 103:8, 111:22, 117:3, 135:12, 141:4, 147:5

**cleared** [1] - 119:4

**clearly** [7] - 36:22, 51:2, 51:17, 60:2, 78:21, 99:16, 141:8

**client** [6] - 16:8, 39:2, 44:3, 52:4, 57:1, 59:24

**client's** [2] - 12:6, 130:2

**clients** [1] - 50:11

**clinics** [2] - 5:25, 14:14

**clocks** [1] - 140:16

**close** [5] - 14:12, 117:8, 133:15, 137:13

**closing** [5] - 6:24, 103:24, 147:15, 147:25, 148:24

**clubs** [1] - 77:15

**co** [30] - 3:14, 5:6, 22:1, 25:18, 26:15, 29:4, 30:14, 30:17, 36:3, 36:4, 53:20, 53:24, 76:9, 77:22, 82:10, 95:18, 96:3, 96:5, 97:8, 97:11, 97:20, 103:16, 104:16, 109:15, 111:1, 112:6, 120:17, 121:1, 143:3, 147:22

**Co** [19] - 21:3, 22:15, 22:16, 22:20, 22:25, 23:16, 24:11, 25:18, 25:22, 26:19, 26:25, 28:17, 30:6, 30:11, 30:25, 31:4, 31:13, 31:17, 31:19

**co-conspirator** [17] - 5:6, 22:1, 25:18, 29:4, 30:14, 30:17, 36:4, 53:20, 96:3, 97:8, 97:20, 109:15, 111:1, 112:6, 120:17, 121:1, 147:22

**Co-conspirator** [18] - 21:3, 22:15, 22:16, 22:20, 23:16, 24:11, 25:18, 25:22, 26:19, 26:25, 28:17, 30:6, 30:11, 30:25, 31:4, 31:13, 31:17,

31:19

**Co-conspirator's** [1] - 22:25

**co-conspirator's** [1] - 26:15

**co-conspirators** [8] - 53:24, 76:9, 77:22, 82:10, 95:18, 96:5, 103:16, 104:16

**co-counsel** [1] - 3:14

**co-defendant** [2] - 36:3, 143:3

**cocktail** [1] - 79:9

**collateral** [3] - 104:14, 104:15, 104:18

**colleagues** [2] - 73:10, 106:16

**collection** [1] - 53:21

**colloquied** [2] - 48:19, 68:25

**colloquy** [11] - 34:5, 47:23, 48:4, 48:6, 56:16, 64:24, 68:1, 68:8, 68:19, 72:11, 73:7

**comfort** [4] - 26:12, 73:18, 131:8, 153:21

**comfortable** [13] - 39:18, 55:10, 65:2, 67:6, 67:25, 69:3, 70:14, 70:21, 86:25, 88:6, 130:6, 131:17, 154:6

**comforted** [1] - 125:17

**coming** [25] - 12:3, 18:2, 19:12, 21:12, 22:16, 23:8, 28:24, 29:10, 35:17, 37:12, 51:23, 54:25, 55:1, 84:21, 95:23, 95:24, 96:2, 96:3, 99:5, 102:9, 132:2, 144:25, 145:4, 150:17, 150:23

**commandeer** [1] - 151:7

**comment** [3] - 5:5, 42:13, 103:4

**comments** [3] - 47:13, 71:12, 121:14

**commit** [1] - 18:6

**committed** [1] - 16:8

**committing** [3] - 14:19, 18:4, 28:1

**common** [1] - 85:13

**communicate** [2] - 66:15, 67:12

**communicating** [2] - 66:18, 99:3

**communication** [2] - 117:24, 118:12

**communications** [12] - 34:18, 58:17, 59:2, 68:10, 92:7, 93:5, 95:21, 97:7, 98:24, 98:25, 99:8, 99:25

**companies** [1] - 86:5

**company** [6] - 17:4, 27:24, 56:5, 81:21, 81:22, 153:13

**compel** [6] - 94:1, 119:9, 119:17, 125:17, 128:14, 130:15

**compelled** [1] - 70:7

**compensating** [2] - 9:11, 22:12

**competent** [2] - 108:25, 109:4

**competently** [1] - 25:23

**complaint** [1] - 27:16

**complete** [5] - 5:11, 39:19, 93:13, 108:24, 135:13

**completely** [6] - 15:11, 55:12, 77:19, 91:7, 93:11, 153:5

**completeness** [11] - 11:1, 11:18, 96:16, 97:23, 99:12, 99:14, 100:13, 100:17, 100:20, 100:22, 101:11

**compliance** [10] - 42:4, 57:13, 88:25, 89:7, 89:17, 89:22, 89:25, 90:8, 94:8, 134:6

**compliant** [1] - 92:9

**complicated** [1] - 27:24

**complied** [1] - 114:2

**concealing** [1] - 81:9

**concede** [1] - 24:19

**conceded** [1] - 83:21

**concept** [4] - 140:25, 143:17, 144:2, 145:22

**concepts** [1] - 141:20

**concern** [35] - 8:10, 11:25, 14:5, 19:11, 23:15, 25:16, 33:15, 35:8, 38:7, 38:17, 38:23, 39:8, 39:10, 40:7, 44:23, 48:11, 49:8, 53:17, 54:2, 60:14, 66:18, 67:4, 69:15, 70:11, 83:20, 88:8, 89:3, 104:24, 117:7, 119:13, 127:17, 128:12, 135:25, 153:25, 154:6

**concerned** [18] - 12:9, 13:16, 25:9, 34:19, 37:1, 37:4, 39:20, 41:6, 69:22, 71:24, 92:20, 93:1, 103:24, 107:19, 110:13, 115:3, 126:12, 132:11

**concerning** [2] - 29:11, 121:15

**concerns** [14] - 5:4, 7:20, 8:20, 10:6, 13:10, 13:15, 34:9, 67:2, 70:21, 97:25, 133:1, 133:24, 142:19

**conclude** [1] - 31:23

**concluded** [1] - 129:25

**conduct** [21] - 5:11, 9:1, 12:14, 29:16, 36:23, 42:23, 50:9, 50:10, 50:11, 52:4, 57:11, 59:19, 59:24, 72:4,

88:7, 89:2, 89:14, 90:5, 93:10, 109:7, 114:14

**conducted** [2] - 48:6, 128:24

**conducting** [2] - 65:3, 73:7

**conduit** [1] - 22:20

**confer** [1] - 141:5

**conference** [6] - 82:9, 106:14, 112:3, 151:1, 151:2, 151:8

**confident** [1] - 108:17

**confirm** [2] - 11:13, 39:18

**confirmed** [2] - 16:24, 64:15

**confirms** [1] - 153:21

**conflict** [7] - 4:1, 34:8, 37:3, 40:10, 41:4, 41:21, 141:12

**conflicted** [2] - 34:24, 38:5

**conflicts** [2] - 67:18, 141:6

**confronted** [1] - 61:21

**confuse** [1] - 118:11

**confused** [1] - 108:2

**confusing** [1] - 115:6

**connect** [3] - 41:17, 107:25, 111:1

**connected** [3] - 16:24, 80:15, 147:15

**connection** [1] - 11:24

**consciousness** [3] - 21:17, 23:18, 25:17

**consciousness-of-guilt** [1] - 25:17

**consequence** [1] - 154:4

**consequences** [3] - 104:14, 104:16, 104:19

**consider** [3] - 16:5, 100:7, 108:11

**considered** [2] - 108:25, 110:24

**considering** [1] - 10:25

**consolidate** [1] - 40:25

**consolidated** [1] - 41:10

**conspiracy** [5] - 21:7, 33:21, 60:21, 112:6

**conspirator** [36] - 5:6, 21:3, 22:1, 22:15, 22:16, 22:20, 23:16, 24:11, 25:18, 25:22, 26:19, 26:25, 28:17, 29:4, 30:6, 30:11, 30:14, 30:17, 30:25, 31:4, 31:13, 31:17, 31:19, 36:4, 53:20, 96:3, 97:8, 97:11, 97:20, 109:15, 111:1, 112:6, 120:17, 121:1, 147:22

**conspirator's** [2] - 22:25, 26:15

**conspirators** [8] - 53:24, 76:9, 77:22, 82:10, 95:18, 96:5, 103:16, 104:16

**constitute** [1] - 50:9

**constitutes** [1] - 50:9

**consume** [1] - 82:6

**contain** [1] - 98:10

**contained** [1] - 76:18

**context** [26] - 12:4, 19:25, 21:1, 24:9, 25:16, 28:16, 29:2, 29:3, 29:9, 30:8, 30:14, 30:16, 31:1, 31:7, 32:10, 42:19, 44:10, 54:12, 96:10, 97:23, 99:14, 99:16, 116:21, 124:4, 124:25, 148:15

**continue** [6] - 48:12, 61:16, 68:11, 70:22, 71:25, 112:2

**continued** [3] - 2:1, 42:2, 130:2

**continues** [1] - 57:16

**continuously** [1] - 85:25

**contract** [4] - 12:16, 13:11, 27:12, 28:7

**contrary** [1] - 57:5

**contributed** [4] - 36:20, 38:14, 39:6, 53:3

**control** [5] - 8:24, 9:24, 21:6, 65:10, 76:21

**conversation** [7] - 23:25, 28:18, 57:17, 57:18, 57:20, 121:21, 130:1

**conversations** [11] - 14:1, 43:14, 44:22, 46:19, 52:25, 57:7, 57:13, 58:2, 58:3, 62:12, 70:9

**convert** [1] - 34:21

**conviction** [3] - 104:16, 104:19, 135:5

**convictions** [3] - 33:6, 136:23, 136:24

**convincing** [1] - 117:17

**cooperating** [3] - 105:9, 145:9, 145:14

**cooperative** [1] - 62:14

**cooperators** [1] - 33:24

**copies** [1] - 155:7

**copy** [5] - 65:20, 65:21, 66:25, 73:8, 128:22

**correct** [19] - 4:10, 6:12, 7:1, 7:24, 21:5, 35:15, 45:16, 71:20, 86:10, 87:11, 89:4, 106:10, 107:1, 107:9, 115:21, 120:19, 130:17, 132:1, 137:3

**correctly** [2] - 106:17, 106:23

**corruption** [1] - 15:21

**counsel** [66] - 3:14, 5:15, 5:19, 13:14, 33:22, 34:13, 34:14, 38:23, 38:25, 40:12, 41:5, 41:8, 41:9, 41:12, 41:14, 41:25, 42:4, 44:9, 44:14, 44:17, 44:24, 46:8,

47:2, 49:22, 51:15, 53:4,
56:3, 59:13, 60:5, 60:9,
60:12, 61:11, 61:13, 61:23,
63:19, 66:1, 66:12, 67:3,
67:5, 67:9, 67:17, 67:23,
69:18, 70:1, 70:4, 70:14,
70:22, 71:6, 71:25, 73:3,
74:10, 84:20, 106:21,
107:11, 109:19, 110:5,
111:7, 114:10, 114:20,
116:20, 120:8, 129:11,
129:23, 153:5, 153:11,
153:25
   **Counsel** [5] - 17:16, 59:16,
66:22, 116:23, 135:13
   **counsels'** [1] - 40:5
   **count** [1] - 142:21
   **counts** [1] - 136:24
   **couple** [7] - 7:19, 7:21,
85:9, 113:12, 134:12,
138:14, 149:17
   **course** [21] - 5:16, 29:21,
38:12, 40:10, 41:6, 43:1,
46:6, 68:22, 83:17, 87:24,
92:4, 95:6, 95:20, 95:21,
100:24, 109:7, 113:23,
141:25, 142:5, 146:16,
148:16
   **Court** [81] - 1:21, 1:22, 3:1,
3:22, 8:12, 11:19, 17:7,
22:23, 26:12, 28:25, 29:1,
29:8, 29:24, 31:11, 31:25,
32:2, 42:19, 46:14, 46:25,
52:18, 57:23, 58:6, 60:16,
60:17, 65:15, 66:13, 66:23,
67:5, 67:15, 67:18, 68:16,
68:18, 68:21, 69:25, 70:6,
71:21, 72:3, 72:6, 73:10,
74:1, 74:13, 74:17, 75:1,
77:20, 79:19, 80:12, 80:17,
81:18, 82:2, 82:15, 83:5,
84:5, 85:4, 85:10, 94:3,
94:22, 97:22, 98:2, 99:5,
107:10, 108:8, 109:15,
112:1, 119:3, 121:6, 123:2,
125:17, 127:15, 127:21,
135:2, 135:7, 140:19,
143:18, 144:14, 150:20,
152:3, 155:20, 156:4, 156:5
   **COURT** [240] - 1:1, 3:2,
3:11, 3:19, 6:19, 7:1, 7:17,
8:3, 9:6, 10:1, 10:6, 10:11,
10:23, 11:5, 11:9, 11:12,
11:25, 12:7, 13:4, 13:15,
14:5, 15:17, 16:3, 16:12,
16:14, 17:15, 17:24, 18:8,
19:9, 20:25, 21:15, 21:19,
22:14, 22:19, 23:10, 23:23,
24:3, 24:8, 24:23, 24:25,
25:2, 26:18, 27:8, 27:11,

27:15, 27:22, 28:4, 28:21,
29:12, 30:2, 30:24, 32:8,
32:13, 35:15, 35:18, 36:2,
36:9, 36:12, 37:7, 37:11,
37:20, 38:1, 39:14, 44:7,
45:8, 46:10, 46:14, 47:18,
48:8, 48:21, 49:5, 49:20,
50:17, 51:13, 51:15, 51:19,
52:14, 53:25, 55:5, 55:10,
55:22, 59:9, 62:7, 62:18,
62:22, 63:2, 63:11, 63:21,
64:11, 64:22, 65:24, 66:4,
66:10, 66:17, 67:14, 68:7,
68:22, 69:4, 69:11, 70:13,
70:24, 71:4, 71:21, 73:15,
73:20, 75:19, 75:22, 76:5,
76:23, 79:24, 84:10, 84:11,
84:21, 85:2, 85:3, 85:6,
86:11, 87:4, 87:7, 87:12,
88:3, 89:6, 89:19, 90:19,
90:23, 91:17, 92:12, 92:18,
93:22, 94:23, 95:16, 95:20,
96:1, 96:6, 96:12, 97:5,
97:15, 98:3, 99:12, 99:15,
99:18, 100:4, 100:10, 101:2,
102:19, 102:23, 103:7,
103:21, 104:12, 105:16,
106:5, 106:11, 108:4,
108:21, 111:3, 113:15,
114:9, 115:11, 115:14,
116:5, 116:19, 117:10,
117:21, 118:6, 120:14,
120:19, 121:8, 122:16,
123:5, 123:10, 123:17,
125:6, 125:15, 127:6, 127:8,
127:19, 129:5, 129:10,
129:14, 129:17, 130:13,
130:18, 132:3, 134:15,
134:21, 134:24, 135:1,
135:9, 135:17, 136:8,
136:12, 137:2, 137:18,
137:24, 138:4, 138:10,
138:17, 139:1, 142:14,
142:22, 142:24, 143:13,
143:16, 143:20, 143:22,
143:24, 144:10, 144:15,
144:25, 145:11, 145:20,
146:3, 146:6, 147:6, 147:18,
148:6, 148:10, 148:19,
148:21, 149:7, 149:10,
149:13, 149:18, 149:21,
149:25, 150:2, 150:12,
150:18, 150:21, 151:5,
152:2, 152:5, 152:23,
153:15, 153:18, 154:9,
155:6, 155:13, 155:15,
155:19
   **court** [6] - 16:21, 40:20,
59:16, 66:21, 71:24, 93:14
   **Court's** [7] - 25:2, 66:15,
86:20, 101:3, 114:6, 134:13,

154:20
   **courthouse** [1] - 115:17
   **courtroom** [8] - 131:17,
139:2, 140:2, 140:6, 150:17,
151:13, 152:6, 155:9
   **cover** [2] - 14:8, 142:8
   **coverage** [2] - 113:17,
113:19
   **covered** [2] - 141:20,
144:21
   **COVID** [1] - 142:19
   **crafting** [2] - 20:18, 82:11
   **crazy** [1] - 144:1
   **CRD** [5] - 130:22, 139:3,
151:6, 151:19, 155:7
   **created** [1] - 43:22
   **creating** [2] - 43:23, 75:7
   **credibility** [3] - 122:14,
122:25, 124:8
   **credible** [1] - 124:16
   **crime** [2] - 18:7, 21:9
   **crimes** [4] - 14:20, 15:22,
27:14, 145:10
   **criminal** [28] - 17:19, 33:22,
41:8, 41:9, 41:11, 41:19,
42:5, 42:6, 43:5, 43:11, 44:4,
44:15, 44:21, 45:24, 49:10,
50:9, 50:10, 51:12, 52:1,
52:13, 57:21, 59:15, 59:25,
60:4, 136:20, 137:16, 137:20
   **CRIMINAL** [1] - 1:15
   **criminality** [2] - 114:5
   **critical** [1] - 20:15
   **cross** [23] - 11:7, 13:19,
14:21, 24:10, 40:2, 43:13,
43:21, 53:9, 54:17, 56:20,
62:1, 64:12, 65:3, 68:12,
70:7, 102:13, 107:21,
108:19, 110:20, 115:8,
116:3, 116:18, 117:13
   **cross-examination** [7] -
11:7, 13:19, 24:10, 40:2,
62:1, 102:13, 116:18
   **cross-examinations** [1] -
65:3
   **cross-examine** [7] - 14:21,
43:13, 53:9, 54:17, 56:20,
68:12, 116:3
   **cross-examining** [3] - 70:7,
115:8, 117:13
   **cross-reference** [1] - 64:12
   **CRR** [2] - 1:21, 156:4
   **crystallize** [1] - 119:12
   **curative** [5] - 17:7, 20:11,
25:10, 31:16, 35:8
   **cures** [2] - 40:4, 97:24
   **curious** [1] - 11:2
   **currency** [2] - 49:19, 50:22
   **current** [2] - 11:22, 139:16
   **cursory** [1] - 21:23

**cushion** [1] - 143:9
**custody** [1] - 65:10
**customized** [1] - 140:5
**CUYLER** [1] - 1:14
**Cuyler** [1] - 3:8

# D

**D.C** [1] - 1:16
**dangerously** [1] - 137:13
**dark** [1] - 120:7
**darker** [1] - 132:7
**data** [1] - 82:25
**DATE** [1] - 156:3
**date** [4] - 59:7, 61:1, 82:8,
130:24
**day-to-day** [1] - 9:24
**days** [1] - 138:15
**DE** [80] - 1:13, 3:7, 40:8,
45:5, 45:9, 46:11, 46:21,
48:6, 48:10, 56:24, 62:5,
62:8, 62:21, 63:1, 63:4,
63:13, 63:25, 64:18, 66:14,
67:13, 68:4, 68:8, 68:23,
73:6, 75:16, 75:20, 75:23,
76:6, 85:1, 86:10, 87:21,
89:4, 89:7, 93:20, 93:23,
97:1, 97:6, 100:15, 107:9,
110:23, 113:12, 113:16,
115:25, 116:6, 120:6,
120:15, 120:20, 121:9,
123:14, 126:24, 127:7,
127:9, 128:19, 130:12,
130:17, 132:1, 134:5,
134:16, 134:23, 134:25,
135:2, 138:25, 142:10,
143:12, 145:23, 147:8,
147:24, 148:7, 148:15,
148:20, 149:1, 149:24,
152:20, 153:10, 153:16,
154:8, 155:4, 155:12,
155:14, 155:17
**de** [20] - 3:7, 7:1, 40:6, 44:7,
48:24, 50:2, 52:14, 55:23,
61:14, 66:10, 67:21, 71:4,
72:20, 96:13, 96:24, 107:1,
109:24, 130:14, 138:23,
142:9
**deal** [9] - 4:2, 12:2, 32:23,
73:22, 96:17, 110:19,
120:10, 132:5, 145:15
**dealing** [9] - 10:25, 23:22,
33:3, 42:23, 57:4, 62:14,
81:25, 104:9, 126:20
**deals** [1] - 4:20
**dealt** [3] - 9:10, 65:12,
146:1
**debate** [1] - 108:23
**debated** [1] - 106:16
**December** [1] - 138:8

**decide** [7] - 13:21, 31:5, 81:8, 100:24, 110:22, 111:12, 111:14

**decided** [1] - 89:24

**deciding** [1] - 24:5

**decision** [7] - 15:24, 16:2, 21:8, 29:25, 103:2, 127:20, 136:20

**decisions** [2] - 42:10, 104:17

**dedicated** [1] - 10:8

**deem** [1] - 96:10

**deeper** [1] - 60:15

**defendant** [36] - 5:5, 15:5, 19:23, 29:15, 36:3, 44:12, 45:24, 46:3, 47:11, 48:12, 48:14, 48:19, 68:10, 68:19, 68:25, 76:7, 76:8, 76:21, 79:5, 80:16, 81:1, 93:15, 97:8, 98:11, 108:23, 109:6, 113:1, 114:2, 116:15, 116:17, 117:20, 117:24, 121:3, 136:10, 143:3, 147:9

**DEFENDANT** [5] - 1:17, 2:2, 70:12, 70:23, 71:3

**Defendant** [2] - 1:7, 69:10

**defendant's** [14] - 4:20, 8:13, 8:16, 21:2, 21:6, 29:20, 32:24, 42:8, 46:9, 64:9, 83:7, 94:17, 121:5, 123:14

**defendants** [1] - 101:18

**defending** [1] - 42:7

**defense** [114] - 5:15, 5:18, 6:1, 6:8, 8:18, 9:4, 11:19, 13:14, 17:19, 26:12, 26:17, 33:4, 33:13, 33:22, 33:25, 34:11, 34:14, 34:19, 39:21, 40:12, 41:11, 41:13, 41:14, 41:16, 42:1, 42:2, 42:4, 42:6, 44:15, 44:21, 44:24, 46:8, 47:2, 47:16, 50:10, 51:12, 53:24, 59:11, 60:5, 60:9, 60:12, 61:11, 61:12, 63:8, 63:19, 64:1, 64:22, 65:8, 65:10, 67:3, 67:9, 73:8, 74:7, 74:23, 81:5, 81:19, 81:25, 82:11, 82:19, 82:25, 84:2, 84:16, 85:22, 86:16, 86:21, 87:24, 91:12, 92:23, 94:18, 97:16, 101:10, 101:13, 101:20, 101:25, 102:4, 102:11, 102:15, 103:7, 103:17, 105:4, 105:14, 105:20, 106:1, 106:3, 106:8, 106:21, 107:10, 108:6, 108:10, 109:2, 110:25, 111:7, 111:18, 112:2, 114:17, 114:20, 114:25, 119:6, 119:14, 128:10,

134:8, 135:4, 136:17, 138:10, 139:17, 143:14, 150:15, 151:2, 152:25, 153:5

**defense's** [10] - 52:24, 69:6, 77:12, 80:12, 81:19, 83:12, 85:15, 85:21, 109:3, 129:5

**defensive** [1] - 59:11

**definitely** [3] - 8:21, 16:19, 93:4

**definitive** [1] - 114:23

**definitively** [2] - 114:12, 118:16

**degree** [1] - 116:9

**delay** [1] - 12:11

**deliberates** [1] - 136:19

**delineate** [1] - 109:8

**denied** [2] - 83:11, 83:13

**denounced** [1] - 86:25

**deny** [5] - 74:2, 74:6, 81:18, 130:14, 130:18

**denying** [1] - 67:19

**DEPARTMENT** [1] - 1:14

**depended** [1] - 107:17

**depo** [2] - 10:15, 148:10

**deposition** [10] - 5:2, 9:8, 9:9, 9:18, 9:23, 11:4, 11:7, 19:23, 22:13, 32:10

**depositions** [1] - 19:16

**described** [2] - 19:1, 121:22

**description** [2] - 122:5, 124:8

**design** [2] - 52:19, 106:14

**designate** [1] - 112:17

**designed** [1] - 78:21

**designing** [1] - 140:5

**desire** [2] - 8:23, 35:2

**despite** [1] - 73:2

**detail** [2] - 42:12, 109:22

**detailed** [5] - 17:2, 17:21, 25:21, 28:12, 43:3

**details** [3] - 111:16, 124:20, 154:23

**determination** [2] - 58:7, 112:18

**determinations** [1] - 112:23

**determine** [4] - 10:8, 13:25, 18:25, 20:13

**develop** [1] - 68:15

**developed** [2] - 76:10, 125:8

**developing** [1] - 43:15

**develops** [1] - 52:15

**devices** [2] - 150:19, 150:23

**die** [1] - 111:21

**difference** [4] - 42:3, 44:16, 55:3, 70:3

**differences** [1] - 108:16

**different** [11] - 13:5, 17:3, 40:9, 60:19, 61:18, 76:23, 88:25, 108:11, 110:18, 117:4, 121:11

**difficult** [3] - 52:18, 100:2, 100:24

**difficulty** [1] - 92:1

**dire** [6] - 140:16, 140:25, 144:13, 145:4, 152:12, 152:14

**direct** [4] - 59:23, 60:17, 68:12, 107:14

**direction** [2] - 68:5, 121:20

**directly** [4] - 61:11, 71:11, 80:15, 129:24

**disagree** [5] - 42:6, 80:11, 83:6, 97:16, 122:22

**disagreeing** [2] - 86:1, 112:25

**disagreement** [3] - 68:6, 91:12, 96:21

**disaster** [1] - 68:14

**disclose** [1] - 129:12

**disclosed** [2] - 65:22, 107:16

**discovery** [6] - 11:6, 82:15, 82:22, 83:15, 105:19, 105:25

**discrepancies** [1] - 110:10

**discretion** [1] - 80:17

**discuss** [5] - 3:24, 48:13, 55:14, 134:13

**discussed** [4] - 70:10, 101:22, 109:12, 154:1

**discussing** [1] - 9:2

**discussion** [11] - 21:2, 25:20, 34:12, 34:15, 41:24, 56:1, 68:20, 74:24, 75:1, 77:13, 146:7

**discussions** [5] - 73:4, 73:12, 74:8, 74:16, 79:25

**dispute** [6] - 12:5, 19:5, 34:3, 61:21, 97:14, 112:14

**disputes** [2] - 94:14, 94:15

**disputing** [2] - 82:23, 100:23

**disqualification** [1] - 74:10

**disregard** [1] - 111:3

**disregarded** [1] - 112:20

**distance** [1] - 93:10

**distinct** [2] - 20:22, 20:23

**distinction** [4] - 42:2, 44:16, 56:5, 79:20

**distinguishing** [1] - 80:14

**DISTRICT** [3] - 1:1, 1:1, 1:10

**District** [4] - 1:22, 42:22, 58:21, 156:5

**disturbed** [1] - 151:9

**dive** [1] - 60:15

**DIVISION** [2] - 1:2, 1:15

**docket** [2] - 31:15, 101:16

**Docket** [6] - 4:18, 7:17, 16:16, 31:10, 32:25, 112:11

**doctor** [1] - 15:8

**doctor's** [2] - 121:23, 122:1

**doctors** [3] - 15:20, 16:24, 18:4

**document** [14] - 6:23, 14:8, 14:13, 16:21, 17:5, 62:19, 63:5, 63:9, 63:11, 64:7, 64:21, 64:23, 97:4, 119:20

**documents** [15] - 7:21, 8:11, 53:21, 54:17, 57:7, 57:19, 58:15, 58:17, 62:25, 65:14, 82:25, 91:21, 92:13, 92:15, 93:23

**dollar** [1] - 16:25

**dollars** [1] - 19:5

**Don** [1] - 3:16

**DONALD** [1] - 2:2

**done** [45] - 7:18, 11:3, 18:15, 19:17, 31:8, 31:20, 36:15, 50:15, 56:17, 64:16, 64:25, 68:3, 72:22, 73:21, 73:23, 78:15, 82:17, 83:23, 88:25, 89:23, 89:25, 91:1, 92:8, 98:7, 100:8, 112:5, 113:21, 114:13, 131:13, 132:17, 132:24, 135:20, 135:23, 136:4, 137:9, 138:5, 138:20, 140:18, 141:5, 143:7, 154:11, 154:17, 155:1

**door** [5] - 20:4, 38:25, 125:23, 126:9, 151:22

**dooring** [1] - 124:22

**dots** [1] - 41:17

**double** [1] - 64:25

**double-check** [1] - 64:25

**doubt** [1] - 16:4

**doubting** [1] - 37:7

**dovetails** [3] - 13:6, 33:14, 128:6

**down** [7] - 22:2, 39:11, 79:9, 98:23, 115:16, 132:2, 144:6

**dozen** [1] - 100:18

**draft** [10] - 26:13, 43:19, 51:1, 62:8, 62:20, 62:22, 65:24, 65:25, 67:15, 82:9

**drafted** [3] - 43:17, 62:9, 63:16

**drafting** [1] - 51:3

**drafts** [4] - 62:9, 62:17, 63:6

**dragged** [1] - 38:16

**drags** [1] - 36:16

**dramatically** [1] - 39:21

**dramatizing** [1] - 113:7

**drastic** [1] - 83:2

**draw** [5] - 42:3, 56:5, 94:21,

118:13, 141:16

**drawn** [3] - 93:4, 104:8, 114:3

**Drive** [1] - 2:3

**drop** [1] - 132:5

**drop-off** [1] - 132:5

**drove** [1] - 144:1

**drug** [12] - 33:6, 74:20, 75:5, 75:10, 75:13, 76:3, 76:7, 76:25, 77:13, 79:25, 83:19

**drugs** [10] - 75:6, 76:15, 76:16, 77:5, 77:18, 77:22, 77:24, 77:25, 78:4, 81:20

**drumming** [1] - 97:12

**dubious** [1] - 23:4

**due** [7] - 49:4, 49:11, 52:11, 54:6, 54:13, 108:13, 125:3

**duly** [1] - 69:10

**duplicative** [1] - 13:5

**during** [14] - 9:23, 22:25, 29:13, 34:12, 46:19, 54:8, 59:4, 98:7, 98:24, 99:3, 125:9, 125:10, 126:3, 130:8

## E

**early** [4] - 12:14, 60:21, 131:19, 132:20

**earth** [1] - 155:3

**earth-shattering** [1] - 155:3

**easier** [2] - 31:16, 66:6

**easiest** [1] - 32:24

**easily** [2] - 44:18, 124:18

**East** [2] - 1:23, 156:5

**easy** [3] - 120:10, 120:14, 127:20

**eating** [1] - 79:9

**effect** [3] - 22:25, 123:5, 123:22

**effort** [1] - 40:24

**efforts** [7] - 13:13, 21:6, 21:7, 78:5, 83:1, 89:8

**eight** [1] - 153:6

**either** [17] - 21:25, 27:1, 31:8, 35:5, 37:19, 38:13, 57:1, 97:7, 100:1, 106:6, 106:20, 114:6, 118:16, 123:7, 124:2, 124:19, 148:13

**election** [1] - 138:11

**electronic** [1] - 150:19

**elements** [2] - 17:3, 107:11

**Eleventh** [1] - 106:17

**elicit** [4] - 98:14, 105:24, 110:1, 120:25

**elicited** [2] - 7:14, 86:13

**eliminate** [1] - 83:9

**ELMO** [1] - 149:4

**Elon** [1] - 10:9

**elude** [1] - 44:22

**Elysee** [1] - 16:2

**email** [15] - 51:5, 54:9, 63:14, 65:16, 65:19, 73:20, 94:11, 94:12, 94:13, 96:8, 96:9, 97:20, 117:12, 154:14

**emails** [18] - 54:8, 54:23, 54:24, 91:20, 92:2, 92:20, 93:2, 93:15, 94:4, 94:6, 95:7, 95:15, 96:11, 97:2, 97:17, 125:9, 125:13, 126:16

**emergency** [1] - 154:16

**Emily** [1] - 3:8

**EMILY** [1] - 1:13

**emphasis** [1] - 149:12

**emphasized** [1] - 34:23

**employees** [2] - 95:19, 99:2

**employing** [1] - 63:18

**encompass** [1] - 108:15

**end** [18] - 4:2, 11:13, 25:7, 32:6, 81:9, 86:8, 104:4, 107:25, 109:14, 112:4, 113:8, 132:19, 137:7, 138:6, 138:17, 138:21, 141:24, 142:3

**ended** [2] - 145:13, 146:15

**ends** [2] - 78:14, 131:4

**enforcement** [1] - 43:11

**engage** [1] - 109:9

**engaged** [2] - 15:21, 78:13

**enlist** [1] - 21:9

**enrich** [2] - 80:25, 81:1

**enrollment** [2] - 4:20, 8:1

**enrollments** [2] - 5:24, 8:13

**ensure** [3] - 40:21, 74:18, 126:24

**enter** [1] - 101:8

**enterprise** [2] - 10:19, 77:4

**entertain** [2] - 75:12, 140:19

**entire** [5] - 10:17, 46:7, 49:16, 63:5, 126:3

**entirely** [1] - 64:19

**entities** [3] - 88:9, 88:14, 88:17

**entitled** [2] - 47:15, 156:1

**entitlement** [1] - 111:5

**entry** [2] - 19:3, 31:15, 101:16

**Entry** [6] - 4:18, 7:17, 16:16, 31:11, 32:25, 112:11

**envision** [1] - 4:4

**envisioning** [2] - 142:12

**equally** [2] - 96:23, 104:7

**especially** [2] - 114:3, 133:1

**essence** [2] - 27:16, 58:8

**essentially** [19] - 6:22, 16:7, 16:21, 20:7, 31:11, 34:21, 48:1, 65:12, 69:25, 85:16, 85:18, 88:10, 89:2, 92:22,

112:21, 113:6, 114:23, 124:12, 131:9

**establish** [4] - 13:6, 13:8, 78:11, 106:22

**established** [4] - 48:4, 79:17, 111:25, 117:15

**estate** [1] - 45:7

**et** [2] - 140:24, 141:1

**evaluating** [1] - 47:5

**evening** [1] - 151:13

**event** [1] - 129:2

**evidence** [71] - 6:4, 6:14, 6:23, 7:15, 8:19, 12:5, 14:10, 14:15, 15:4, 15:6, 20:7, 23:14, 25:17, 26:2, 33:4, 33:5, 33:7, 33:13, 34:16, 35:16, 40:17, 46:7, 47:20, 55:7, 60:2, 60:10, 60:18, 74:20, 74:23, 76:8, 76:12, 76:14, 78:1, 78:4, 79:1, 79:3, 79:12, 79:15, 79:21, 79:23, 80:2, 80:12, 80:16, 81:3, 83:17, 87:24, 88:1, 89:2, 89:10, 89:14, 90:8, 92:5, 93:5, 96:18, 97:13, 103:2, 104:15, 111:2, 111:7, 112:3, 115:16, 119:10, 123:12, 123:16, 123:21, 137:16, 137:20, 147:15

**evidentiary** [1] - 133:4

**evolved** [1] - 46:3

**exact** [1] - 117:14

**Exactly** [1] - 143:24

**exactly** [11] - 7:9, 10:21, 13:17, 30:21, 48:18, 62:19, 87:21, 89:11, 116:11, 124:5, 151:9

**exaggerated** [1] - 81:15

**examination** [10] - 11:7, 13:19, 24:10, 40:2, 53:11, 53:17, 53:19, 62:1, 102:13, 116:18

**examinations** [2] - 65:3, 72:5

**examine** [8] - 14:21, 43:13, 53:9, 54:17, 56:20, 68:12, 116:3

**examining** [7] - 53:23, 70:7, 115:8, 117:13, 152:1

**example** [24] - 3:24, 16:23, 26:21, 29:18, 34:13, 43:16, 43:23, 45:7, 48:15, 50:3, 53:7, 56:19, 71:17, 82:24, 86:3, 88:21, 92:7, 95:14, 99:17, 105:2, 109:20, 115:4, 117:25, 141:8

**except** [2] - 65:13, 86:25

**exception** [4] - 14:3, 96:13, 102:12, 103:1

**exceptions** [2] - 84:3, 94:16

**excerpts** [1] - 11:10

**exchange** [1] - 145:14

**exclude** [11] - 33:12, 47:20, 74:23, 80:12, 88:1, 89:18, 93:7, 119:10, 127:10, 127:14, 129:3

**excluded** [1] - 153:4

**excluding** [2] - 74:20, 83:3

**excuse** [3] - 80:25, 101:16, 130:9

**exempt** [1] - 94:7

**exercise** [1] - 57:24

**exercised** [1] - 76:21

**exhibit** [4] - 54:23, 78:15, 97:7, 146:21

**exhibits** [6] - 78:17, 91:19, 125:13, 148:23, 149:4, 152:8

**existence** [5] - 13:2, 22:10, 26:14, 26:24, 64:16

**expect** [7] - 3:23, 22:16, 89:16, 120:25, 121:9, 128:7, 138:2

**expectations** [1] - 130:25

**expected** [1] - 133:21

**expecting** [1] - 135:22

**expedite** [1] - 124:9

**expenditures** [2] - 81:10, 85:18

**expenses** [1] - 81:17

**experience** [6] - 5:19, 136:1, 140:23, 145:3, 146:8, 146:12

**experienced** [2] - 42:7, 133:18

**expert** [13] - 6:19, 6:20, 7:11, 7:12, 7:24, 8:6, 18:5, 32:4, 112:8, 112:11, 112:14, 112:20, 112:24

**experts** [5] - 7:19, 19:17, 112:16, 112:17, 113:13

**explain** [13] - 6:16, 6:17, 8:4, 110:20, 113:24, 113:25, 114:19, 116:21, 116:22, 118:2, 124:20, 145:5

**explained** [4] - 25:21, 46:4, 84:18, 124:6

**explaining** [3] - 8:6, 116:5, 118:22

**explanation** [1] - 20:17

**explanations** [2] - 112:25, 113:3

**explore** [2] - 42:11, 117:3

**explored** [1] - 47:25

**expose** [1] - 27:19

**exposed** [1] - 23:3

**exposure** [8] - 44:4, 49:10, 57:2, 57:3, 57:11, 57:21, 59:15, 60:4

**extensive** [1] - 140:16

**extent** [26] - 36:5, 44:1,

53:1, 54:1, 57:9, 66:8, 67:4,
67:20, 70:2, 73:23, 74:15,
80:11, 87:14, 88:14, 96:22,
97:21, 98:10, 101:6, 114:2,
127:11, 128:22, 133:20,
141:6, 147:11, 148:1
**extortion** [2] - 19:1, 27:17
**extra** [4] - 75:12, 111:19,
138:6, 138:15
**extraneous** [1] - 25:13
**extravagant** [1] - 75:12
**extremely** [1] - 43:20
**extricate** [2] - 38:15, 92:23
**eye** [4] - 59:6, 60:7, 78:11,
80:19
**eye-popping** [2] - 78:11,
80:19
**eyes** [1] - 73:3

**F**

**fabricate** [1] - 105:7
**face** [1] - 59:15
**faced** [1] - 21:24
**facetious** [1] - 90:2
**facets** [1] - 21:6
**facing** [1] - 139:17
**fact** [40] - 21:24, 22:10,
27:23, 34:21, 36:17, 37:8,
38:16, 42:6, 43:8, 56:13,
59:17, 60:13, 69:1, 69:4,
70:8, 70:19, 75:10, 77:20,
77:23, 79:8, 80:18, 82:18,
82:21, 83:23, 83:24, 86:13,
87:16, 87:22, 88:23, 102:7,
103:15, 104:8, 112:15,
114:4, 119:19, 120:25,
121:3, 122:24, 125:17,
129:18
**factored** [1] - 87:19
**facts** [14] - 43:25, 45:23,
47:7, 47:8, 56:22, 107:16,
107:18, 108:24, 111:13,
114:8, 127:4, 127:11, 127:15
**factual** [2] - 106:22, 111:24
**factually** [1] - 78:24
**failed** [1] - 108:8
**failure** [1] - 104:9
**fair** [17] - 10:10, 39:14,
53:25, 55:17, 65:2, 68:2,
81:17, 83:16, 83:17, 87:12,
89:24, 91:5, 92:18, 95:4,
105:11, 130:15, 144:2
**fairly** [1] - 140:15
**fairness** [2] - 41:22, 54:2
**faith** [6] - 13:23, 108:24,
109:19, 109:23, 111:6,
111:13
**fall** [3] - 5:12, 94:20, 96:15
**false** [2] - 45:13, 57:16

**familiar** [2] - 4:13, 123:18
**families** [1] - 154:21
**fan** [1] - 25:3
**far** [19] - 7:19, 12:4, 24:5,
34:3, 51:23, 59:10, 64:12,
71:12, 80:6, 88:8, 90:4, 93:8,
110:13, 114:9, 118:14,
118:20, 132:9, 145:17,
146:18
**fashion** [1] - 102:18
**fast** [2] - 76:25, 80:8
**favorable** [1] - 92:3
**fear** [3] - 38:12, 48:2,
135:20
**feature** [4] - 76:19, 120:21,
146:7
**featured** [1] - 127:1
**February** [4] - 42:21, 57:3,
57:12, 57:15
**feckless** [1] - 85:17
**federal** [3] - 105:19, 105:22,
113:21
**fee** [2] - 58:11
**feelings** [2] - 105:24,
145:14, 146:9
**fellow** [1] - 81:21
**felons** [1] - 17:1
**felt** [1] - 124:10
**Ferrari** [3] - 78:18, 79:13,
79:22
**few** [8] - 7:15, 24:1, 40:9,
65:13, 91:11, 134:5, 153:4,
154:23
**field** [1] - 146:8
**Fifth** [3] - 103:11, 103:17,
104:2
**figment** [1] - 18:10
**figure** [4] - 22:3, 35:7,
38:15, 45:1
**figures** [1] - 78:10
**file** [3] - 93:25, 150:21,
150:22
**filed** [4] - 23:3, 25:21,
26:22, 136:12
**filings** [1] - 128:23
**fill** [6] - 139:10, 139:22,
140:1, 140:2, 140:8
**filter** [4] - 3:10, 58:1, 82:17,
82:20
**final** [6] - 29:25, 66:3,
114:14, 118:16, 119:1, 119:8
**financial** [2] - 137:21, 148:4
**fine** [24] - 8:8, 8:15, 24:25,
31:3, 38:6, 39:7, 55:12, 65:6,
69:4, 86:16, 86:21, 89:20,
97:12, 128:16, 137:15,
138:12, 138:21, 150:1,
150:2, 150:4, 152:9, 152:11,
152:17, 154:10
**fine-tune** [1] - 24:25

**finer** [6] - 76:3, 85:11,
85:14, 89:5, 104:2, 116:1
**finish** [5] - 83:7, 131:12,
132:20, 137:3, 150:13
**firm** [3] - 88:22, 88:24,
88:25
**firms** [1] - 153:3
**first** [30] - 4:20, 5:24, 6:10,
8:12, 9:16, 14:7, 14:17,
15:15, 19:3, 23:20, 30:11,
31:5, 32:23, 33:3, 33:12,
35:13, 52:16, 52:21, 58:23,
66:20, 67:6, 73:24, 74:6,
74:10, 85:12, 97:19, 113:13,
132:18, 132:21, 149:21
**five** [9] - 4:18, 57:19, 84:9,
84:11, 84:24, 106:15,
117:18, 140:19, 144:11
**five-minute** [3] - 84:9,
84:11, 84:24
**fix** [1] - 91:3
**flags** [1] - 50:1
**flexibility** [1] - 131:22
**flip** [2] - 47:15, 149:4
**floating** [1] - 126:13
**Floor** [1] - 1:15
**FLORIDA** [1] - 1:1
**Florida** [5] - 1:3, 1:23,
42:22, 58:21, 156:6
**flow** [1] - 55:16
**fly** [1] - 99:8
**focus** [3] - 83:1, 118:11,
142:4
**focused** [5] - 11:14, 44:14,
71:15, 119:18, 141:23
**focusing** [3] - 11:17, 61:5,
77:8
**fodder** [1] - 13:19
**fold** [2] - 76:9, 76:22
**folks** [6] - 72:10, 77:24,
81:22, 141:11, 141:16,
150:16
**follow** [7] - 4:22, 71:22,
115:20, 118:3, 132:23,
141:15, 146:17
**follow-up** [2] - 71:22,
141:15
**followed** [1] - 109:8
**following** [5] - 20:20, 26:1,
69:13, 118:18, 128:18
**FOR** [3] - 1:13, 1:17, 2:2
**forefront** [1] - 21:13
**foregoing** [1] - 155:24
**foresee** [3] - 35:12, 46:20,
53:18
**forfeiture** [11] - 135:6,
135:10, 135:15, 135:18,
136:2, 136:18, 136:22,
136:25, 137:25, 138:21
**form** [6] - 13:11, 22:8, 93:2,

121:21, 137:1, 153:22
**formal** [1] - 130:14
**format** [1] - 105:24
**former** [3] - 5:3, 12:19,
26:22
**forms** [9] - 7:14, 8:2, 8:5,
8:13, 13:7, 19:13, 19:18,
19:23, 20:23
**Fort** [3] - 1:23, 152:6, 156:6
**forth** [7] - 20:5, 53:3, 92:20,
93:5, 93:16, 99:21, 148:8
**forward** [8] - 37:19, 47:6,
74:5, 91:9, 136:7, 136:22,
137:20, 145:24
**founded** [1] - 117:1
**four** [4] - 12:13, 33:2,
101:18, 106:15
**fourth** [2] - 134:18, 134:19
**Fox** [6] - 64:7, 64:8, 66:12,
66:15, 67:4, 67:8
**framed** [4] - 25:15, 49:9,
55:6, 125:16
**frames** [1] - 26:25
**frankly** [6] - 67:7, 110:24,
127:14, 127:22, 137:19,
154:3
**fraud** [9] - 4:14, 5:4, 16:25,
18:4, 42:7, 45:11, 79:3,
81:14, 122:4
**FRAUD** [1] - 1:15
**fraudulent** [2] - 12:14,
87:17
**free** [2] - 53:2, 129:12
**fresh** [1] - 132:21
**friends** [3] - 75:10, 77:15,
77:18
**front** [11] - 22:4, 58:14,
60:10, 62:2, 95:13, 103:9,
128:18, 129:18, 139:4,
142:23, 145:18
**full** [9] - 12:10, 21:21, 29:9,
30:13, 51:12, 96:19, 108:23,
109:2, 137:23
**fully** [4] - 47:16, 70:21,
107:25, 123:12
**fulsome** [1] - 67:22
**function** [4] - 110:7, 111:8,
114:6, 114:7
**funding** [2] - 81:3, 81:16
**furtherance** [1] - 112:6

**G**

**gained** [1] - 13:24
**gaining** [2] - 14:25, 15:1
**game** [10] - 56:18, 65:1,
65:2, 81:17, 83:16, 83:17,
89:24, 91:5, 95:4, 105:11
**GARLAND** [1] - 2:3
**gatekeeping** [2] - 110:7,

111:8
**gateway** [1] - 94:25
**gather** [1] - 127:15
**gating** [1] - 48:22
**general** [5] - 14:1, 33:2, 116:3, 140:25
**generally** [5] - 55:14, 56:15, 94:6, 145:3, 146:6
**generate** [1] - 45:12
**generated** [1] - 20:8
**generating** [1] - 121:16
**generic** [1] - 116:13
**genetic** [7] - 4:25, 8:17, 144:21, 145:3, 145:24, 146:7, 146:10
**gentleman** [1] - 129:11
**genuinely** [1] - 135:21
**Georgia** [3] - 1:19, 2:4, 2:7
**given** [14] - 10:12, 12:8, 35:8, 44:21, 46:18, 50:8, 51:21, 52:25, 66:24, 74:12, 110:9, 113:1, 113:25, 117:11
**glad** [1] - 106:12
**goal** [3] - 141:3, 141:19, 142:2, 142:16, 144:6
**God** [1] - 54:15
**Godfather** [1] - 24:13
**good-faith** [5] - 108:24, 109:19, 109:23, 111:6, 111:13
**goose** [1] - 113:10
**goose/gander** [3] - 108:11, 115:3, 115:4
**gospel** [3] - 14:15, 25:11, 27:3
**GOVERNMENT** [1] - 1:13
**government** [152] - 3:6, 4:13, 5:2, 5:22, 6:3, 6:15, 8:25, 9:16, 10:16, 12:17, 12:23, 14:10, 17:12, 19:10, 20:14, 25:4, 25:12, 25:15, 26:1, 26:8, 29:5, 29:7, 30:19, 34:16, 34:22, 36:5, 37:11, 38:8, 39:12, 41:13, 44:5, 46:6, 47:1, 49:21, 51:24, 54:22, 55:19, 58:15, 59:20, 60:8, 60:15, 61:10, 62:3, 62:10, 63:10, 63:15, 65:7, 67:1, 69:21, 71:11, 73:6, 74:24, 77:9, 78:2, 78:7, 78:8, 78:11, 78:15, 78:25, 80:2, 82:14, 82:18, 82:19, 84:15, 84:20, 85:12, 86:4, 86:7, 86:25, 87:10, 87:14, 88:13, 88:19, 88:21, 91:2, 91:6, 91:19, 92:10, 92:19, 93:1, 93:7, 93:19, 94:4, 94:16, 95:1, 96:8, 97:21, 98:5, 98:7, 98:11, 98:23, 99:6, 99:11, 100:8, 100:12, 100:19,
101:19, 103:12, 103:13, 103:18, 103:19, 103:24, 103:25, 104:8, 104:17, 104:21, 105:10, 105:23, 106:12, 106:24, 106:25, 108:1, 108:6, 108:8, 108:13, 109:14, 112:12, 112:16, 113:2, 115:8, 115:10, 117:17, 118:1, 119:5, 119:21, 119:24, 120:2, 120:12, 120:16, 122:15, 123:20, 125:2, 126:12, 126:19, 126:23, 128:2, 128:7, 128:13, 128:20, 129:1, 129:16, 129:25, 136:16, 139:15, 139:17, 139:19, 144:21, 145:8, 145:15, 147:1, 147:6, 155:14
**government's** [47] - 3:9, 11:13, 13:13, 18:2, 24:1, 27:4, 32:6, 33:14, 35:2, 37:1, 37:18, 37:23, 44:11, 47:23, 50:4, 60:14, 63:4, 68:16, 74:3, 75:14, 80:5, 81:9, 81:16, 83:25, 84:8, 84:12, 85:7, 86:8, 89:3, 90:9, 90:16, 91:23, 92:16, 95:17, 98:14, 101:17, 104:24, 109:21, 112:4, 113:8, 120:4, 125:19, 132:19, 134:3, 145:21, 146:21, 152:13
**grab** [1] - 69:11
**Gracie** [5] - 69:6, 130:22, 139:5, 140:11, 151:18
**grand** [2] - 50:14, 50:16
**grant** [9] - 31:25, 74:6, 81:19, 88:6, 90:22, 104:12, 118:25, 150:21, 150:24
**granted** [6] - 32:1, 83:13, 86:11, 101:7, 101:15, 102:25
**granting** [1] - 90:24
**great** [3] - 42:12, 142:25, 154:24
**green** [1] - 129:24
**grids** [1] - 140:5
**ground** [1] - 154:12
**grounds** [5] - 5:9, 64:4, 127:10, 127:14, 129:4
**group** [1] - 77:16
**Gucci** [4] - 78:19, 78:20, 79:14, 79:22
**guess** [13] - 12:2, 22:5, 30:2, 34:10, 34:25, 44:19, 49:5, 52:14, 60:22, 93:24, 103:21, 107:10, 147:22
**guessing** [1] - 37:12
**guidance** [4] - 26:8, 32:16, 90:3, 117:5
**guidelines** [1] - 113:20
**guilt** [3] - 21:17, 23:18,
25:17
**guilty** [1] - 145:10
**Gurskis** [2] - 3:8, 7:6
**GURSKIS** [18] - 1:13, 7:8, 7:24, 9:21, 10:3, 11:21, 12:23, 13:12, 16:13, 20:16, 21:5, 21:18, 22:6, 22:18, 23:9, 26:11, 32:7, 32:9
**guy** [3] - 24:2, 41:16, 69:13
**guys** [44] - 3:19, 13:16, 28:3, 32:14, 36:18, 39:15, 53:13, 73:15, 74:22, 83:10, 84:21, 84:25, 87:5, 88:4, 89:19, 89:21, 89:24, 90:7, 103:8, 104:10, 112:15, 113:9, 115:19, 126:17, 131:17, 133:7, 133:18, 137:8, 138:12, 138:14, 140:8, 140:12, 140:22, 141:10, 141:14, 141:22, 142:3, 146:18, 149:23, 151:12, 151:19, 154:25, 155:13, 155:19

---

# H

**habits** [2] - 10:14, 77:8
**half** [8] - 27:10, 27:21, 28:8, 64:20, 99:4, 132:8, 138:2, 140:18
**hand** [4] - 20:21, 20:22, 21:12
**handing** [1] - 54:14
**handle** [4] - 3:22, 127:20, 127:21, 127:24
**handling** [1] - 76:13
**hang** [1] - 110:4
**Hanukkah** [2] - 134:19, 135:23
**happily** [1] - 140:24
**Happy** [1] - 155:16
**harbor** [3] - 106:7, 106:9, 106:14
**hard** [5] - 61:10, 93:8, 93:22, 118:19, 119:13
**harm** [4] - 21:3, 22:2, 23:2, 23:17
**hat** [1] - 110:4
**hats** [1] - 154:22
**head** [2] - 113:23, 115:17
**healthcare** [4] - 42:7, 45:10, 112:9, 140:23
**hear** [10] - 11:8, 29:1, 29:24, 30:10, 31:4, 81:8, 94:24, 125:12, 135:7, 144:14
**heard** [12] - 14:17, 25:3, 38:20, 49:2, 74:11, 110:14, 120:1, 121:3, 122:8, 123:2, 124:17, 125:25
**HEARING** [1] - 1:9
**hearing** [16] - 12:3, 39:19, 41:9, 41:10, 55:11, 56:22, 59:16, 60:5, 61:10, 91:6, 101:23, 108:25, 119:18, 123:20, 129:21, 129:25
**hearings** [1] - 128:24
**hearsay** [4] - 14:16, 91:12, 94:7, 94:15
**heart** [2] - 21:13, 38:13
**heat** [1] - 43:8
**heightening** [1] - 8:5
**help** [3] - 10:11, 19:7, 151:19
**helpful** [1] - 32:10
**hereby** [1] - 155:24
**hesitant** [1] - 129:7
**high** [2] - 76:25, 108:2
**highlight** [2] - 10:18, 10:20
**highlighted** [1] - 11:15
**highlights** [1] - 12:11
**himself** [5] - 10:8, 22:12, 60:12, 92:24, 93:10
**hindsight** [1] - 118:10
**hired** [2] - 17:19, 18:5
**hit** [5] - 40:15, 110:15, 113:23, 154:12
**hoc** [1] - 114:4
**hold** [2] - 54:11, 111:15
**Holden** [1] - 117:18
**holds** [1] - 98:16
**holiday** [8] - 131:5, 131:11, 131:14, 132:15, 134:1, 135:24, 154:19, 154:21
**holidays** [7] - 131:8, 137:5, 137:10, 137:13, 138:7, 143:6, 154:15
**homework** [2] - 3:20, 154:11
**honest** [1] - 65:21
**Honor** [87] - 3:7, 3:13, 3:17, 7:8, 7:15, 9:5, 9:21, 10:3, 11:21, 12:23, 13:12, 14:4, 16:13, 20:17, 20:24, 21:5, 21:18, 22:6, 22:9, 22:18, 23:9, 26:11, 28:20, 29:9, 32:7, 32:12, 36:22, 40:8, 40:11, 40:15, 45:6, 45:16, 48:11, 48:15, 49:2, 51:7, 51:24, 54:21, 55:20, 56:25, 62:5, 63:5, 63:25, 67:13, 68:5, 71:20, 73:6, 75:16, 75:24, 76:4, 77:19, 78:6, 79:2, 84:19, 85:1, 86:10, 86:23, 87:21, 89:11, 100:15, 108:10, 110:23, 110:25, 113:12, 113:22, 120:6, 130:12, 132:1, 134:5, 135:14, 136:6, 136:14, 137:15, 138:9, 138:16, 142:10, 143:12, 145:23,

149:3, 149:17, 149:24,
151:24, 152:21, 154:8,
155:12, 155:17, 155:18
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hooked** [1] - 77:4
**hope** [6] - 72:25, 137:5,
139:12, 154:16, 154:20,
154:24
**Hope** [4] - 78:23, 79:12,
80:13, 81:15
**hopefully** [1] - 140:7,
154:17
**hoping** [2] - 126:24, 126:25
**horribles** [1] - 38:9
**HOSTETLER** [1] - 2:5
**hotel** [1] - 79:8
**hour** [6] - 106:13, 132:8,
133:9, 140:17, 151:15
**hourly** [1] - 58:13
**hours** [1] - 119:12
**housekeeping** [4] - 3:24,
133:8, 133:23, 134:12
**houses** [1] - 75:22
**hundred** [3] - 38:18, 52:2,
54:17
**hypothetical** [3] - 36:13,
50:6, 94:22
**hypothetically** [3] - 49:23,
69:23, 70:6

---

**I**

**icing** [1] - 11:4
**idea** [13] - 24:7, 26:18,
30:13, 52:1, 52:10, 58:25,
85:23, 108:12, 109:17,
110:16, 119:25, 124:10,
124:12
**ideal** [1] - 154:18
**identified** [3] - 11:20,
11:22, 12:9
**identify** [1] - 70:3
**II** [2] - 1:10, 1:22
**illegal** [9] - 21:25, 29:20,
36:15, 99:7, 99:22, 114:13,
118:17, 122:19, 124:13
**illegality** [1] - 18:14
**Ilona** [1] - 84:8
**ILONA** [2] - 1:21, 156:4
**imagine** [6] - 10:17, 45:22,
45:24, 95:7, 99:13, 137:12
**immediately** [1] - 150:22
**impacts** [2] - 39:21, 39:22
**impanel** [1] - 132:15
**impeach** [1] - 102:14
**impeaches** [1] - 122:13
**impeaching** [1] - 101:19
**impeachment** [7] - 95:3,
116:10, 119:15, 120:16,

---

123:19, 125:22, 128:3
**implemented** [1] - 125:21
**implicate** [2] - 61:22, 100:9
**implicated** [1] - 40:5
**implications** [1] - 113:3
**importance** [1] - 7:25
**important** [11] - 15:5, 15:9,
32:13, 46:25, 59:9, 71:8,
97:15, 101:4, 117:25,
122:16, 125:15
**improper** [2] - 103:8, 105:5
**improperly** [3] - 89:1,
101:19, 102:14
**improprieties** [1] - 28:9
**impropriety** [1] - 29:16
**in-camera** [1] - 73:24
**inaccurate** [1] - 49:4
**inappropriate** [2] - 35:23,
37:17
**inasmuch** [1] - 83:8
**inbox** [1] - 134:9
**incapable** [1] - 85:18
**inclined** [2] - 48:11, 77:13
**include** [6] - 46:12, 57:19,
78:17, 93:14, 95:15, 95:17
**included** [1] - 121:4
**including** [8] - 4:22, 6:6,
28:10, 69:2, 106:16, 134:7,
134:16, 154:14
**incorrect** [1] - 115:21
**increase** [1] - 121:19
**incredibly** [1] - 62:13
**incriminating** [1] - 98:15
**indeed** [4] - 52:17, 59:1,
70:17, 97:16
**independent** [1] - 18:15
**independently** [2] - 20:8,
148:13
**indicate** [5] - 7:3, 8:23,
9:18, 13:23, 122:22
**indicated** [5] - 36:1, 64:9,
68:19, 105:5, 105:20
**indicates** [1] - 150:22
**indicating** [1] - 58:25
**indicative** [2] - 17:6, 23:18
**indictment** [4] - 58:20,
58:22, 120:12, 136:24
**individual** [2] - 58:21,
146:24
**individually** [1] - 57:22
**individuals** [3] - 77:21,
99:1, 100:2
**inextricably** [4] - 5:10, 6:3,
8:22, 14:11
**inferences** [1] - 104:8
**inflame** [1] - 80:3
**influenced** [1] - 47:14
**inform** [1] - 69:25
**information** [7] - 14:1, 30:6,

---

92:15, 98:15, 100:21, 109:4,
110:9
**informative** [1] - 146:1
**informed** [1] - 129:23
**inherently** [1] - 41:13
**initials** [2] - 98:16, 103:20
**inner** [1] - 51:4
**input** [2] - 50:15, 59:21
**inquire** [5] - 39:17, 57:24,
58:2, 71:12, 128:20
**inquiry** [1] - 78:14
**inside** [2] - 150:5, 150:6
**instances** [1] - 95:11
**instead** [1] - 139:15
**instruct** [2] - 38:21, 111:2
**instructing** [1] - 52:22
**instruction** [1] - 35:8,
106:14, 107:12, 108:17,
108:22, 110:1, 110:14,
111:5, 111:6, 115:15, 145:1
**instructions** [6] - 16:5,
36:23, 112:19, 112:24,
114:24, 118:18
**insurance** [5] - 16:25, 86:4,
87:19, 113:18, 113:19
**insurers** [1] - 87:17
**intelligence** [1] - 20:13
**intend** [5] - 7:11, 10:21,
12:24, 99:10, 136:21
**intended** [2] - 117:6,
145:23
**intending** [2] - 40:17, 95:22
**intends** [3] - 3:22, 99:11,
100:12, 147:1
**intent** [15] - 4:19, 5:13,
5:17, 7:18, 19:12, 19:21,
19:22, 23:14, 42:9, 81:13,
85:24, 112:11, 121:5,
122:10, 123:15
**interact** [1] - 72:10
**interacted** [1] - 76:17
**interaction** [3] - 49:14,
49:16, 54:19
**interactions** [3] - 42:18,
51:9, 59:3
**interesting** [2] - 106:24,
125:7
**interests** [3] - 52:13, 74:3,
130:3
**interpret** [1] - 41:7
**interpreted** [2] - 116:15,
116:17
**interpreting** [1] - 44:2
**interrupt** [2] - 36:10, 151:16
**interruptions** [1] - 132:9
**intertwined** [5] - 5:10, 6:4,
8:23, 14:11, 23:11, 44:17,
45:4, 45:17
**intertwining** [1] - 47:19
**interview** [5] - 40:19, 40:20,

---

101:20, 102:1, 102:25
**interviewed** [6] - 37:24,
42:16, 47:2, 64:1, 64:19,
108:14
**interviewing** [1] - 108:16
**interviews** [2] - 30:22,
125:5
**intimately** [1] - 123:18
**introduce** [16] - 3:14, 5:2,
6:3, 10:4, 10:21, 36:5, 78:4,
91:22, 91:25, 92:5, 95:22,
98:23, 98:25, 99:11, 99:24,
123:11
**introduced** [12] - 6:13,
12:25, 14:18, 79:2, 79:4,
79:12, 91:14, 96:22, 137:16,
138:2
**introducing** [3] - 91:20,
98:6, 120:17
**introduction** [2] - 99:10,
100:18
**invested** [1] - 69:18
**investigate** [1] - 47:16
**investigated** [1] - 17:18
**investigation** [6] - 18:6,
18:19, 43:6, 43:10, 85:19,
126:4
**investigations** [3] - 42:24,
57:9
**investigator** [1] - 137:21
**investigators** [1] - 150:16
**invite** [1] - 68:14
**invocation** [1] - 44:11
**invoice** [4] - 58:9, 58:10,
94:8, 94:10
**invoices** [4] - 47:9, 58:6,
95:9
**invoicing** [1] - 58:12
**invokes** [1] - 44:9
**involve** [4] - 23:24, 47:11,
97:7, 116:6
**involved** [18] - 9:25, 43:2,
45:1, 46:23, 46:24, 50:5,
50:13, 52:6, 56:3, 57:1,
58:24, 70:17, 70:18, 97:9,
107:24, 146:24, 148:18,
150:16
**involvement** [16] - 10:18,
34:7, 43:14, 44:2, 47:21,
59:17, 60:6, 60:20, 61:12,
67:2, 71:1, 71:15, 72:13,
72:18, 107:21, 129:22
**involves** [1] - 55:8
**involving** [4] - 33:23, 47:10,
47:11, 95:19
**ironic** [1] - 27:20
**irrelevant** [2] - 15:12,
104:19
**isolated** [1] - 125:19
**isolation** [1] - 97:21

**issue** [51] - 8:8, 20:22, 21:13, 24:6, 26:13, 29:22, 32:21, 34:10, 34:11, 35:10, 40:10, 41:25, 44:19, 57:11, 61:2, 70:5, 74:9, 74:19, 75:18, 75:24, 76:1, 80:18, 84:4, 87:5, 88:13, 88:21, 88:22, 89:9, 89:13, 89:16, 89:22, 94:19, 100:13, 102:2, 109:19, 109:24, 120:11, 122:15, 122:25, 123:23, 124:16, 127:24, 128:17, 128:25, 129:20, 130:16, 133:4, 145:24, 154:9

**issued** [2] - 34:4, 49:22

**issues** [24] - 4:11, 4:17, 5:17, 6:2, 9:4, 10:25, 25:8, 28:15, 33:11, 35:24, 40:9, 41:5, 47:12, 72:24, 90:6, 90:14, 94:1, 94:25, 132:12, 133:1, 133:23, 140:24, 153:22, 154:1

**it'll** [1] - 125:7

**itching** [1] - 19:7

**items** [1] - 153:6

**itself** [6] - 7:20, 48:3, 75:21, 129:22, 142:2, 154:14

---

**J**

**Jaguar** [1] - 79:15

**JAMIE** [1] - 1:13

**Jamie** [1] - 3:7

**January** [1] - 135:18

**Jencks** [1] - 101:23

**job** [3] - 52:6, 52:12

**Johnny** [1] - 103:25

**joke** [1] - 24:13

**Jr** [1] - 3:8

**JR** [1] - 1:14

**judge** [7] - 39:16, 50:11, 61:8, 65:17, 65:18, 69:17, 71:24

**JUDGE** [1] - 1:10

**Judge** [7] - 15:23, 16:2, 34:23, 48:7, 134:6, 142:23, 153:4

**judge's** [2] - 64:24, 68:1

**judges** [1] - 143:25

**judgment** [2] - 118:17, 145:18

**July** [2] - 57:15, 98:8

**jump** [2] - 19:10, 115:16

**jumping** [1] - 144:2

**jumps** [1] - 146:10

**June** [3] - 57:15, 92:8, 98:8

**Juror** [1] - 143:18

**jurors** [14] - 18:10, 20:11, 27:4, 131:2, 131:8, 131:9, 132:4, 132:21, 133:9,

137:14, 140:8, 140:14, 141:21, 143:8

**jury** [74] - 8:19, 10:7, 13:20, 13:25, 16:5, 22:4, 25:10, 26:21, 28:16, 30:5, 31:5, 32:10, 32:19, 36:17, 41:7, 41:15, 50:14, 50:16, 68:24, 73:13, 74:17, 75:5, 77:6, 80:4, 81:8, 100:23, 104:25, 105:11, 105:24, 107:22, 108:2, 108:8, 109:25, 110:9, 111:2, 111:12, 112:19, 114:7, 114:13, 114:24, 115:15, 118:11, 118:18, 130:9, 132:15, 132:17, 134:14, 135:5, 135:14, 136:6, 136:7, 136:8, 136:11, 136:15, 136:16, 136:18, 136:19, 136:23, 136:24, 137:1, 137:7, 137:16, 138:12, 139:9, 139:21, 144:25, 146:19, 147:14, 148:25, 149:2, 149:5, 155:5

**jury's** [4] - 18:2, 41:17, 111:13, 114:7

**JUSTICE** [1] - 1:14

**justifies** [1] - 83:8

---

**K**

**keep** [12] - 11:14, 24:24, 28:14, 56:19, 60:23, 76:9, 76:18, 81:21, 101:14, 144:1, 151:16, 152:12

**keeping** [2] - 59:6, 77:3

**keeps** [1] - 144:2

**kept** [3] - 21:8, 76:21, 92:3

**key** [6] - 37:9, 48:1, 48:17, 80:4, 116:19, 118:7

**Key** [1] - 79:9

**kickback** [7] - 4:23, 5:20, 19:14, 22:11, 36:24, 45:10, 60:1

**kickbacks** [2] - 76:2, 80:20

**kids** [2] - 79:11, 132:5

**killed** [1] - 15:8

**kind** [29] - 13:6, 24:9, 27:20, 29:10, 33:14, 33:19, 40:14, 44:25, 47:19, 61:5, 67:14, 71:10, 77:15, 84:3, 86:12, 91:22, 94:9, 101:12, 104:1, 104:23, 108:11, 109:12, 113:7, 113:10, 119:1, 132:7, 133:25, 134:16, 146:13

**kinds** [2] - 14:20, 40:19

**kit** [2] - 121:24, 122:2

**kits** [2] - 121:22, 121:25

**knock** [1] - 129:20

**knowing** [1] - 95:7

**knowledge** [27] - 5:3, 5:13, 5:16, 6:5, 7:3, 7:22, 8:14, 9:13, 12:13, 13:6, 13:13, 13:17, 13:24, 14:25, 15:1, 15:2, 15:4, 17:9, 19:12, 19:21, 19:22, 21:13, 21:16, 23:14, 42:9, 85:24, 114:1

**knowledgeable** [1] - 145:9

**knows** [8] - 15:5, 15:19, 15:20, 61:19, 72:6, 97:16

---

**L**

**lab** [6] - 45:12, 47:3, 47:12, 57:22, 58:5, 76:12

**LabSolutions** [34] - 5:1, 9:24, 10:9, 16:22, 17:12, 19:6, 23:4, 27:10, 28:8, 28:10, 29:14, 34:1, 36:15, 42:21, 49:17, 49:22, 51:9, 57:2, 57:10, 57:16, 58:24, 60:7, 71:14, 71:18, 76:11, 78:9, 91:21, 92:14, 93:6, 94:13, 95:19, 99:2, 99:21, 117:15

**LabSolutions'** [2] - 17:1, 33:18

**lack** [3] - 7:4, 34:7, 41:8

**ladies** [1] - 90:3

**laid** [1] - 95:8

**landscape** [4] - 10:14, 114:11, 114:21, 116:21

**language** [1] - 101:21

**large** [2] - 11:16, 154:18

**last** [23] - 16:2, 26:2, 58:9, 64:6, 65:12, 78:22, 81:24, 82:8, 83:25, 84:14, 101:23, 109:13, 112:7, 112:10, 114:12, 119:12, 119:18, 120:1, 120:5, 133:25, 134:8, 151:1, 154:23

**Last** [1] - 98:20

**lasted** [1] - 23:25

**late** [2] - 98:8, 134:8

**latest** [2] - 152:23, 152:25

**Lauderdale** [1] - 1:23, 152:6, 156:6

**laundering** [2] - 76:2, 80:22

**laundry** [1] - 28:13

**law** [13] - 8:21, 28:1, 42:9, 59:10, 76:15, 113:17, 113:24, 114:7, 115:5, 115:6, 116:7, 116:14, 153:3

**LAW** [1] - 1:17

**lawsuit** [22] - 13:20, 13:22, 18:25, 20:21, 22:10, 23:3, 24:12, 25:20, 26:9, 26:14, 26:16, 26:20, 27:7, 27:9, 27:25, 28:7, 28:9, 29:14, 30:10, 31:3, 31:6, 31:12

**lawsuit's** [1] - 26:24

**lawsuits** [1] - 20:10

**Lawyer** [8] - 45:25, 46:1, 46:2, 46:4, 46:7, 50:3

**lawyer** [19] - 17:18, 17:19, 18:5, 18:19, 18:21, 33:19, 33:24, 41:19, 45:7, 45:13, 50:5, 50:10, 58:12, 60:13, 66:20, 114:19, 118:16, 143:25

**lawyering** [1] - 52:10

**lawyers** [16] - 19:5, 27:23, 41:16, 43:2, 44:11, 44:25, 45:9, 45:17, 47:17, 52:2, 54:11, 70:16, 109:2, 110:2, 118:22

**lawyers'** [1] - 130:25

**lay** [10] - 12:1, 55:20, 95:6, 95:11, 96:24, 97:18, 107:2, 152:4, 152:6, 152:8

**layer** [1] - 19:21

**layering** [1] - 19:21

**lead** [10] - 33:4, 33:13, 33:22, 33:25, 35:1, 41:12, 69:20, 70:16, 70:22, 82:2

**lead-up** [1] - 82:2

**leading** [1] - 54:8

**leads** [1] - 20:9

**learning** [2] - 47:7, 47:8

**least** [27] - 5:16, 33:20, 34:6, 35:3, 37:23, 44:21, 46:23, 47:1, 47:23, 52:20, 55:25, 56:12, 56:22, 61:6, 62:12, 67:25, 80:8, 82:7, 89:15, 92:19, 98:7, 99:20, 101:5, 125:17, 125:18, 126:22, 154:5

**leave** [3] - 130:3, 130:5, 152:17

**leaves** [1] - 120:15

**leeway** [5] - 84:5, 104:5, 116:20, 117:6, 118:21

**left** [7] - 54:23, 54:25, 66:13, 85:6, 137:9, 145:5, 153:7

**legal** [29] - 43:18, 63:18, 70:3, 71:15, 72:13, 73:5, 109:4, 109:9, 111:16, 112:22, 113:3, 113:6, 114:13, 114:20, 114:23, 115:5, 115:7, 116:7, 116:21, 118:7, 118:10, 118:17, 118:23, 119:1, 123:9, 123:13, 123:24, 124:19, 146:5

**legality** [1] - 112:8, 113:9

**legitimate** [3] - 87:18, 87:23, 88:1

**length** [1] - 151:7

**lengthy** [1] - 16:2

**less** [2] - 21:16, 74:9
**letter** [2] - 14:8, 16:11
**letters** [1] - 16:20
**level** [11] - 60:6, 60:19, 61:11, 72:17, 73:18, 82:16, 82:22, 83:2, 108:3, 125:25, 130:8
**levels** [1] - 115:1
**liability** [2] - 59:15, 59:25
**lies** [1] - 17:22
**lifestyle** [4] - 76:25, 80:9, 81:3, 81:17
**light** [6] - 21:11, 21:12, 63:8, 68:19, 82:5, 129:24
**likely** [3] - 11:23, 45:12, 127:9
**limine** [12] - 3:22, 32:23, 32:24, 69:6, 74:6, 83:12, 84:1, 85:7, 87:15, 101:17, 118:15, 119:6
**limit** [3] - 24:20, 52:24, 71:1
**limitation** [1] - 71:6
**limitations** [2] - 42:17, 102:24
**limited** [14] - 12:9, 18:18, 28:10, 59:17, 73:4, 76:19, 123:21, 127:1, 127:25, 128:3, 128:14, 129:22, 141:10, 146:17
**limiting** [2] - 48:16, 72:4
**limits** [1] - 100:20
**line** [13] - 9:20, 9:21, 25:25, 31:11, 71:8, 87:16, 89:23, 93:4, 94:21, 104:1, 114:3, 116:18
**lines** [6] - 28:5, 91:10, 104:25, 112:24, 118:13, 147:4
**lineup** [1] - 150:14
**link** [1] - 8:25
**list** [10] - 15:11, 15:22, 28:13, 37:22, 61:6, 78:16, 97:7, 125:13, 144:3, 146:21
**listen** [1] - 123:18
**listener** [2] - 123:6, 123:22
**lists** [2] - 82:9, 82:10
**literally** [1] - 55:13
**litigate** [1] - 19:5
**live** [2] - 84:4, 111:20
**living** [1] - 80:8
**LLP** [1] - 2:5
**LOEB** [1] - 2:3
**logistics** [1] - 131:18
**logistics-wise** [1] - 131:18
**look** [32] - 14:7, 14:13, 15:22, 16:15, 19:11, 24:25, 25:10, 30:22, 38:2, 52:13, 54:15, 55:23, 60:22, 73:17, 73:21, 73:24, 77:1, 80:7, 82:12, 85:13, 92:18, 94:23,

101:2, 104:18, 111:4, 119:11, 130:3, 136:3, 137:6, 139:24, 142:16, 148:5
**looked** [7] - 59:11, 85:14, 105:10, 127:23, 153:19, 154:9
**looking** [16] - 4:10, 16:6, 24:17, 46:15, 57:10, 73:10, 76:19, 85:18, 101:14, 106:1, 106:8, 112:10, 116:24, 138:7, 141:14, 141:22
**looks** [3] - 101:6, 126:7, 144:17
**looping** [1] - 34:19
**loosen** [1] - 141:20
**Loper** [1] - 51:10
**lose** [2] - 77:7, 137:14
**lost** [1] - 24:6
**love** [1] - 142:25
**lunch** [3] - 132:8, 151:15, 152:14
**LUPOWITZ** [1] - 1:21, 156:4
**Lupowitz** [1] - 156:3
**luxury** [3] - 81:4, 81:12, 81:17
**lynchpin** [1] - 77:15

# M

**mad** [1] - 38:20
**Magistrate** [1] - 34:23
**magistrate** [11] - 35:13, 39:16, 53:6, 61:8, 64:24, 65:14, 65:18, 68:1, 69:16, 71:24, 151:22
**magistrate's** [1] - 34:5
**mail** [1] - 121:24
**main** [2] - 33:9, 41:15
**maintain** [1] - 39:2
**maintained** [1] - 28:8
**maintaining** [1] - 49:22
**major** [8] - 8:10, 8:18, 18:24, 35:7, 56:12, 126:2, 132:9, 141:6
**majority** [3] - 32:2, 82:7, 97:6
**man** [1] - 33:19
**manage** [1] - 57:21
**manifest** [2] - 48:2, 129:22
**manifests** [2] - 142:1, 154:13
**manual** [1] - 94:8
**Maple** [1] - 2:3
**Marc** [1] - 33:8
**March** [1] - 57:15
**marketer** [4] - 89:15, 121:11, 121:15, 121:16
**marketers** [13] - 15:21, 42:23, 57:4, 76:13, 76:16, 76:22, 77:4, 88:20, 89:9,

89:13, 91:1, 107:15, 121:10
**marketing** [5] - 88:9, 88:22, 88:23, 88:25, 89:22
**marshals** [1] - 150:24
**match** [1] - 90:17
**material** [16] - 20:2, 67:9, 82:19, 91:22, 92:13, 102:18, 108:24, 111:13, 119:20, 119:23, 123:19, 125:22, 126:13, 128:1, 128:8, 128:12
**materially** [1] - 107:18
**materials** [3] - 82:6, 151:3, 153:11
**matter** [17] - 3:3, 15:16, 15:25, 17:6, 17:22, 18:1, 18:11, 25:10, 32:17, 45:10, 45:14, 46:1, 46:12, 80:5, 85:10, 146:19, 156:1
**matters** [5] - 24:9, 56:3, 125:12, 134:12, 136:2
**max** [1] - 132:8
**Maxim** [1] - 18:24
**McKeon** [28] - 33:8, 33:24, 35:5, 36:12, 36:21, 37:14, 39:25, 53:16, 53:22, 54:7, 54:14, 54:17, 54:20, 54:24, 56:10, 81:25, 83:3, 83:16, 121:9, 121:12, 121:14, 121:17, 121:19, 121:20, 122:3, 122:19, 122:22, 125:4
**McKeon's** [3] - 33:24, 54:24, 127:12
**mean** [118] - 7:1, 10:7, 13:4, 13:20, 15:3, 15:22, 18:9, 19:18, 21:19, 23:4, 23:5, 24:11, 25:7, 29:13, 30:7, 32:16, 34:13, 35:4, 35:6, 36:13, 36:17, 37:11, 37:12, 38:4, 38:7, 39:16, 40:4, 45:1, 47:24, 48:2, 48:5, 48:21, 48:25, 52:14, 52:16, 53:9, 53:25, 54:4, 55:24, 56:6, 56:17, 58:5, 59:10, 59:11, 60:16, 60:25, 61:9, 61:19, 62:3, 63:22, 64:11, 64:12, 64:14, 67:15, 71:11, 75:11, 76:24, 77:1, 81:8, 82:1, 86:2, 86:24, 87:4, 87:12, 87:23, 90:1, 90:21, 91:4, 95:11, 95:12, 96:12, 96:24, 101:22, 102:4, 103:7, 103:23, 104:18, 107:3, 107:4, 108:21, 109:20, 110:15, 110:22, 112:22, 113:7, 114:10, 114:18, 115:14, 115:16, 115:17, 116:16, 116:17, 117:2, 117:4, 117:13, 117:22, 118:8, 118:13, 123:15, 123:18, 123:24, 124:4, 124:14,

127:22, 128:18, 137:6, 137:11, 137:15, 138:11, 139:8, 142:16, 143:5, 145:2, 145:3, 151:13, 153:3, 153:7, 153:18
**meaning** [3] - 6:5, 6:15, 59:12
**means** [4] - 6:17, 87:18, 113:4, 122:23
**meant** [5] - 24:8, 24:11, 53:12, 116:4, 117:19
**measure** [2] - 52:17, 52:19, 53:7
**measures** [4] - 48:13, 68:24, 69:1, 72:4
**meat** [1] - 29:11
**mechanics** [2] - 130:21, 138:23
**mechanics-wise** [1] - 130:21
**mediation** [1] - 19:3
**Medicaid** [2] - 79:6, 79:10
**medical** [5] - 16:25, 141:9, 145:4, 145:6, 146:8
**medically** [1] - 144:22
**Medicare** [24] - 4:14, 4:21, 4:22, 5:20, 5:24, 6:20, 7:12, 7:25, 8:14, 19:13, 45:11, 45:13, 57:16, 76:3, 80:20, 80:24, 80:25, 85:17, 85:25, 86:14, 86:19, 113:13, 140:24, 144:22
**Medicare's** [2] - 6:6, 113:17
**meet** [3] - 141:5, 147:11, 151:10
**meeting** [44] - 33:4, 33:5, 33:13, 33:15, 33:23, 34:2, 34:12, 34:17, 34:20, 35:3, 36:20, 38:15, 39:6, 40:18, 40:24, 40:25, 41:2, 41:3, 41:7, 41:19, 41:23, 42:14, 42:15, 45:18, 52:23, 53:4, 54:4, 54:8, 54:9, 54:19, 55:2, 55:4, 55:7, 55:15, 55:19, 56:10, 56:14, 61:1, 61:3, 65:5, 74:9, 74:15, 83:21
**meetings** [4] - 34:8, 35:11, 47:10, 70:9
**memo** [5] - 115:5, 116:8, 117:11, 118:2, 118:4
**memorialize** [2] - 4:12, 155:1
**memory** [2] - 38:14, 131:19
**memos** [1] - 116:2
**mention** [13] - 23:17, 50:18, 53:1, 55:11, 56:2, 56:6, 56:13, 65:4, 81:20, 83:22, 88:15, 112:1, 113:24
**mentioned** [9] - 23:15, 40:11, 48:15, 55:19, 74:13,

102:12, 109:12, 147:2

**mentioning** [4] - 20:24, 22:24, 61:3, 125:11

**mentions** [1] - 60:23

**mere** [1] - 65:4

**merrier** [1] - 142:18

**mess** [1] - 86:5

**message** [5] - 97:20, 146:24, 147:3, 148:2, 148:13

**messages** [15] - 91:21, 93:3, 93:12, 93:16, 94:5, 94:6, 97:2, 125:9, 146:20, 147:4, 147:9, 147:11, 147:13, 147:19, 148:17

**met** [1] - 107:12

**method** [2] - 39:17, 82:13

**MI** [1] - 98:20

**Miami** [2] - 1:3, 51:12

**Michaels** [2] - 3:8, 3:9

**microphone** [1] - 69:12

**middle** [4] - 48:1, 48:23, 58:18, 127:12

**might** [23] - 26:18, 32:23, 41:7, 42:8, 55:20, 58:6, 68:18, 77:22, 84:14, 94:11, 94:12, 116:4, 116:6, 119:12, 126:5, 128:20, 129:9, 129:18, 134:19, 148:7, 152:15

**million** [10] - 78:8, 78:9, 79:18, 79:19, 80:20, 80:21, 92:15

**MINAL** [2] - 1:6, 69:10

**Minal** [5] - 3:4, 15:7, 42:25, 92:7, 122:21

**mind** [20] - 5:21, 6:17, 15:14, 17:9, 18:9, 18:17, 18:20, 20:3, 20:7, 46:9, 46:13, 60:3, 68:21, 70:20, 86:2, 87:9, 87:15, 88:4, 90:17, 148:3

**mine** [1] - 53:24

**minimize** [1] - 133:19

**minimized** [1] - 35:11

**minimum** [2] - 73:9, 142:25

**minute** [6] - 69:8, 84:9, 84:11, 84:24, 116:16, 150:4

**minutes** [5] - 24:1, 141:15, 141:23, 149:24, 150:3

**misbehaving** [1] - 91:2

**mischaracterize** [1] - 77:7

**mischaracterizing** [1] - 80:8

**misdirected** [1] - 58:9

**misleading** [1] - 25:9

**misled** [1] - 108:2

**missed** [2] - 134:9, 134:11

**missing** [2] - 4:9, 113:11

**misstating** [1] - 60:20

**mistake** [2] - 5:14, 114:16

**mistakenly** [1] - 26:19

**misunderstanding** [1] - 100:7

**MO** [1] - 17:11

**mode** [3] - 51:13, 51:14, 51:15

**modus** [1] - 17:10

**moment** [7] - 38:21, 59:13, 63:19, 86:15, 102:3, 118:10, 123:25

**moments** [1] - 7:15

**Monday** [20] - 3:21, 118:6, 130:21, 131:11, 132:10, 132:14, 132:17, 132:21, 134:2, 134:22, 140:10, 144:15, 150:13, 151:11, 151:12, 151:20, 152:10, 154:12, 154:23, 155:4

**money** [2] - 18:6, 27:11, 51:11, 65:17, 65:18, 75:6, 75:9, 76:2, 76:16, 76:25, 78:13, 79:7, 79:17, 80:22, 80:23, 80:24, 81:2, 81:6, 81:20, 122:2, 124:9

**month** [1] - 64:20

**months** [2] - 53:20, 82:7

**moot** [8] - 39:3, 60:25, 126:22, 126:25, 127:21, 129:19, 130:15, 130:18

**morning** [14] - 3:2, 3:7, 3:11, 3:13, 3:17, 3:19, 62:12, 64:6, 64:10, 118:6, 131:22, 133:3, 151:20

**most** [5] - 5:21, 31:25, 119:4, 137:19, 138:3, 142:8, 147:14, 155:2

**mostly** [1] - 142:10

**MOTION** [1] - 1:9

**motion** [50] - 3:23, 11:11, 32:24, 33:12, 47:19, 52:24, 55:5, 55:6, 56:12, 60:23, 65:6, 69:6, 74:6, 74:20, 74:23, 76:24, 81:24, 83:7, 83:12, 84:1, 84:12, 85:7, 87:15, 88:2, 88:5, 89:10, 89:11, 89:18, 90:16, 90:22, 92:19, 93:25, 101:17, 118:15, 118:25, 119:8, 119:9, 119:17, 125:16, 126:11, 127:16, 129:3, 130:15, 150:21, 150:22

**motions** [6] - 3:22, 32:23, 49:18, 119:4, 119:6, 130:20

**motivations** [1] - 105:7

**motive** [7] - 5:13, 5:17, 76:1, 78:12, 79:7, 79:16, 81:13

**mouth** [1] - 36:7

**move** [17] - 4:5, 4:15, 12:11, 18:16, 24:5, 32:22, 33:10,

69:5, 127:9, 127:13, 128:20, 128:23, 143:23, 150:10, 152:3, 152:7, 152:15

**moved** [2] - 148:13, 148:23

**movement** [1] - 80:24

**moves** [1] - 89:1

**movies** [1] - 24:13

**moving** [6] - 8:16, 11:23, 74:5, 81:24, 132:25, 133:13

**MR** [148] - 3:13, 3:16, 3:17, 6:12, 6:22, 9:5, 10:10, 10:20, 10:24, 11:6, 11:10, 12:4, 14:3, 14:7, 15:18, 16:10, 17:14, 17:17, 17:25, 18:18, 23:21, 23:24, 24:4, 24:16, 24:24, 25:1, 27:6, 27:9, 27:13, 27:16, 27:23, 28:20, 28:22, 29:13, 30:13, 35:13, 35:16, 35:19, 36:3, 36:11, 37:5, 37:9, 37:14, 37:21, 39:9, 49:2, 49:11, 50:7, 50:19, 51:14, 51:16, 51:20, 53:19, 54:6, 55:9, 55:18, 58:8, 65:12, 65:25, 66:5, 71:20, 73:19, 77:19, 84:19, 86:23, 87:6, 87:8, 90:15, 90:21, 91:16, 91:18, 92:13, 95:14, 95:17, 95:22, 96:2, 96:7, 98:1, 98:4, 98:19, 98:20, 98:21, 98:22, 99:14, 99:16, 99:19, 100:5, 102:17, 102:20, 103:6, 103:10, 104:11, 105:15, 106:4, 106:10, 108:5, 115:2, 115:13, 117:8, 117:11, 117:22, 117:24, 122:17, 123:8, 123:11, 124:24, 125:7, 129:8, 129:11, 129:15, 135:14, 136:6, 136:10, 136:14, 137:15, 137:19, 138:1, 138:9, 138:16, 143:15, 143:17, 143:21, 143:23, 144:9, 144:11, 144:20, 145:8, 145:19, 146:4, 146:19, 147:17, 149:8, 149:11, 149:17, 149:19, 150:1, 150:8, 150:15, 150:19, 151:1, 151:24, 151:25, 152:3, 152:19, 153:2, 153:8, 153:12, 155:18

**MS** [96] - 3:7, 7:8, 7:24, 9:21, 10:3, 11:21, 12:23, 13:12, 16:13, 20:16, 21:5, 21:18, 22:6, 22:18, 23:9, 26:11, 32:7, 32:9, 40:8, 45:5, 45:9, 46:11, 46:21, 48:6, 48:10, 56:24, 62:5, 62:8, 62:21, 63:1, 63:4, 63:13, 63:25, 64:18, 66:14, 67:13,

68:4, 68:8, 68:23, 73:6, 75:16, 75:20, 75:23, 76:6, 85:1, 86:10, 87:21, 89:4, 89:7, 93:20, 93:23, 97:1, 97:6, 100:15, 107:9, 110:23, 113:12, 113:16, 115:25, 116:6, 120:6, 120:15, 120:20, 121:9, 123:14, 126:24, 127:7, 127:9, 128:19, 130:12, 130:17, 132:1, 134:5, 134:16, 134:23, 134:25, 135:2, 138:25, 142:10, 143:12, 145:23, 147:8, 147:24, 148:7, 148:15, 148:20, 149:1, 149:24, 152:20, 153:10, 153:16, 154:8, 155:4, 155:12, 155:14, 155:17

**multimillion** [1] - 16:25

**multimillion-dollar** [1] - 16:25

**multiple** [1] - 37:15

**Musk** [2] - 10:9, 10:12

**must** [2] - 57:17, 57:20

**N**

**nail** [1] - 113:23

**name** [5] - 36:4, 53:15, 98:17, 98:20, 99:20

**named** [1] - 36:4

**narrative** [4] - 25:25, 77:3, 91:8, 93:13

**natural** [2] - 76:20, 107:23

**naturally** [1] - 47:14

**nature** [6] - 57:8, 58:2, 58:3, 105:19, 105:25, 118:22

**navigate** [1] - 37:3

**NE** [1] - 2:3

**near** [2] - 82:16, 139:21

**necessarily** [13] - 4:6, 8:5, 13:23, 23:13, 26:9, 35:2, 44:24, 74:14, 77:3, 83:4, 95:2, 100:25, 126:21

**necessary** [7] - 5:11, 53:14, 80:1, 80:10, 109:22, 110:8, 144:22

**necessitate** [1] - 23:5

**necessity** [2] - 145:4, 145:6

**need** [46] - 10:24, 20:25, 21:4, 21:21, 22:5, 23:6, 25:16, 26:4, 28:2, 32:22, 48:13, 50:17, 52:17, 53:2, 53:7, 66:21, 66:22, 67:21, 75:11, 75:12, 75:15, 78:3, 78:12, 79:24, 83:25, 86:12, 90:3, 90:7, 91:15, 94:24, 96:19, 102:23, 110:12, 112:5, 114:24, 129:6, 130:7,

133:24, 134:3, 136:7, 136:25, 146:13, 149:22, 150:6, 151:23, 152:13
**needed** [2] - 83:2, 153:20
**needle** [1] - 18:16
**needs** [8] - 23:15, 25:13, 68:23, 94:3, 98:5, 116:19, 119:8, 132:20
**negate** [1] - 18:9
**negligence** [1] - 87:19
**negligent** [1] - 85:17
**never** [7] - 49:12, 50:8, 52:4, 132:6, 144:12
**new** [2] - 115:6, 128:12
**New** [1] - 1:15
**news** [2] - 84:2, 137:6
**next** [9] - 32:22, 33:1, 66:14, 88:7, 91:11, 105:18, 139:17, 150:10, 151:22
**nice** [3] - 142:15, 154:21
**night** [5] - 64:6, 120:1, 120:5, 134:8, 150:9
**Nine** [1] - 142:22
**NO** [1] - 1:2
**non** [7] - 15:9, 20:7, 25:11, 97:11, 114:5, 130:10, 154:9
**non-co-conspirator** [1] - 97:11
**non-criminality** [1] - 114:5
**non-issue** [1] - 154:9
**non-party** [1] - 25:11
**non-starter** [2] - 20:7, 130:10
**non-witness** [1] - 15:9
**none** [4] - 54:18, 128:1, 128:16, 153:10
**normal** [1] - 92:3
**normally** [1] - 131:19
**note** [3] - 7:10, 82:5, 134:18
**noted** [3] - 7:15, 23:3, 82:18
**notes** [1] - 152:17
**nothing** [29] - 14:9, 15:2, 19:4, 36:15, 36:19, 38:10, 39:5, 50:7, 51:3, 51:4, 51:16, 54:7, 55:13, 55:15, 67:7, 90:11, 90:13, 124:18, 143:3, 143:4, 153:4, 153:7, 153:12, 153:13, 153:16, 153:17, 153:24, 154:24, 155:14
**nothingburger** [1] - 153:20
**notice** [5] - 4:19, 7:18, 18:14, 73:2, 112:11
**noticed** [3] - 7:12, 29:20, 113:14
**notion** [1] - 101:5
**November** [2] - 1:4, 156:3
**nullification** [1] - 104:25
**number** [16] - 3:2, 4:14, 11:13, 16:5, 23:3, 24:17, 40:16, 47:10, 84:1, 85:19,

**88:9, 95:15, 101:18, 105:18, 120:11, 144:7**
**numbers** [2] - 80:19, 143:18, 144:6
**numerical** [1] - 144:7
**nutritional** [1] - 79:11
**NW** [1] - 1:18

## O

**oath** [3] - 51:24, 56:17, 71:23
**object** [3] - 41:19, 79:21, 144:13
**objecting** [1] - 89:9
**objection** [9] - 6:10, 8:18, 35:2, 41:8, 67:8, 68:17, 74:12, 87:15, 135:17
**objections** [3] - 118:14, 144:12, 144:13
**obligation** [1] - 86:6
**obtained** [1] - 127:5
**obvious** [1] - 122:4
**obviously** [22] - 10:15, 12:1, 23:11, 26:4, 30:18, 39:20, 40:7, 42:12, 50:14, 52:15, 62:10, 91:8, 98:1, 104:18, 114:9, 118:3, 120:3, 131:15, 135:25, 138:10, 146:24, 154:13
**occasional** [1] - 151:14
**occurring** [1] - 44:5
**OF** [5] - 1:1, 1:3, 1:9, 1:14, 1:17
**offense** [1] - 80:15
**offer** [2] - 122:5, 122:7
**offered** [9] - 5:22, 15:15, 15:18, 121:1, 121:2, 122:13, 123:3, 123:4, 123:5
**offering** [1] - 123:1
**office** [1] - 10:1
**OFFICE** [1] - 1:17
**OFFICER** [2] - 85:3, 142:22
**officer** [2] - 59:16, 71:23
**officers** [1] - 47:11
**Official** [2] - 1:21, 156:4
**often** [3] - 8:22, 97:2, 105:3
**oftentimes** [2] - 102:2, 141:3
**old** [2] - 90:2, 152:6
**Omar** [1] - 16:16
**omnibus** [2] - 32:24, 85:7
**once** [10] - 19:24, 39:21, 47:15, 60:7, 60:8, 71:15, 72:14, 136:3, 144:5, 152:13
**one** [112] - 3:25, 4:11, 4:20, 5:10, 5:24, 7:10, 9:21, 9:22, 11:13, 15:11, 20:19, 22:7, 22:20, 23:25, 24:13, 26:11, 28:4, 29:19, 31:8, 32:7,

**32:11, 33:3, 33:12, 33:23, 35:21, 37:16, 37:23, 38:13, 40:1, 40:10, 40:16, 41:1, 41:12, 43:16, 43:23, 44:12, 45:4, 45:17, 45:18, 45:20, 46:25, 48:10, 52:3, 52:5, 54:22, 56:24, 56:25, 59:4, 62:8, 63:25, 65:25, 66:2, 66:8, 67:14, 69:15, 70:16, 73:8, 73:16, 73:17, 73:19, 73:22, 74:22, 76:21, 78:22, 81:24, 85:12, 88:6, 88:7, 89:15, 91:20, 92:22, 94:2, 94:20, 98:7, 100:16, 100:19, 102:12, 103:20, 104:9, 104:12, 105:18, 106:15, 106:23, 106:24, 109:1, 110:1, 110:24, 114:9, 120:11, 121:14, 125:19, 129:8, 129:12, 132:20, 133:6, 134:6, 137:9, 139:11, 144:7, 145:7, 145:12, 146:19, 148:3, 148:7, 148:14, 149:6, 151:25, 152:4, 152:7, 152:16**
**one's** [1] - 82:23
**ones** [4] - 20:12, 70:10, 88:20, 148:21
**ongoing** [1] - 17:1
**open** [8] - 38:25, 73:3, 122:3, 125:23, 126:9, 145:13, 146:15, 155:9
**open-ended** [2] - 145:13, 146:15
**opening** [12] - 20:4, 107:3, 107:6, 107:20, 108:19, 109:20, 111:19, 112:1, 133:9, 141:19, 149:19, 149:20
**openings** [3] - 132:16, 132:17, 150:13
**operandi** [1] - 17:10
**operated** [1] - 122:6
**operation** [5] - 8:24, 41:1, 41:11, 121:18
**operationally** [1] - 48:19
**opine** [1] - 112:8
**opinion** [11] - 70:3, 109:5, 111:16, 112:14, 114:4, 114:23, 115:5, 116:25, 119:1, 124:19, 128:1
**opinions** [2] - 116:7, 118:23
**opponent** [2] - 23:7, 95:1
**opportunity** [4] - 8:4, 81:12, 133:25, 139:2
**oppose** [1] - 129:8
**opposed** [5] - 15:20, 29:4, 30:15, 44:15, 65:23
**optics** [1] - 54:2

**optimistic** [1] - 143:5
**option** [3] - 22:8, 40:3, 70:15
**oral** [1] - 93:15
**orbit** [1] - 70:19
**Order** [1] - 3:1
**order** [7] - 4:12, 16:17, 66:5, 74:4, 83:14, 122:1, 150:20
**ordered** [1] - 134:6, 144:22
**orders** [4] - 4:14, 101:8, 128:24, 155:1
**organized** [1] - 21:9
**original** [2] - 11:11, 13:7
**Orr** [13] - 36:4, 37:15, 53:22, 54:14, 54:20, 121:9, 121:12, 121:20, 122:3, 122:19, 122:22, 125:3, 127:12
**otherwise** [1] - 27:19
**ought** [4] - 30:21, 48:20, 97:11, 121:17
**ourselves** [6] - 34:8, 48:22, 104:2, 107:20, 108:1, 129:2
**out-of-court** [1] - 93:14
**outlined** [1] - 7:19
**outside** [8] - 30:5, 31:5, 57:25, 70:9, 74:17, 91:7, 115:17, 151:3
**outweighed** [1] - 80:6
**overblown** [2] - 41:4, 41:24
**overcharged** [1] - 105:4
**overcharging** [2] - 104:20, 105:12
**overlapping** [1] - 52:18
**overnight** [2] - 134:11, 151:4
**overreach** [1] - 104:17
**overrule** [1] - 67:10
**overruled** [1] - 68:16
**own** [8] - 53:10, 94:17, 108:6, 110:6, 114:1, 130:2, 140:15, 147:21
**owned** [2] - 27:10, 28:8
**owners** [1] - 27:21

## P

**p.m** [4] - 1:5, 85:4, 85:5, 155:20
**pace** [3] - 4:5, 33:10, 135:21
**page** [5] - 69:9, 69:23, 84:23, 112:13, 115:1
**Pages** [1] - 1:7
**pages** [3] - 10:15, 14:8, 14:9
**paid** [10] - 18:5, 58:11, 76:2, 78:9, 78:10, 79:18, 80:24, 80:25, 86:7, 87:22

**PALM** [1] - 1:2
**panel** [1] - 134:17
**paper** [2] - 14:23, 152:1
**paperless** [5] - 4:12, 4:14, 32:2, 83:14, 155:1
**papers** [1] - 152:8
**parade** [1] - 38:9
**paraded** [2] - 23:13, 25:6
**parading** [3] - 22:4, 26:9, 27:2
**paragraph** [3] - 29:19, 58:23
**parse** [4] - 9:17, 10:18, 45:2, 122:18
**parsing** [1] - 122:17
**part** [25] - 17:17, 25:25, 32:1, 37:3, 39:22, 43:12, 60:11, 61:5, 61:12, 63:24, 67:21, 74:6, 75:12, 76:20, 80:4, 81:21, 83:13, 89:23, 97:19, 98:4, 119:21, 144:9
**partaken** [1] - 75:10
**partially** [1] - 22:23
**participation** [1] - 141:18
**particular** [14] - 20:22, 41:3, 43:6, 44:12, 52:23, 62:19, 64:23, 65:6, 75:5, 98:7, 103:20, 107:14, 123:21, 129:12
**particularly** [4] - 17:4, 41:14, 47:6, 119:17
**parties** [6] - 28:6, 31:2, 77:5, 77:14, 133:22, 136:14
**partner** [1] - 18:3
**partners** [5] - 5:3, 12:16, 12:20, 26:22, 77:4
**parts** [4] - 70:17, 132:25, 133:13, 139:23
**party** [4] - 16:7, 23:7, 25:11, 95:1
**pass** [2] - 15:13, 15:23
**passing** [3] - 14:12, 56:2, 85:21
**passions** [1] - 80:4
**past** [5] - 37:19, 85:22, 105:1, 131:7, 132:6
**PATEL** [2] - 1:6, 69:10
**Patel** [102] - 3:4, 3:12, 3:14, 5:18, 6:5, 7:21, 9:10, 9:23, 12:16, 13:2, 13:22, 15:8, 17:4, 19:6, 22:12, 23:1, 24:6, 25:18, 26:23, 28:2, 30:19, 31:7, 31:19, 33:22, 33:24, 34:15, 36:23, 39:17, 42:25, 43:6, 45:20, 47:24, 48:4, 50:5, 50:16, 52:11, 56:16, 57:22, 58:3, 59:5, 59:14, 59:24, 60:2, 61:24, 62:15, 64:25, 69:7, 69:8, 69:11, 71:14, 71:18, 71:23, 72:2,

73:2, 75:8, 77:7, 77:21, 77:25, 78:3, 78:10, 78:13, 78:19, 79:19, 85:24, 87:25, 88:9, 88:15, 89:25, 90:2, 90:13, 91:1, 92:7, 92:22, 93:9, 95:15, 99:1, 99:7, 109:3, 110:2, 110:21, 111:15, 112:21, 115:10, 117:2, 117:11, 121:11, 121:14, 121:17, 122:4, 122:8, 122:21, 123:6, 123:8, 123:25, 124:5, 124:11, 124:18, 124:21, 125:9, 154:2
**Patel's** [16] - 6:17, 15:14, 33:4, 33:7, 33:13, 33:25, 41:11, 43:9, 46:13, 62:16, 79:13, 86:18, 120:22, 121:20, 124:2, 124:17
**path** [2] - 24:20, 98:23
**patient** [4] - 15:8, 81:1, 121:25, 144:23
**patients** [2] - 107:15, 121:23
**patrol** [2] - 112:2, 119:16
**pattern** [2] - 82:21, 108:21
**pay** [2] - 27:19, 87:17, 122:1
**paying** [3] - 81:1, 81:17, 85:25
**payments** [1] - 87:11
**payoffs** [1] - 21:25
**PC** [2] - 1:17, 2:3
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**pending** [4] - 26:5, 74:4, 119:7, 130:19
**people** [13] - 20:10, 70:3, 73:4, 97:8, 99:3, 123:3, 139:6, 140:17, 142:17, 145:25, 147:10, 147:13, 152:8
**percent** [1] - 38:18
**perception** [1] - 10:12
**percipient** [1] - 68:13
**peremptories** [3] - 142:1, 142:4, 142:11
**perfect** [1] - 38:2
**perfectly** [1] - 65:21
**perhaps** [10] - 4:4, 21:11, 23:19, 26:20, 30:9, 52:19, 63:8, 67:24, 113:3, 139:15
**peril** [3] - 108:6, 108:7, 110:6
**period** [7] - 29:14, 59:5, 64:2, 98:8, 98:24, 99:3, 125:10
**permissible** [1] - 6:25
**permit** [5] - 8:12, 31:11, 31:25, 32:2, 79:25
**permits** [2] - 28:16, 109:13

**permitted** [11] - 9:7, 9:14, 9:19, 22:23, 23:17, 25:24, 42:11, 64:4, 68:12, 80:16, 142:5
**permutations** [1] - 72:21
**person** [3] - 3:13, 9:2, 71:2
**personal** [2] - 77:8, 114:1
**perspective** [2] - 75:3, 77:10
**pertained** [1] - 43:18
**pertaining** [1] - 120:24
**pertains** [2] - 63:12, 63:13
**Peterson** [3] - 52:9, 65:19, 117:17
**Peterson's** [1] - 59:3
**pews** [4] - 139:6, 139:14, 139:18, 139:23
**phase** [3] - 56:4, 59:12, 61:13
**phone** [2] - 117:11, 121:21
**photograph** [1] - 78:18
**photographs** [4] - 78:18, 79:14, 79:22
**phrase** [2] - 7:4, 27:17
**physical** [1] - 23:17
**physically** [2] - 21:3, 22:2
**physician** [1] - 144:23
**physicians** [2] - 9:12, 22:12
**pick** [3] - 73:13, 85:6, 131:15
**picked** [1] - 96:18
**picking** [1] - 142:13
**picture** [5] - 44:8, 49:21, 96:19, 105:12, 109:3
**piece** [7] - 14:23, 78:6, 123:21, 124:7, 129:13, 137:9, 148:14
**pin** [1] - 87:13
**place** [20] - 36:6, 49:12, 53:7, 54:7, 54:12, 54:19, 61:1, 69:1, 72:5, 92:14, 98:25, 105:25, 131:16, 139:11, 151:20, 152:6
**plaintiff** [3] - 5:8, 20:21, 21:3
**plan** [10] - 4:11, 11:22, 103:8, 131:24, 132:14, 132:19, 138:19, 144:3, 144:8, 155:11
**planes** [1] - 75:2
**play** [14] - 5:21, 12:8, 22:19, 31:21, 49:6, 72:23, 93:12, 95:10, 100:11, 115:7, 126:18, 128:8, 148:8, 149:1
**player** [1] - 126:2
**playing** [4] - 46:20, 60:9, 88:11, 88:17
**plays** [4] - 71:9, 100:19, 125:1, 128:15
**plea** [1] - 151:14

**pleadings** [2] - 4:6, 4:15
**pled** [1] - 145:10
**plenty** [2] - 13:18, 126:15
**pluck** [1] - 89:25
**podium** [1] - 139:20
**point** [92] - 5:23, 6:11, 7:10, 9:22, 10:12, 12:13, 12:25, 13:7, 16:6, 17:13, 18:12, 19:20, 21:16, 28:4, 32:7, 32:11, 37:2, 39:4, 39:14, 45:3, 50:4, 50:22, 51:7, 51:12, 51:17, 51:21, 52:15, 54:1, 54:13, 56:24, 59:1, 59:19, 60:8, 60:25, 61:19, 63:23, 65:7, 66:24, 68:5, 68:24, 69:2, 71:2, 71:7, 71:13, 72:9, 75:17, 76:4, 77:2, 81:24, 85:11, 85:14, 85:21, 86:23, 87:4, 87:12, 89:5, 92:18, 94:24, 96:12, 96:13, 97:10, 97:19, 100:13, 101:16, 103:22, 104:2, 105:20, 106:17, 109:25, 110:10, 110:12, 111:23, 112:7, 116:1, 116:23, 118:25, 119:8, 120:25, 121:14, 123:16, 126:5, 127:18, 128:5, 128:25, 129:19, 129:23, 130:7, 133:23, 137:13, 140:21, 141:6
**pointed** [5] - 8:10, 10:15, 47:18, 47:22, 81:5, 110:25, 113:2
**pointing** [4] - 44:16, 50:2, 105:9, 126:15
**points** [7] - 9:22, 40:15, 77:12, 85:9, 109:1, 110:15, 113:12
**policy** [1] - 113:19
**pool** [1] - 79:9
**popping** [2] - 78:11, 80:19
**portable** [1] - 82:24
**portion** [15] - 7:20, 12:12, 14:6, 19:15, 21:4, 22:15, 99:11, 100:19, 110:17, 136:11, 136:15, 136:16, 136:22, 136:25, 138:20
**portions** [6] - 9:17, 11:16, 11:23, 69:20, 98:10, 98:12
**portray** [1] - 10:8
**posed** [2] - 17:2, 71:22
**position** [17] - 23:19, 34:9, 53:13, 54:16, 55:2, 61:16, 62:16, 64:22, 65:8, 67:25, 70:1, 95:23, 99:22, 109:21, 120:5, 124:25, 130:5
**positioned** [1] - 38:8
**positive** [2] - 92:3, 99:9
**posits** [1] - 117:14

**possession** [3] - 128:2, 128:13, 130:4
**possibility** [5] - 47:25, 69:3, 70:20, 72:6, 105:2
**possibly** [1] - 92:9
**post** [2] - 114:4, 132:15
**posture** [3] - 20:10, 59:12, 125:10
**potential** [19] - 39:18, 40:11, 41:25, 43:5, 43:10, 44:4, 52:13, 57:2, 57:11, 57:21, 67:17, 68:15, 101:11, 116:9, 122:10, 126:16, 134:19, 140:13
**potentially** [7] - 13:1, 44:2, 48:17, 52:7, 58:5, 59:7, 124:13
**power** [1] - 103:14
**practically** [1] - 44:8
**practice** [2] - 122:19, 122:22
**practices** [4] - 21:25, 23:4, 88:10, 112:9
**pre** [2] - 140:20, 145:5
**pre-trying** [2] - 140:20, 145:5
**precluded** [3] - 101:19, 105:1, 111:25
**predicate** [9] - 12:1, 95:6, 95:8, 95:11, 96:24, 97:18, 106:22, 107:2, 111:24
**predicates** [1] - 148:23
**preemption** [1] - 59:12
**prefer** [6] - 24:16, 30:9, 31:4, 73:16, 129:19, 150:12
**preferred** [2] - 71:6, 73:3
**prefix** [1] - 57:19
**preinvestigation** [1] - 56:4
**prejudice** [3] - 41:21, 77:25, 80:7
**prejudiced** [1] - 108:2
**prejudicial** [2] - 41:13, 75:7
**preliminary** [1] - 56:3
**premise** [1] - 116:12
**preparation** [1] - 64:14
**prepare** [3] - 49:18, 74:3, 131:1
**prepared** [15] - 11:19, 17:21, 50:18, 62:20, 62:22, 63:2, 63:7, 63:8, 63:23, 70:21, 97:22, 134:17, 137:8, 137:11, 140:10
**prepping** [1] - 53:19
**presence** [21] - 17:9, 30:5, 31:5, 34:7, 35:10, 36:17, 41:7, 41:8, 47:2, 53:1, 53:10, 55:15, 55:18, 57:25, 61:3, 65:4, 74:8, 74:13, 74:17, 107:22, 108:3
**present** [14] - 32:15, 32:18,

40:17, 46:19, 55:11, 56:13, 70:9, 78:2, 81:12, 83:21, 83:22, 100:23, 118:23, 145:8
**presentation** [3] - 40:18, 42:4, 80:5
**presented** [9] - 43:3, 70:4, 107:22, 111:17, 118:12, 146:23, 147:16, 147:22
**preserving** [1] - 69:19
**presumably** [7] - 9:12, 25:22, 45:19, 50:5, 50:8, 119:25, 120:3
**presume** [1] - 139:3
**presuming** [1] - 52:1
**pretarget** [1] - 56:4
**pretend** [1] - 55:12
**pretrial** [2] - 119:22, 134:6
**pretty** [5] - 81:11, 102:17, 103:3, 116:2, 140:12
**prevent** [5] - 87:16, 90:10, 101:24, 101:25, 114:17
**preventing** [3] - 89:21, 105:8, 128:12
**primary** [1] - 76:11
**principal** [1] - 141:20
**private** [2] - 113:18
**privilege** [10] - 40:12, 43:19, 62:24, 63:22, 64:1, 64:5, 64:10, 65:13, 66:8, 66:24
**privileged** [1] - 65:14
**probative** [6] - 8:6, 19:25, 25:8, 41:2, 42:8, 80:6
**problem** [48] - 9:2, 9:14, 10:13, 24:17, 26:1, 26:21, 27:1, 28:23, 30:4, 35:16, 36:7, 36:8, 39:19, 40:4, 41:21, 43:24, 47:18, 50:7, 50:25, 52:22, 55:14, 55:18, 56:12, 57:25, 58:20, 59:1, 65:22, 66:19, 69:17, 92:17, 96:16, 96:25, 106:15, 112:22, 114:16, 122:9, 122:23, 123:7, 124:12, 125:20, 126:1, 135:21, 147:17, 147:20, 150:3, 150:7, 152:5, 152:18
**problematic** [4] - 55:16, 66:2, 118:24, 126:7
**problems** [11] - 9:11, 34:22, 51:22, 58:14, 68:15, 74:18, 127:22, 133:17, 149:8, 150:24, 152:3
**proceeding** [1] - 48:12
**proceedings** [3] - 41:22, 128:21, 155:25
**proceeds** [2] - 76:3, 81:10
**process** [10] - 8:1, 45:12, 66:6, 95:21, 108:16, 122:6, 122:7, 122:10, 134:13,

139:11
**processed** [1] - 95:9
**processes** [1] - 102:8
**procured** [1] - 107:14
**produce** [1] - 67:10
**produced** [10] - 62:10, 63:15, 67:1, 72:16, 78:7, 82:13, 119:21, 126:16, 154:5
**producing** [1] - 67:5
**production** [11] - 50:15, 57:20, 62:16, 63:9, 64:7, 64:21, 66:13, 82:3, 83:8, 126:19, 153:8
**productions** [4] - 50:16, 83:15, 153:9, 153:10
**proffer** [11] - 30:5, 31:1, 52:20, 71:13, 71:22, 107:2, 107:5, 107:10, 110:7, 121:6, 126:25
**proffered** [4] - 44:20, 59:16, 113:1, 125:20
**proffering** [2] - 46:16, 109:17
**program** [1] - 113:21
**prohibit** [1] - 101:10
**prohibited** [1] - 86:19
**promise** [1] - 131:11
**promises** [1] - 8:1
**prompt** [2] - 4:9, 56:9
**prompted** [1] - 22:1
**pronounced** [1] - 130:19
**proof** [3] - 25:13, 29:21, 141:1
**proper** [2] - 115:8, 119:23
**properly** [2] - 107:16, 122:12
**property** [1] - 49:19
**prophylactic** [5] - 39:17, 48:13, 52:17, 68:23, 72:4
**proposal** [1] - 26:11
**proposals** [1] - 22:7
**proposed** [1] - 140:18
**proposing** [1] - 25:4
**proposition** [1] - 85:20
**prosecution** [1] - 117:13
**prosecutor** [1] - 51:10
**prosecutors** [3] - 57:8, 57:10, 132:2
**prospect** [3] - 47:5, 107:21, 121:4
**prospective** [2] - 47:5, 49:24
**prove** [9] - 5:13, 18:20, 30:19, 46:8, 78:3, 78:12, 108:9, 122:6, 122:7
**proved** [2] - 79:3, 79:8
**provide** [2] - 63:24, 71:14
**provided** [8] - 11:10, 58:4, 58:5, 60:20, 63:14, 64:13, 84:5, 114:18

**provider** [1] - 8:2
**provides** [1] - 31:9
**providing** [1] - 70:18
**proving** [1] - 80:18
**public** [1] - 10:12
**publish** [1] - 102:5
**published** [1] - 146:20
**pull** [3] - 65:15, 90:24, 138:4
**purchase** [1] - 79:13
**purchases** [2] - 81:4, 81:12
**purely** [1] - 92:24
**purported** [8] - 4:1, 21:22, 30:6, 31:18, 33:21, 60:21, 67:18, 87:19
**purportedly** [6] - 5:6, 17:12, 33:23, 78:13, 80:24, 80:25
**purpose** [9] - 40:21, 40:22, 46:7, 76:6, 76:7, 77:23, 79:16, 122:2, 126:11
**purposes** [14] - 7:10, 8:9, 25:2, 30:20, 31:10, 34:14, 48:20, 67:23, 97:17, 102:13, 103:23, 104:6, 118:15, 125:16
**pursuant** [1] - 82:8
**purview** [1] - 4:25
**put** [44] - 5:7, 6:2, 6:15, 6:16, 6:23, 14:10, 15:7, 17:22, 18:13, 18:23, 29:7, 30:23, 36:6, 37:18, 41:23, 46:6, 53:21, 56:17, 65:18, 69:1, 73:2, 76:3, 76:13, 82:9, 83:13, 87:13, 89:4, 89:13, 89:16, 93:24, 97:11, 98:12, 99:21, 111:4, 115:2, 116:1, 122:14, 127:13, 133:12, 137:25, 139:6, 149:4
**puts** [2] - 96:10, 154:22
**putting** [8] - 15:3, 85:11, 89:9, 100:19, 100:25, 108:12, 119:14, 137:20

## Q

**qualifications** [2] - 32:4, 101:9
**qualify** [1] - 5:12
**quarterback** [1] - 118:6
**quell** [1] - 67:1
**questioned** [3] - 61:25, 63:18, 89:22
**questioning** [13] - 25:25, 31:12, 35:5, 48:16, 53:16, 68:3, 71:22, 87:16, 139:21, 141:11, 141:23, 146:17
**questionnaires** [3] - 140:4, 141:22, 142:6
**questions** [17] - 3:25, 6:9,

31:18, 47:17, 51:25, 54:3,
108:13, 140:19, 140:23,
140:25, 141:16, 142:8,
143:14, 144:12, 144:13,
148:18, 155:8
**quickly** [1] - 144:18
**quite** [4] - 4:16, 20:2,
30:23, 48:7, 59:20, 67:7,
69:16, 71:11, 82:2, 115:6,
125:1, 137:19, 147:5, 154:3
**quote** [2] - 18:14, 88:5

## R

**RAFFERTY** [13] - 2:5, 3:17,
77:19, 84:19, 98:19, 98:21,
149:17, 149:19, 150:8,
150:15, 150:19, 151:1,
151:24
**Rafferty** [6] - 3:18, 24:19,
40:3, 53:18, 54:15, 77:1
**rail** [1] - 133:16
**raise** [9] - 13:10, 69:16,
85:23, 90:9, 106:7, 108:18,
110:13, 111:20, 128:25
**raised** [12] - 4:18, 4:19, 5:4,
6:13, 17:17, 34:3, 74:16,
85:12, 91:2, 106:12, 108:10,
129:9
**raises** [3] - 88:21, 105:2,
125:25
**raising** [4] - 69:21, 96:17,
109:22, 111:19
**ramifications** [1] - 146:5
**randomize** [2] - 143:20,
143:24
**range** [1] - 131:3
**Range** [1] - 79:15
**ranges** [1] - 130:24
**Raskin** [3] - 36:1, 54:24,
61:18
**Raskins** [5] - 37:22, 54:11,
61:2, 69:24, 72:10
**rather** [3] - 13:14, 121:2,
139:5
**reach** [1] - 154:14
**reached** [3] - 50:19, 50:20,
50:21
**react** [1] - 124:21
**reacted** [1] - 124:5
**reaction** [4] - 122:9, 124:2,
124:11, 124:17
**read** [16] - 4:5, 10:17, 11:4,
11:20, 16:20, 26:23, 28:15,
48:8, 92:19, 93:3, 135:10,
147:4, 147:14, 147:17,
148:25, 149:5
**readily** [1] - 96:14
**reading** [9] - 12:10, 14:22,
16:12, 26:21, 102:5, 148:10,

148:17, 149:10, 149:11
**ready** [1] - 101:3
**real** [5] - 6:10, 14:3, 45:7,
69:15, 117:8
**reality** [2] - 5:9, 66:23
**really** [66] - 6:1, 9:20, 11:11,
12:18, 13:4, 18:16, 20:14,
21:12, 21:15, 21:16, 21:19,
21:21, 23:5, 23:21, 24:11,
32:16, 33:2, 47:20, 54:11,
55:15, 56:2, 56:16, 56:21,
59:13, 60:23, 61:5, 61:24,
66:10, 67:21, 74:5, 74:19,
75:3, 75:6, 75:12, 75:14,
77:10, 77:20, 79:15, 81:25,
83:1, 83:20, 84:4, 86:7, 86:9,
86:15, 88:19, 101:12, 104:7,
104:24, 105:21, 105:25,
107:2, 107:3, 112:15, 114:6,
117:16, 118:7, 122:17,
126:1, 127:1, 130:7, 130:16,
146:12, 152:5, 154:4
**realm** [1] - 111:12
**reason** [9] - 44:19, 50:13,
56:19, 60:17, 61:9, 77:18,
136:9, 136:13, 139:18
**reasonable** [4] - 86:18,
115:15, 115:22, 118:8
**reasonableness** [1] - 86:17
**reasonably** [1] - 109:9
**reasons** [2] - 90:23, 131:9
**rebut** [3] - 6:9, 18:12, 20:6
**rebuttal** [1] - 13:19
**receive** [1] - 109:7
**received** [5] - 50:23, 57:3,
134:10, 147:10, 153:9
**receiving** [1] - 127:18
**recess** [2] - 126:8, 155:15
**recessed** [2] - 85:4, 155:20
**recipe** [1] - 68:14
**recital** [1] - 102:8
**recognize** [1] - 28:6
**recognized** [1] - 102:11
**recognizing** [1] - 9:11
**recollection** [1] - 102:21
**reconfigure** [2] - 152:11,
152:15
**reconvene** [1] - 134:1
**record** [22] - 31:24, 33:16,
33:17, 48:20, 60:10, 60:18,
62:4, 66:7, 66:20, 67:22,
71:6, 72:1, 83:11, 85:5,
90:23, 94:9, 94:11, 95:8,
96:14, 97:13, 101:9, 155:2
**recorded** [2] - 24:2, 101:10
**recording** [1] - 98:14
**recordings** [8] - 98:6,
100:6, 100:18, 122:11,
127:5, 127:18, 128:22
**records** [9] - 92:13, 94:4,

94:5, 94:6, 94:7, 96:22, 97:3,
97:18
**recruiters** [1] - 81:2
**red** [1] - 50:1
**redacted** [2] - 22:8, 63:5
**refer** [1] - 155:2
**reference** [7] - 9:23, 26:9,
55:7, 58:23, 64:12, 109:18,
116:6
**referenced** [2] - 7:11,
120:21
**referencing** [1] - 55:14
**referring** [2] - 121:15, 147:9
**reflect** [1] - 47:9
**reflected** [1] - 102:1
**refreshing** [1] - 102:21
**refusing** [1] - 63:23
**regard** [9] - 32:9, 59:24,
61:15, 80:17, 86:20, 94:14,
119:1, 126:2, 153:3
**regarding** [23] - 4:1, 5:3,
7:14, 8:14, 20:19, 22:7,
22:11, 26:13, 28:9, 31:8,
31:12, 31:18, 32:4, 41:20,
46:22, 67:17, 68:9, 83:3,
95:21, 103:2, 126:3, 140:23
**regardless** [1] - 43:9
**regards** [2] - 48:7, 68:10
**REGINALD** [1] - 1:14
**Reginald** [1] - 3:8
**regular** [2] - 95:20
**regulated** [1] - 113:17
**regulations** [9] - 4:22, 5:20,
6:6, 6:21, 7:13, 7:22, 8:14,
13:3, 19:14
**regulatory** [13] - 10:14,
33:19, 39:1, 42:10, 43:2,
44:3, 44:14, 50:4, 51:8,
51:16, 59:21, 89:25
**rehabilitate** [1] - 28:18
**rehabilitation** [1] - 24:10
**rehash** [1] - 73:12
**reimbursements** [1] -
80:21
**Reinhart** [3] - 48:7, 134:6,
153:4
**Reinhart's** [1] - 34:23
**reject** [1] - 143:21
**related** [4] - 33:6, 79:5,
79:15, 79:21
**relates** [2] - 41:4, 46:11
**relating** [2] - 20:20, 33:8
**relationship** [2] - 39:3,
120:23
**relationships** [2] - 88:16,
91:3
**relaxed** [1] - 141:19
**relevance** [1] - 77:20
**relevancy** [2] - 90:12, 117:2
**relevant** [16] - 7:22, 14:11,

15:13, 16:1, 16:3, 23:22,
35:24, 43:20, 62:11, 75:25,
77:11, 110:8, 115:12, 118:7,
122:10
**reliance** [1] - 109:19
**relied** [1] - 109:9
**relies** [2] - 5:15, 111:6
**rely** [6] - 25:13, 32:15,
109:5, 115:22, 118:8, 137:16
**relying** [1] - 94:16
**remain** [1] - 141:1
**remedy** [2] - 83:2, 83:5
**remember** [5] - 29:8, 90:24,
129:9, 131:25, 143:25
**remind** [1] - 56:9
**remove** [1] - 70:7
**removed** [1] - 120:11
**rendered** [3] - 43:15, 47:17,
107:17
**repeating** [1] - 64:9
**repercussions** [1] - 61:20
**reply** [2] - 16:17, 90:17
**report** [8] - 17:21, 18:13,
18:15, 18:19, 102:20, 108:24,
111:13, 137:10
**REPORTED** [1] - 1:20
**reported** [1] - 122:4
**reporter** [1] - 66:21
**REPORTER** [1] - 84:10
**Reporter** [2] - 1:21, 156:4
**reports** [3] - 101:20, 102:7,
102:25
**represent** [5] - 48:12,
50:12, 52:6, 70:5, 154:1
**representation** [2] - 59:23,
71:19
**representations** [1] - 49:3
**representative** [1] - 113:19
**representatives** [2] - 99:20,
99:22
**represented** [1] - 72:25
**representing** [1] - 51:17
**request** [21] - 8:13, 21:2,
23:1, 23:16, 30:3, 31:24,
62:16, 63:9, 68:11, 73:8,
80:12, 81:16, 81:18, 81:19,
85:13, 86:19, 118:25, 129:5,
131:18, 135:5, 149:24
**requested** [8] - 32:3, 33:3,
43:17, 63:16, 64:7, 64:20,
71:17, 119:21
**requesting** [1] - 21:1
**requests** [2] - 31:7, 62:6
**require** [2] - 97:22, 126:19
**required** [1] - 21:1
**requirements** [1] - 147:12
**requires** [1] - 20:17
**requisition** [1] - 121:23
**resistance** [1] - 64:13
**resolution** [1] - 105:2

**resolved** [2] - 19:4, 105:3
**resources** [2] - 105:19, 105:22
**respect** [14] - 49:4, 49:11, 52:11, 54:6, 54:13, 76:15, 79:1, 89:13, 108:13, 113:13, 113:22, 125:3, 150:8, 151:1
**respond** [1] - 17:13
**responding** [2] - 43:1, 49:15
**responds** [1] - 97:11
**response** [10] - 6:22, 10:22, 17:18, 55:21, 57:6, 85:15, 87:1, 90:16, 134:10, 152:24
**rest** [1] - 69:5
**restate** [1] - 33:17
**restraining** [1] - 16:17
**result** [1] - 99:9
**resurfaces** [1] - 57:13
**retained** [2] - 136:7, 136:25
**retaining** [1] - 136:18
**return** [1] - 49:19
**returns** [1] - 135:14
**review** [2] - 13:14, 73:24
**reviewing** [1] - 67:6
**revisit** [1] - 72:24
**rid** [1] - 28:3
**ridiculous** [1] - 115:18
**rightly** [1] - 81:5
**rise** [3] - 82:22, 83:2, 85:3
**rises** [2] - 82:16, 130:8
**risk** [2] - 20:4, 110:14
**risks** [1] - 133:12
**RMR** [2] - 1:21, 156:4
**Robert** [1] - 104:1
**robust** [1] - 5:14
**Rodolfo** [1] - 1:22
**RODOLFO** [1] - 1:10
**role** [8] - 48:16, 53:22, 60:9, 61:16, 76:11, 128:8, 128:15, 148:8
**role-play** [1] - 148:8
**roll** [1] - 143:7
**rolling** [1] - 82:3
**roof** [1] - 41:2
**room** [1] - 151:2
**rooms** [1] - 151:2
**Rothschild** [5] - 62:13, 64:8, 66:12, 67:8
**Rothschild's** [2] - 66:15, 67:5
**rough** [1] - 66:21
**rouletting** [1] - 144:3
**route** [4] - 75:15, 104:3, 105:21, 126:22
**Rover** [1] - 79:15
**row** [2] - 139:3, 139:10
**RPR** [2] - 1:21, 156:4
**RUIZ** [1] - 1:10

**Ruiz** [1] - 1:22
**rule** [10] - 10:25, 83:25, 96:22, 100:17, 100:20, 100:22, 101:11, 108:11, 115:4, 136:11
**Rule** [3] - 134:7, 152:20, 152:25
**ruled** [3] - 16:2, 83:23, 83:24
**rules** [16] - 4:22, 5:20, 6:6, 6:14, 6:20, 7:12, 7:15, 7:22, 8:14, 19:14, 72:5, 88:18, 94:7, 117:12, 119:14, 119:22
**ruling** [1] - 4:11, 25:3, 32:1, 34:24, 66:11, 66:15, 66:18, 74:14, 86:20, 91:9, 133:16
**rulings** [3] - 96:20, 130:19, 133:20
**run** [9] - 21:7, 34:22, 36:24, 60:1, 60:6, 93:17, 131:10, 133:11, 133:19
**running** [3] - 76:12, 151:22, 154:12
**runs** [1] - 121:18
**rush** [1] - 155:9

## S

**SADOW** [87] - 1:17, 1:17, 3:13, 28:20, 28:22, 29:13, 30:13, 35:13, 35:16, 35:19, 36:3, 36:11, 37:5, 37:9, 37:14, 37:21, 39:9, 49:2, 49:11, 50:7, 50:19, 51:14, 51:16, 51:20, 53:19, 54:6, 55:9, 55:18, 58:8, 65:12, 65:25, 66:5, 71:20, 91:16, 91:18, 92:13, 95:14, 95:17, 95:22, 96:2, 96:7, 98:1, 98:4, 98:20, 98:22, 99:14, 99:16, 99:19, 100:5, 102:17, 102:20, 103:6, 103:10, 104:11, 105:15, 106:4, 108:5, 117:24, 122:17, 123:8, 123:11, 124:24, 125:7, 129:8, 129:11, 129:15, 138:16, 143:15, 143:17, 143:21, 143:23, 144:9, 144:11, 144:20, 145:8, 145:19, 146:4, 146:19, 147:17, 149:8, 149:11, 150:1, 151:25, 152:3, 152:19, 153:8, 155:18
**Sadow** [84] - 3:14, 4:2, 19:10, 23:10, 24:18, 33:22, 33:25, 34:20, 34:25, 35:10, 36:9, 36:14, 36:22, 38:3, 40:1, 40:15, 41:18, 41:20, 42:13, 42:18, 43:2, 43:14,

43:17, 44:21, 46:18, 46:22, 46:23, 47:8, 47:10, 47:25, 48:11, 49:5, 49:10, 49:20, 53:8, 53:12, 56:6, 56:20, 56:25, 57:13, 58:3, 58:6, 59:14, 59:23, 60:11, 60:24, 61:19, 63:15, 63:16, 64:16, 65:2, 67:18, 67:23, 68:9, 68:11, 69:19, 70:4, 70:7, 70:17, 70:22, 71:10, 71:23, 72:7, 72:11, 72:18, 73:21, 74:12, 74:16, 83:21, 94:2, 94:23, 96:17, 100:16, 107:5, 109:12, 110:20, 115:3, 119:18, 123:17, 144:18, 147:8, 148:16, 149:15, 153:23
**Sadow's** [26] - 34:7, 39:22, 40:17, 41:7, 42:11, 43:14, 44:1, 46:12, 47:13, 47:21, 48:16, 53:1, 57:5, 61:3, 66:24, 67:2, 72:4, 72:12, 74:8, 97:10, 109:25, 126:5, 126:15, 128:5, 129:23, 154:1
**safe** [3] - 106:7, 106:9, 106:14
**safely** [1] - 151:17
**safer** [1] - 27:5
**salesperson** [1] - 78:20
**SAMUEL** [45] - 2:2, 2:3, 3:16, 6:12, 6:22, 9:5, 10:10, 10:20, 10:24, 11:6, 11:10, 12:4, 14:3, 14:7, 15:18, 16:10, 17:14, 17:17, 17:25, 18:18, 23:21, 23:24, 24:4, 24:16, 24:24, 25:1, 27:6, 27:9, 27:13, 27:16, 27:23, 73:19, 86:23, 87:6, 87:8, 90:15, 90:21, 106:10, 115:2, 115:13, 117:8, 117:11, 117:22, 153:2, 153:12
**Samuel** [11] - 3:16, 7:11, 8:9, 10:6, 11:25, 13:15, 20:6, 23:10, 34:25, 40:3, 116:23
**Samuel's** [2] - 17:13, 87:8
**Samuels** [1] - 9:6
**sanction** [1] - 100:18
**sat** [1] - 41:19
**satisfied** [6] - 67:7, 67:20, 69:16, 71:21, 72:15, 102:4
**satisfy** [3] - 107:11, 117:7, 148:23
**satisfying** [1] - 60:16
**Saturday** [1] - 134:24
**save** [1] - 124:9
**saved** [1] - 106:13
**saving** [1] - 63:19
**saw** [2] - 52:17, 88:23, 136:12, 136:13
**scale** [2] - 23:11, 145:22

**scales** [2] - 60:11, 75:6
**scenario** [2] - 56:18, 69:23
**scenarios** [1] - 65:1
**sceptically** [1] - 105:11
**schedule** [4] - 132:10, 132:14, 132:23, 154:20
**scheduled** [2] - 3:21, 82:8
**scheduling** [2] - 133:24, 141:3
**scheme** [1] - 16:25
**scope** [1] - 91:7
**scripted** [1] - 73:1
**scrub** [1] - 34:6
**scrubbed** [1] - 35:14
**sealed** [1] - 151:13
**search** [2] - 49:17, 51:9
**searches** [2] - 82:11, 82:25
**seasoned** [1] - 133:18
**seat** [4] - 69:11, 139:22, 142:21, 144:5
**seated** [1] - 144:5
**seating** [3] - 134:16, 140:5, 142:6
**second** [2] - 74:20, 113:16
**secondhand** [1] - 127:4
**secret** [1] - 21:8
**SECTION** [1] - 1:15
**section** [2] - 20:20, 139:9
**sections** [4] - 10:17, 11:14, 11:17, 20:19
**SECURITY** [2] - 85:3, 142:22
**see** [33] - 18:3, 25:19, 36:8, 37:9, 52:15, 52:21, 54:21, 56:19, 66:1, 67:12, 71:8, 72:7, 72:22, 77:18, 77:23, 79:20, 89:20, 95:10, 97:4, 97:5, 100:12, 106:17, 111:7, 111:17, 112:3, 124:14, 125:1, 125:8, 126:6, 128:5, 131:5, 134:1
**seeing** [4] - 64:15, 93:8, 93:22, 93:23
**seek** [4] - 11:21, 98:12, 98:25, 99:10
**seeking** [9] - 62:20, 74:24, 88:1, 88:19, 89:18, 90:10, 91:25, 94:4, 99:25
**seeks** [2] - 5:2, 93:7
**segments** [1] - 39:22
**seized** [2] - 49:19
**seizure** [2] - 50:22, 92:14
**selected** [2] - 131:10, 141:12
**selection** [5] - 131:2, 134:14, 139:11, 146:20, 155:5
**self** [16] - 91:12, 91:24, 92:6, 92:11, 92:21, 92:24, 93:2, 93:6, 93:11, 93:17,

96:10, 98:11, 98:13, 100:7, 101:5, 101:12

**self-serving** [16] - 91:12, 91:24, 92:6, 92:11, 92:21, 92:24, 93:2, 93:6, 93:11, 93:17, 96:10, 98:11, 98:13, 100:7, 101:5, 101:12

**sell** [1] - 124:24

**selling** [1] - 13:7

**send** [3] - 121:22, 140:18, 140:22

**sender** [1] - 148:12

**sending** [3] - 51:4, 54:9, 79:14

**sense** [24] - 4:7, 26:7, 28:19, 31:21, 32:19, 33:11, 40:6, 56:11, 98:13, 105:14, 114:18, 114:25, 117:2, 117:6, 119:2, 119:22, 121:18, 126:23, 131:3, 133:21, 136:3, 136:5, 138:13, 147:7

**sensitive** [1] - 104:23

**sent** [5] - 58:9, 65:19, 66:19, 115:4, 147:9

**sentencing** [1] - 151:15

**separate** [4] - 29:24, 81:7, 88:19, 121:10

**separately** [1] - 44:4

**serious** [1] - 17:2

**seriously** [2] - 24:8, 135:22

**seriousness** [1] - 19:18

**serve** [2] - 143:8, 146:13

**served** [1] - 42:21

**serves** [1] - 131:20

**services** [1] - 79:11

**serving** [16] - 91:12, 91:24, 92:6, 92:11, 92:21, 92:24, 93:2, 93:6, 93:11, 93:17, 96:10, 98:11, 98:13, 100:7, 101:5, 101:12

**set** [10] - 27:23, 58:11, 99:7, 139:3, 140:1, 140:10, 142:1, 149:19, 155:8, 155:13

**setting** [1] - 155:10

**setup** [1] - 152:12

**seven** [1] - 105:18

**several** [4] - 103:15, 108:15, 131:15, 146:20

**shape** [1] - 153:22

**share** [3] - 46:4, 130:5, 138:14

**shared** [3] - 74:16, 124:10, 125:20

**shares** [1] - 46:3

**shattering** [1] - 155:3

**shed** [1] - 63:8

**shield** [3] - 38:24, 40:13, 42:1

**shirts** [3] - 78:19, 79:14,

79:23

**shoes** [1] - 148:12

**short** [2] - 20:16, 93:25

**show** [16] - 6:4, 7:21, 13:2, 15:4, 15:18, 17:8, 20:2, 66:22, 75:8, 76:12, 78:7, 78:12, 79:7, 90:5, 112:5, 123:12

**showing** [4] - 7:2, 76:6, 79:16, 79:18

**shown** [5] - 19:22, 79:7, 109:14, 111:5, 111:8

**shrimp** [1] - 79:9

**shut** [1] - 22:2

**side** [21] - 11:8, 33:20, 39:1, 47:15, 86:21, 94:20, 103:7, 106:3, 108:12, 110:1, 118:16, 134:3, 140:2, 140:8, 140:12, 140:19, 141:15, 142:11, 149:20, 150:15

**sidebar** [1] - 126:8

**sidebars** [1] - 133:11

**sides** [11] - 3:22, 78:23, 96:14, 96:23, 97:2, 103:4, 144:11, 146:1, 146:16, 150:9, 150:23

**sideshow** [3] - 18:23, 18:24, 24:21

**sign** [1] - 19:19

**signature** [1] - 121:23

**signed** [12] - 4:21, 5:25, 7:2, 13:9, 51:1, 51:2, 65:20, 65:21, 65:23, 65:25, 66:25, 73:22

**significant** [2] - 69:20, 135:25

**signify** [1] - 8:7

**signing** [3] - 7:21, 8:2, 19:18

**signoff** [1] - 19:13

**signs** [1] - 8:7

**silent** [2] - 141:1, 141:17

**silos** [1] - 45:17

**similar** [3] - 95:24, 108:12, 110:25

**simple** [3] - 57:24, 58:16, 74:3

**simplify** [2] - 28:11, 59:13

**simply** [14] - 6:2, 18:13, 28:5, 43:10, 64:18, 64:20, 67:9, 70:8, 74:14, 80:7, 124:8, 132:15, 147:24, 149:4

**sit** [4] - 10:16, 36:17, 39:11, 52:18

**site** [1] - 77:7

**sitting** [2] - 36:14, 139:16

**situation** [22] - 38:24, 45:22, 45:24, 48:25, 59:22, 61:7, 69:21, 70:2, 70:6, 70:15, 70:25, 71:17, 86:12,

95:7, 97:19, 104:3, 107:20, 108:1, 129:3, 129:18, 148:9, 148:11

**situational** [1] - 103:22

**situationally** [2] - 101:3, 128:5

**situations** [1] - 97:3

**Sixth** [2] - 34:9, 69:19

**slept** [1] - 10:1

**smack** [1] - 140:21

**small** [1] - 32:7

**smaller** [1] - 148:14

**smoothly** [1] - 125:2

**sniff** [1] - 141:4

**so..** [2] - 12:6, 24:22

**socialized** [1] - 77:22

**softer** [1] - 146:14

**sold** [1] - 124:22

**solely** [1] - 92:22

**solicitation** [1] - 107:15

**solid** [1] - 132:11

**solution** [4] - 24:16, 28:22, 28:23, 31:9

**someone** [28] - 7:12, 8:4, 8:7, 11:3, 15:1, 15:10, 18:25, 19:24, 38:25, 40:4, 44:9, 49:9, 50:20, 51:17, 61:18, 63:7, 88:15, 92:7, 100:9, 113:5, 116:13, 123:25, 141:8, 141:12, 145:16, 146:9, 146:11, 148:11

**something's** [1] - 56:8

**sometimes** [5] - 47:10, 106:12, 140:19, 140:20, 147:4

**somewhat** [5] - 21:23, 34:2, 44:17, 95:3, 120:8

**soon** [1] - 142:6

**sorry** [7] - 7:6, 36:9, 87:6, 134:25

**sort** [7] - 6:2, 20:21, 38:24, 79:23, 82:15, 89:25, 114:4

**sorts** [1] - 141:20

**sought** [1] - 59:21

**sound** [2] - 124:1, 151:25

**sounded** [1] - 124:19

**sounds** [5] - 46:5, 53:5, 53:6, 65:9, 87:2

**South** [1] - 42:22

**SOUTHERN** [1] - 1:1

**Southern** [2] - 42:22, 58:21

**space** [3] - 140:12, 140:24, 152:8

**speaking** [2] - 44:8, 85:22

**special** [1] - 111:19

**specific** [11] - 36:23, 64:7, 87:25, 89:12, 89:14, 89:17, 93:23, 109:7, 140:23, 145:11, 148:3

**specifically** [6] - 9:8, 46:18,

79:3, 79:4, 104:15, 109:6

**specimen** [1] - 22:12

**specimens** [1] - 9:12

**speed** [2] - 120:8, 120:9

**spell** [1] - 109:21

**spend** [1] - 22:3

**spending** [14] - 33:7, 74:24, 74:25, 75:2, 75:9, 75:12, 75:17, 75:20, 76:16, 77:17, 78:6, 79:1, 79:5, 80:13

**spent** [1] - 19:5

**Spider** [1] - 78:18

**spill** [3] - 131:7, 131:12, 137:4

**spills** [1] - 138:5

**spoken** [1] - 84:20

**Sporn** [4] - 33:8, 81:25, 83:3, 83:15

**spot** [1] - 139:22

**sprees** [1] - 75:2

**squarely** [5] - 5:21, 62:10, 75:25, 93:6, 123:15

**stages** [1] - 60:21

**stand** [8] - 11:3, 15:7, 29:7, 31:22, 39:12, 43:13, 69:8, 85:20

**standard** [1] - 103:3

**standby** [1] - 132:20

**standing** [3] - 69:12, 80:16, 148:12

**stands** [4] - 65:1, 136:11, 138:1, 152:22

**start** [20] - 4:3, 4:17, 10:25, 19:24, 23:20, 77:7, 88:14, 112:23, 115:8, 119:14, 130:21, 131:18, 131:19, 132:3, 132:18, 133:2, 133:6, 134:2, 143:6, 155:10

**starter** [2] - 20:7, 130:10

**starting** [7] - 131:20, 132:10, 132:13, 143:8, 144:7, 155:4, 155:11

**starts** [3] - 133:10, 134:21, 154:22

**state** [16] - 5:21, 6:4, 15:14, 17:9, 18:9, 18:13, 18:16, 18:20, 20:3, 20:7, 28:5, 60:3, 86:2, 87:9, 87:15, 88:4

**state-of-mind** [1] - 20:7

**statement** [28] - 26:17, 30:6, 30:15, 57:5, 92:6, 92:11, 92:22, 92:25, 93:17, 94:11, 102:1, 102:22, 108:19, 111:19, 112:1, 116:14, 120:24, 121:1, 121:2, 121:3, 121:4, 122:7, 122:8, 122:13, 125:19

**statements** [29] - 5:1, 12:6, 19:23, 25:17, 30:22, 31:7, 31:19, 37:14, 37:15, 68:9,

93:2, 93:7, 93:13, 93:14, 93:15, 94:17, 98:11, 107:20, 109:16, 111:1, 112:6, 119:18, 120:17, 126:3, 149:19, 149:20
**states** [2] - 16:23, 29:20
**STATES** [4] - 1:1, 1:3, 1:10, 1:14
**States** [5] - 1:22, 3:3, 3:9, 59:4, 156:5
**stating** [2] - 5:6, 59:24
**status** [2] - 82:9, 109:13
**statute** [8] - 4:23, 5:20, 19:15, 22:11, 36:24, 45:10, 60:1, 143:4
**statutory** [1] - 143:2
**stay** [4] - 69:12, 91:10, 141:11, 150:6
**stayed** [3] - 64:4, 64:19, 141:17
**staying** [1] - 150:5
**stays** [1] - 6:14
**STENOGRAPHICALLY** [1] - 1:20
**step** [9] - 66:11, 66:14, 68:4, 102:3, 111:19, 114:9, 114:12, 118:14, 118:16
**steps** [5] - 89:17, 89:22, 90:8, 90:12, 91:3
**Steve** [3] - 3:13, 19:7, 41:18
**STEVEN** [2] - 1:17, 1:17
**Steven** [2] - 3:8, 65:19
**sticking** [3] - 65:7, 109:1, 154:19
**stiffed** [1] - 27:11
**still** [16] - 16:1, 65:14, 67:4, 71:1, 74:2, 86:21, 95:3, 106:18, 120:7, 131:7, 131:21, 131:24, 136:18, 136:21, 138:8, 154:20
**stipulate** [2] - 28:6, 29:2
**stipulation** [7] - 26:13, 26:21, 28:6, 29:10, 30:10, 31:3, 32:9
**stock** [2] - 78:17, 79:22
**stop** [2] - 5:7, 90:25
**stopped** [2] - 29:16, 87:10
**store** [1] - 151:4
**story** [6] - 5:11, 8:22, 11:8, 76:20, 99:4, 110:2
**straight** [1] - 144:6
**strange** [1] - 151:25
**strategy** [1] - 63:18
**Street** [2] - 1:18, 2:6
**street** [1] - 90:3
**stretch** [1] - 127:21
**strike** [2] - 111:10, 143:2
**strike-wise** [1] - 143:2
**strikes** [4] - 108:9, 134:14, 142:5, 143:3

**striking** [1] - 143:17
**strong** [7] - 19:2, 20:11, 25:10, 30:23, 53:13, 145:12, 145:14
**struck** [2] - 111:2, 145:15
**structure** [1] - 27:24
**structured** [1] - 106:25
**stuff** [7] - 110:4, 151:9, 151:12, 151:17, 152:4, 152:6, 152:17
**stupid** [1] - 24:7
**subject** [6] - 31:24, 45:10, 45:14, 46:12, 59:25, 60:4
**subjects** [1] - 42:24
**submission** [1] - 135:10
**submissions** [1] - 45:13
**submit** [2] - 57:16, 150:20
**submitted** [3] - 45:11, 79:10, 144:11
**submitting** [1] - 79:6
**subparts** [1] - 84:1
**subpoena** [5] - 57:6, 134:7, 134:10, 152:21, 153:6
**subpoenas** [9] - 42:22, 43:1, 49:16, 50:14, 50:16, 57:3, 58:25, 59:18, 71:16
**substance** [3] - 34:2, 36:6, 39:5, 39:15, 52:25, 64:14, 73:22
**substantial** [2] - 48:15, 125:21
**substantiate** [1] - 23:16
**substantive** [3] - 34:20, 35:21, 123:15
**substantively** [1] - 55:20
**substitute** [3] - 27:4, 118:17, 123:14
**substituted** [1] - 112:20
**substituting** [1] - 112:23
**suddenly** [1] - 38:14
**sued** [1] - 19:24
**sufficient** [2] - 90:8, 109:4
**suggest** [10] - 19:22, 28:24, 54:13, 60:2, 60:19, 68:8, 68:18, 68:20, 124:12, 140:22
**suggested** [7] - 35:13, 38:3, 39:24, 49:15, 63:17, 116:22, 121:17
**suggesting** [7] - 29:22, 30:17, 68:15, 75:25, 105:3, 125:2, 146:21
**suggestion** [4] - 34:6, 60:10, 108:5, 145:1
**suing** [2] - 12:16, 28:2
**suit** [7] - 5:5, 16:18, 21:24, 25:7, 26:5, 26:22, 30:11
**Suite** [2] - 1:18, 2:6
**summarize** [1] - 83:12
**summarized** [1] - 87:21
**summary** [14] - 11:24, 12:3,

13:1, 14:17, 14:18, 14:21, 15:10, 22:21, 25:5, 26:15, 78:7, 78:16, 147:2
**superseding** [1] - 58:20
**supplemental** [1] - 7:18
**support** [3] - 16:17, 73:25, 81:16
**supportive** [1] - 92:23
**supports** [2] - 51:6, 112:3
**suppose** [2] - 94:9, 148:2
**supposed** [1] - 15:22
**supposedly** [2] - 30:16, 123:3
**surprises** [2] - 72:12, 133:19
**suspect** [1] - 110:18
**suspicions** [1] - 16:23
**sustain** [1] - 118:13
**swear** [2] - 69:6, 69:8
**sweeping** [1] - 105:12
**swiftly** [1] - 4:16
**sword** [2] - 40:13, 42:1
**sworn** [3] - 27:5, 68:24, 69:10
**system** [2] - 85:17, 86:15

## T

**table** [5] - 36:20, 40:5, 41:12, 57:12, 139:16
**tables** [2] - 152:4, 152:13
**tag** [1] - 82:25
**tailored** [1] - 141:23
**talks** [2] - 103:25, 148:3
**tape** [1] - 100:6
**target** [6] - 51:18, 51:19, 60:8, 61:23, 71:16, 131:12
**targeting** [2] - 104:22, 142:20
**team** [8] - 3:10, 58:1, 82:17, 82:20, 84:16, 106:8, 119:14, 138:11
**tease** [1] - 146:13
**telemarketers** [1] - 110:21
**telemarketing** [9] - 4:25, 8:17, 8:24, 41:1, 41:9, 47:3, 49:24, 107:13, 110:17
**telemedicine** [6] - 41:1, 41:10, 47:3, 49:25, 107:13, 110:3
**temper** [1] - 24:7
**temporary** [1] - 16:17
**temptation** [1] - 77:6
**ten** [1] - 14:8
**tend** [4] - 93:9, 110:23, 130:25, 152:1
**tendency** [1] - 107:23
**terminate** [1] - 89:23
**terminated** [5] - 88:10, 88:12, 88:16, 88:20, 88:23

**terms** [14] - 8:5, 11:23, 20:18, 42:18, 63:22, 65:3, 75:7, 80:2, 84:17, 97:12, 103:20, 114:3, 114:11, 135:18
**test** [7] - 14:12, 15:13, 15:23, 121:22, 121:24, 121:25, 122:2
**tested** [1] - 146:10
**testified** [1] - 36:7
**testify** [17] - 22:17, 25:23, 35:20, 38:2, 46:22, 49:13, 50:19, 51:23, 51:24, 52:8, 52:9, 52:22, 56:8, 98:17, 103:16, 103:18, 148:4
**testifying** [6] - 48:25, 64:14, 96:4, 98:18, 147:10, 148:22
**testimony** [30] - 7:11, 7:13, 9:10, 11:16, 22:25, 26:25, 31:12, 40:23, 41:20, 60:2, 61:22, 62:11, 71:8, 83:9, 85:16, 86:12, 88:15, 88:16, 93:2, 102:9, 105:10, 108:3, 124:7, 125:21, 127:12, 127:25, 132:22, 145:9, 145:15, 148:15
**testing** [5] - 145:3, 145:25, 146:8, 146:10, 146:12
**tests** [7] - 4:25, 8:17, 95:21, 107:14, 121:24, 144:21, 146:1
**text** [19] - 91:21, 93:3, 93:16, 94:5, 94:6, 97:2, 97:20, 125:8, 146:20, 147:3, 147:9, 147:11, 147:13, 147:19, 148:2, 148:12, 148:17
**textbook** [1] - 101:12
**texted** [1] - 78:19
**Thanksgiving** [4] - 132:15, 154:19, 154:25, 155:16
**that'll** [1] - 101:15
**THE** [246] - 1:10, 1:13, 1:17, 2:2, 3:2, 3:11, 3:19, 6:19, 7:1, 7:17, 8:3, 9:6, 10:1, 10:6, 10:11, 10:23, 11:5, 11:9, 11:12, 11:25, 12:7, 13:4, 13:15, 14:5, 15:17, 16:3, 16:12, 16:14, 17:15, 17:24, 18:8, 19:9, 20:25, 21:15, 21:19, 22:14, 22:19, 23:10, 23:23, 24:3, 24:8, 24:23, 24:25, 25:2, 26:18, 27:8, 27:11, 27:15, 27:22, 28:4, 28:21, 29:12, 30:2, 30:24, 32:8, 32:13, 35:15, 35:18, 36:2, 36:9, 36:12, 37:7, 37:11, 37:20, 38:1, 39:14, 44:7, 45:8, 46:10,

46:14, 47:18, 48:8, 48:21,
49:5, 49:20, 50:17, 51:13,
51:15, 51:19, 52:14, 53:25,
55:5, 55:10, 55:22, 59:9,
62:7, 62:18, 62:22, 63:2,
63:11, 63:21, 64:11, 64:22,
65:24, 66:4, 66:10, 66:17,
67:14, 68:7, 68:22, 69:4,
69:11, 70:12, 70:13, 70:23,
70:24, 71:3, 71:4, 71:21,
73:15, 73:20, 75:19, 75:22,
76:5, 76:23, 79:24, 84:10,
84:11, 84:21, 85:2, 85:3,
85:6, 86:11, 87:4, 87:7,
87:12, 88:3, 89:6, 89:19,
90:19, 90:23, 91:17, 92:12,
92:18, 93:22, 94:23, 95:16,
95:20, 96:1, 96:6, 96:12,
97:5, 97:15, 98:3, 99:12,
99:15, 99:18, 100:4, 100:10,
101:2, 102:19, 102:23,
103:7, 103:21, 104:12,
105:16, 106:5, 106:11,
108:4, 108:21, 111:3,
113:15, 114:9, 115:11,
115:14, 116:5, 116:19,
117:10, 117:21, 118:6,
120:14, 120:19, 121:8,
122:16, 123:5, 123:10,
123:17, 125:6, 125:15,
127:6, 127:8, 127:19, 129:5,
129:10, 129:14, 129:17,
130:13, 130:18, 132:3,
134:15, 134:21, 134:24,
135:1, 135:9, 135:17, 136:8,
136:12, 137:2, 137:18,
137:24, 138:4, 138:10,
138:17, 139:1, 142:14,
142:22, 142:24, 143:13,
143:16, 143:20, 143:22,
143:24, 144:10, 144:15,
144:25, 145:11, 145:20,
146:3, 146:6, 147:6, 147:18,
148:6, 148:10, 148:19,
148:21, 149:7, 149:10,
149:13, 149:18, 149:21,
149:25, 150:2, 150:12,
150:18, 150:21, 151:5,
152:2, 152:5, 152:23,
153:15, 153:18, 154:9,
155:6, 155:13, 155:15,
155:19
  **them's** [1] - 54:18
  **themselves** [4] - 3:15, 76:2,
78:10, 146:16
  **theories** [1] - 133:22
  **theory** [8] - 5:15, 28:23,
32:18, 34:6, 77:9, 95:24,
97:13, 109:3
  **therefore** [3] - 15:25, 44:18,

103:12
  **they've** [8] - 4:13, 54:23,
54:25, 58:18, 79:17, 108:10,
108:14, 111:8
  **thin** [1] - 122:17
  **thinking** [4] - 30:2, 101:12,
142:15, 149:23
  **thinks** [2] - 66:23, 123:24
  **third** [4] - 16:7, 58:19, 59:1,
133:16
  **third-rail** [1] - 133:16
  **thirdhand** [1] - 127:4
  **thirds** [1] - 96:8
  **thorough** [4] - 17:20, 48:7,
48:9, 85:19
  **thousands** [2] - 19:4, 19:5
  **threat** [12] - 17:2, 20:20,
21:10, 21:22, 23:8, 23:17,
23:19, 23:21, 23:24, 27:18,
29:23, 30:18
  **threatening** [2] - 16:11,
16:20
  **three** [8] - 101:16, 131:5,
131:12, 132:10, 135:20,
137:4, 138:5, 151:17
  **three-week** [1] - 132:10
  **throngs** [1] - 65:16
  **throughout** [3] - 33:20,
33:21, 151:17
  **throw** [1] - 145:17
  **throwing** [1] - 147:5
  **thrown** [1] - 130:24
  **thrust** [2] - 104:24, 122:20
  **ties** [2] - 21:9, 40:24
  **tilt** [1] - 75:6
  **timeline** [3] - 43:3, 82:12,
132:7
  **timing** [3] - 105:19, 105:24,
125:8, 132:11, 135:19
  **tip** [1] - 60:10
  **Tjoflat** [1] - 16:2
  **Tjoflat's** [1] - 15:24
  **to-do** [1] - 61:6
  **Tobin** [3] - 33:18, 37:23,
62:21
  **Toby** [1] - 41:18
  **today** [23] - 3:20, 32:16,
37:19, 48:22, 56:1, 56:17,
60:16, 61:6, 71:7, 72:22,
72:25, 73:2, 101:5, 101:8,
104:6, 107:5, 107:6, 120:5,
132:24, 136:17, 139:9,
151:18, 155:2
  **today's** [1] - 133:20
  **together** [12] - 53:21,
65:18, 76:16, 77:5, 81:21,
82:9, 85:10, 121:10, 121:12,
121:13, 141:25
  **tomorrow** [1] - 139:9
  **ton** [1] - 139:25

  **took** [9] - 36:6, 49:12, 54:7,
54:12, 54:18, 61:1, 85:8,
91:3, 92:14
  **topic** [1] - 69:5
  **totaling** [1] - 80:21
  **totally** [2] - 36:13, 152:11
  **touch** [3] - 46:17, 108:19,
149:16
  **touched** [1] - 98:5
  **tough** [1] - 82:5
  **towards** [1] - 85:24
  **tracing** [1] - 137:22
  **track** [2] - 28:14, 144:1
  **traffic** [2] - 131:22, 132:4
  **transaction** [2] - 148:3,
148:5
  **TRANSCRIPT** [1] - 1:9
  **transcript** [8] - 9:18, 11:16,
11:23, 12:10, 20:23, 32:11,
119:19, 148:10
  **transcription** [1] - 155:25
  **transcripts** [5] - 12:12,
98:6, 100:5, 122:12, 128:24
  **transformed** [1] - 60:12
  **transforming** [1] - 65:3
  **transmission** [1] - 94:10
  **transmitted** [1] - 128:23
  **treating** [2] - 8:5, 144:23
  **trial** [61] - 3:21, 12:11,
18:25, 39:19, 48:2, 48:23,
55:25, 68:21, 68:25, 69:20,
70:17, 71:2, 72:5, 72:8, 73:1,
76:12, 76:20, 79:5, 80:16,
82:2, 82:8, 90:1, 104:4,
119:16, 120:21, 120:22,
127:2, 128:17, 129:1, 130:8,
130:23, 130:24, 131:4,
131:16, 133:2, 133:19,
134:19, 135:5, 135:12,
135:15, 135:18, 135:20,
136:4, 136:7, 136:8, 136:9,
136:11, 136:15, 136:16,
136:17, 136:18, 136:22,
137:1, 137:17, 137:21,
137:25, 151:7, 154:18
  **Trial** [2] - 80:17, 154:20
  **tricky** [1] - 147:3
  **tried** [4] - 78:24, 99:6, 99:7,
145:24
  **trigger** [1] - 44:24
  **triggered** [1] - 49:23
  **trotting** [1] - 6:20
  **trouble** [5] - 11:11, 52:7,
57:1, 76:14
  **true** [8] - 15:5, 24:7, 98:16,
110:20, 115:20, 123:10,
123:20
  **truly** [3] - 61:23, 93:10,
112:5
  **trust** [4] - 76:10, 86:14,

90:25, 130:8
  **trust-based** [1] - 86:14
  **truth** [13] - 14:15, 15:15,
15:16, 15:25, 17:6, 17:22,
18:1, 18:11, 26:15, 121:2,
122:14, 123:1, 123:4
  **truthfully** [6] - 11:15, 19:12,
20:1, 65:8, 80:1, 80:4
  **try** [13] - 4:5, 8:24, 8:25,
36:19, 74:17, 83:1, 99:11,
124:24, 131:12, 131:13,
139:2, 141:4, 141:18
  **trying** [29] - 18:8, 18:20,
21:19, 22:3, 35:7, 38:1, 45:1,
49:7, 51:11, 65:17, 66:1,
73:13, 92:23, 94:21, 95:9,
98:12, 99:21, 105:24,
106:14, 116:14, 127:13,
131:25, 136:2, 138:12,
138:19, 139:6, 139:13,
140:20, 145:5
  **Tuesday** [3] - 132:18,
132:22, 150:14
  **tune** [1] - 24:25
  **turn** [8] - 6:8, 19:10, 33:1,
58:16, 84:16, 120:2, 141:14,
154:25
  **turned** [2] - 58:16, 92:16
  **turning** [1] - 6:1
  **two** [23] - 3:25, 5:9, 5:25,
20:18, 20:21, 22:7, 36:1,
42:21, 57:3, 57:4, 62:6,
63:25, 64:6, 82:7, 96:8,
99:20, 100:18, 124:9,
129:16, 139:23, 144:13,
153:3, 153:9
  **two-thirds** [1] - 96:8
  **type** [7] - 60:1, 89:10, 93:6,
105:23, 140:23, 148:9,
148:10
  **types** [4] - 21:10, 78:20,
86:6, 105:12
  **typically** [1] - 149:21

# U

  **ultimately** [2] - 4:11, 88:16
  **umbrella** [1] - 5:1
  **unable** [2] - 86:14, 110:4
  **uncharged** [1] - 104:16
  **unclear** [1] - 117:4
  **under** [31] - 4:25, 5:12, 6:6,
8:21, 23:8, 31:10, 41:1,
41:10, 43:9, 51:23, 56:17,
60:7, 71:23, 80:7, 83:8,
91:24, 94:25, 95:24, 96:15,
97:13, 97:22, 99:25, 100:22,
101:23, 102:20, 102:21,
112:4, 124:15, 125:23,
147:21, 148:15

**underlying** [1] - 57:9
**underprivileged** [1] - 79:11
**understandably** [1] - 13:16
**understood** [8] - 4:21, 22:6, 29:4, 30:14, 92:17, 100:15, 113:25, 130:12
**unfair** [2] - 117:15, 117:22
**unforeseen** [1] - 154:14
**unindicted** [8] - 36:4, 53:20, 53:24, 82:10, 95:18, 96:2, 96:5, 103:16
**uninterrupted** [1] - 131:6
**uniquely** [1] - 103:13
**United** [5] - 1:22, 3:3, 3:9, 59:4, 156:5
**UNITED** [4] - 1:1, 1:3, 1:10, 1:14
**universe** [2] - 128:11, 131:5
**unknown** [1] - 38:12
**unlawful** [1] - 29:16
**unless** [4] - 95:6, 111:5, 111:7, 133:12
**unlike** [1] - 112:3
**unnecessary** [1] - 52:19
**unquote** [2] - 18:14, 88:5
**unredacted** [2] - 62:17, 73:16
**unrelated** [2] - 146:19, 153:5
**unseal** [4] - 128:21, 128:23, 129:19, 130:7
**unsealing** [1] - 129:8
**unsigned** [4] - 66:2, 73:17, 73:19, 153:19
**unsuccessful** [2] - 108:7, 108:9
**untrue** [1] - 37:6
**unusually** [1] - 144:12
**unwieldy** [1] - 139:7
**up** [72] - 6:16, 8:25, 10:2, 10:7, 12:2, 14:19, 20:4, 26:1, 27:23, 29:7, 32:14, 35:4, 36:12, 37:8, 39:12, 39:16, 40:21, 44:18, 47:13, 47:14, 49:9, 53:15, 54:8, 59:7, 65:15, 69:8, 71:22, 82:2, 83:7, 85:6, 90:17, 97:12, 99:7, 100:16, 106:18, 107:25, 108:12, 108:20, 110:16, 110:20, 111:1, 112:20, 113:5, 114:10, 115:16, 115:20, 118:3, 120:8, 120:9, 126:9, 127:12, 130:5, 133:2, 133:7, 133:9, 133:25, 136:19, 137:21, 139:3, 139:10, 140:1, 140:10, 141:15, 141:21, 143:7, 145:18, 146:17, 147:15, 148:24, 154:23, 155:8, 155:10

**update** [1] - 84:15
**updates** [1] - 84:17
**upheld** [1] - 65:14
**upset** [1] - 24:12
**urge** [1] - 141:15
**user** [1] - 76:7
**utilize** [2] - 9:17, 95:1
**utilized** [1] - 125:22

## V

**vacuum** [8] - 93:21, 100:3, 100:4, 100:11, 100:24, 118:19, 119:14, 125:24
**valid** [1] - 39:10
**valuable** [1] - 119:20
**value** [4] - 8:6, 19:25, 41:2, 80:6
**vehicle** [2] - 147:19, 147:23
**venture** [1] - 47:5
**verbatim** [2] - 101:21, 102:8
**verdict** [2] - 135:15, 137:1
**version** [2] - 24:1, 91:23
**versions** [1] - 62:17
**versus** [1] - 3:4
**vet** [1] - 129:1
**vetted** [1] - 133:12
**viable** [1] - 128:2
**victim** [1] - 88:5
**victims** [1] - 85:13
**view** [10] - 19:2, 20:1, 47:23, 49:25, 67:22, 75:14, 77:12, 92:21, 126:22, 129:5
**violating** [2] - 5:19, 28:1
**violation** [3] - 82:15, 82:23, 83:15
**violations** [3] - 22:11, 28:1, 29:18
**virtue** [1] - 79:8
**voices** [1] - 34:3
**voir** [6] - 140:16, 140:25, 144:13, 145:4, 152:12, 152:14
**volume** [4] - 105:18, 121:16, 121:19
**voluminous** [2] - 82:3, 82:23
**vs** [1] - 1:5

## W

**wait** [5] - 97:5, 111:17, 116:16, 124:25, 126:6
**wait-and-see** [1] - 126:6
**waive** [3] - 136:10, 136:15, 153:3
**waived** [3] - 45:14, 62:23, 65:13
**waiver** [9] - 39:3, 40:12,

44:25, 45:6, 62:24, 63:24, 66:24, 71:25, 73:2
**waiving** [1] - 136:16
**wakes** [1] - 10:2
**walk** [3] - 48:24, 48:25, 49:23
**walked** [1] - 72:21
**walks** [1] - 90:2
**wane** [1] - 19:25
**wants** [11] - 6:3, 10:8, 10:9, 12:18, 34:16, 36:5, 51:24, 60:15, 71:11, 96:8, 144:14
**warranted** [1] - 61:8
**Washington** [1] - 1:16
**wasting** [1] - 18:1
**watched** [1] - 24:13
**watchful** [1] - 60:7
**watching** [1] - 133:13
**Watt** [62] - 33:18, 34:1, 35:6, 35:25, 36:22, 37:23, 38:25, 39:25, 41:18, 42:14, 42:16, 42:18, 43:12, 43:17, 43:21, 44:20, 46:15, 46:16, 46:17, 46:21, 46:24, 47:1, 47:2, 48:25, 49:8, 49:13, 49:25, 50:19, 52:8, 52:20, 53:16, 53:23, 54:9, 56:5, 59:22, 61:17, 61:25, 62:9, 62:21, 62:23, 63:3, 63:7, 63:14, 63:15, 63:17, 63:21, 64:1, 64:13, 65:18, 65:20, 66:1, 66:6, 68:11, 69:24, 72:10, 110:16, 115:4, 117:17, 153:23
**Watt's** [10] - 34:14, 42:15, 47:9, 47:14, 62:13, 64:8, 65:9, 66:8, 66:12, 72:18
**wavering** [1] - 63:17
**ways** [3] - 13:5, 75:8, 124:20
**wealth** [11] - 33:7, 74:23, 74:25, 79:1, 79:4, 79:5, 80:2, 80:12, 80:15, 80:16, 83:17
**week** [7] - 58:19, 59:1, 132:10, 134:18, 134:19, 135:23, 138:7
**weekend** [1] - 154:15
**weeks** [6] - 131:6, 131:12, 135:20, 137:4, 138:5, 151:17
**weight** [2] - 8:19, 10:7
**well-founded** [1] - 117:1
**WEST** [1] - 1:2
**whatsoever** [1] - 77:20
**wherein** [1] - 121:21
**white** [28] - 113:7, 120:11, 120:18, 120:20, 120:23, 120:24, 121:11, 121:15, 121:18, 121:21, 121:22, 122:6, 122:19, 122:24, 123:2, 123:12, 123:19,

123:22, 123:23, 124:15, 125:9, 125:14, 125:18, 126:1, 126:21, 127:1, 129:24
**White** [2] - 121:12, 128:15
**White's** [8] - 84:20, 120:8, 122:5, 122:14, 125:20, 127:25, 129:11, 129:22
**white's** [1] - 124:8
**whole** [6] - 24:16, 52:10, 53:2, 54:12, 78:1, 106:13
**wholesale** [1] - 31:15
**wide** [1] - 73:3
**willing** [4] - 23:11, 75:1, 75:11, 143:8
**Willis** [1] - 93:3
**window** [3] - 33:21, 143:6, 143:7
**winds** [1] - 108:19
**wise** [4] - 125:8, 130:21, 131:18, 143:2
**wisely** [1] - 141:15
**wished** [1] - 5:6
**withdrawn** [1] - 74:8
**witness** [60] - 6:16, 11:24, 12:3, 12:24, 13:1, 14:17, 14:18, 14:21, 14:22, 15:7, 15:9, 15:10, 25:5, 28:24, 29:1, 29:6, 30:5, 31:21, 32:18, 34:21, 35:20, 36:17, 37:21, 37:22, 38:16, 40:5, 40:18, 48:1, 52:23, 54:3, 58:22, 60:13, 61:22, 65:4, 68:13, 70:8, 70:19, 82:9, 98:7, 98:16, 98:17, 101:25, 102:9, 102:21, 103:3, 103:5, 103:10, 103:12, 103:14, 103:17, 112:8, 112:20, 116:4, 120:13, 132:12, 132:18, 147:2, 148:17
**witnesses** [34] - 22:21, 32:4, 35:9, 38:13, 39:13, 40:2, 40:19, 48:17, 53:16, 53:18, 53:24, 56:21, 60:18, 68:12, 69:24, 70:8, 70:18, 72:13, 86:13, 100:9, 101:19, 103:3, 104:7, 105:9, 107:21, 108:14, 112:11, 112:15, 124:10, 132:16, 145:9, 145:14, 150:8, 150:10
**wonderful** [1] - 143:1
**wood** [1] - 129:20
**woods** [1] - 7:4
**word** [3] - 32:1, 34:7, 111:23
**words** [1] - 6:15
**workable** [1] - 46:5
**workings** [1] - 51:4
**works** [2] - 8:21, 140:11
**world** [3] - 38:2, 138:6, 138:18

**worried** [13] - 25:12, 25:16, 38:22, 39:4, 68:2, 86:8, 88:4, 88:12, 88:24, 104:7, 126:17, 126:18, 153:22

**worry** [12] - 38:5, 38:10, 50:18, 86:22, 106:11, 106:19, 127:8, 128:9, 138:11, 143:4, 145:6, 150:4

**worrying** [1] - 113:5

**worthwhile** [1] - 13:22

**worthy** [1] - 128:11

**wrap** [1] - 133:25

**written** [1] - 102:7

**wrongdoing** [3] - 16:8, 17:3, 18:15

**wrongful** [1] - 22:13

## Y

**year** [1] - 16:2

**yesterday** [4] - 16:20, 129:25, 135:11, 136:12

**York** [1] - 1:15

**Young** [1] - 106:18